## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CITIZEN POTAWATOMI NATION,**<br> **a federally recognized Indian Tribe,**<br>**1601 S. Gordon Cooper Drive**<br>**Shawnee, Oklahoma 74801**<br>**Plaintiff,**<br><br>v.<br><br>**LYNN SCARLETT, Acting Secretary of the Interior;**<br>**KENNETH REINFELD, Acting Director of the**<br>**Office of Self-Governance,**<br>**Bureau of Indian Affairs**<br>**Department of the Interior**<br>**1849 C Street, N.W.**<br>**Washington, D.C. 20240**<br><br>**STEVEN K. LINSCHEID,**<br>**Chief Administrative Judge**<br>**Interior Board of Indian Appeals**<br>**801 North Quincy Street, Suit 300**<br>**Arlington, Virginia 22203**<br>**Defendants.** | **Case**<br>**Number: 1:06CV00830**<br><br>**Judge Gladys Kessler** |

### MOTION FOR DEFAULT JUDGMENT

Citizen Potawatomi Nation ("CPN", or "Plaintiff"), by its undersigned attorneys,

hereby files this Motion for Default Judgment in the above-captioned action pursuant to

Rule 55(b) of the Federal Rules of Civil Procedure. Entry of default has been obtained

from the Clerk of the Court pursuant to Rule 55(a) of the Federal Rules of Civil

Procedure.

## STATEMENT OF POINTS AND AUTHORITIES

**I.      The United States Has Failed to Plead or
         Otherwise Defend Against CPN's Complaint**

The complaint in this action was filed by CPN in this Court on May 5, 2006.  In connection with the filing of CPN's complaint, CPN caused five (5) summons to be issued by the Court naming each of the three federal defendants in their official capacities (Lynn Scarlett, Acting Secretary of the Interior; Kenneth Reinfeld, Acting Director Office of Self-Governance, Bureau of Indian Affiars; and Steven Linscheid, Chief Judge, Interior Board of Indian Appeals) and also naming the U.S. Attorney (Kenneth Wainstein) and the U.S. Attorney General (Alberto Gonzales).  Each summons stated that an answer to CPN's complaint was due in this Court within sixty (60) days after service of the summons and accompanying complaint.

Pursuant to Rule 4(i) of the Federal Rules of Civil Procedure, CPN served a copy of the complaint and summons upon each of the three federal defendants, the U.S. Attorney and the U.S. Attorney General.  Service of the complaint and each summons was made as to  the five individuals on the following dates:  (1) Lynn Scarlett, Acting Secretary of the Interior – served on May 9, 2006; (2) Kenneth Reinfeld, Acting Director Office of Self-Governance, Bureau of Indian Affiars – served on May 12, 2006; (3) Steven Linscheid, Chief Judge, Interior Board of Indian Appeals – served on May 8, 2006; (4) U.S. Attorney Kenneth Wainstein – served on May 9, 2006; and (5) U.S. Attorney General Alberto Gonzales – served on May 9, 2006.  Proof of service was filed with this court on May 22, 2006 and recorded in the docket of this action for all five.

Pursuant to Rule 12(a)(3) of the Federal Rules of Civil Procedure, the United States, an agency of the United States, and any officer or employee of the United States sued in an official capacity "shall serve an answer to the complaint . . . within 60 days after the United States attorney is served with the pleading asserting the claim." Here, the United States attorney was served a copy of the complaint and summons on May 9, 2006. The 60-day deadline to serve an answer was July 10, 2006. July 10, 2006 came and went with no response from the United States.

To date, over 120 days since the complaint and summons was served upon the U.S. Attorney, no answers or any other responses have been filed by the United States to CPN's complaint nor has any motion for enlargement of time been filed by the United States within which to do so. CPN can wait no longer for the United States to provide a response.

## II.    <u>Default Judgment Against the United States Is Appropriate</u>

Rule 55(b) of the Federal Rules of Civil Procedure provides that when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided for in the Federal Rules of Civil Procedure and that fact is made known by affidavit or otherwise to the Court, judgment by default may be entered. As stated in Federal Rule 55(b)(2), in cases, such as here, where the relief requested does not involve a sum certain, the party entitled to a judgment by default shall apply to the Court. In addition, Federal Rule 55(e) states, with respect to the United States:

> No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes a claim or right to relief by evidence satisfactory to the court.

This action by CPN seeks review of a final decision issued by the Interior Board of Indian Appeals ("IBIA") in <u>Citizen Potawatomi Nation v. Director, Office of Self-Governance,</u> 42 IBIA 160, January 25, 2006 (the "IBIA Decision") in connection with an appeal at the IBIA by CPN of a pre-award dispute with the Department of Interior (the "Department") that arose prior to execution of CPN's Annual Funding Agreement for Fiscal Year 2004 under the Tribal Self-Governance Program of Title IV of the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 458aa-458hh. A copy of the IBIA Decision is attached hereto as Exhibit A. The relief requested by CPN in this action is for this Court to (1) overturn the IBIA Decision since it is erroneous; (2) enjoin the Department from implementing the IBIA Decision as final agency action; and (3) remand this matter back to the IBIA in order to further develop the administrative record and require that the IBIA issue a new decision based on the further-developed administrative record.

CPN recognizes that Rule 55(e) of the Federal Rules of Civil Procedure requires that the claimant establish not only a claim or right to the relief requested but also provide evidence satisfactory to the Court to allow the Court to grant a motion for default judgment against the United States. In order to provide the necessary evidentiary support to allow this Court to grant this Motion, a complete copy of the administrative record that was produced by the Department before the IBIA is attached hereto as Exhibit B. CPN also attaches as Exhibit C to this Motion a copy of a declaration of CPN's Director of Self-Governance (Ms. Rhonda Butcher), that was produced by CPN before the IBIA in connection with the IBIA Decision, as the only supplement to the administrative record. <u>See</u> Exhibit C –Declaration of Rhonda Butcher attached hereto. Exhibit B and Exhibit C

attached hereto together constitute the entire administrative record that was before the IBIA. CPN also attaches to this Motion other relevant documents in further support of the evidentiary basis allowing this Court to grant this Motion.

Here, CPN has established a claim or right to the relief requested and, by this motion and its prior complaint, has provided ample evidence, based on the entire administrative record from the IBIA proceedings and the other documents attached hereto, that should be found satisfactory by this Court to allow it to enter a default judgment against the United States. See, e.g., Stanley v. Heckler, 604 F.Supp. 1102 (D.Mont. 1985).

### A.    CPN Has Established a Right to The Relief Requested

The "Tribal Self-Governance Act of 1994" was enacted as Title II of Public Law 103-413. The Tribal Self-Governance Act of 1994 established a Tribal Self-Governance Program on a permanent basis and was added as Title IV of the ISDA, 25 U.S.C. § 458aa-458hh.   Pursuant to the Tribal Self-Governance Program, the Department is authorized to negotiate and enter into Compacts and Annual Funding Agreements ("AFA") with Indian tribes under which the Indian tribes assume comprehensive responsibility for the planning and administration of programs and services previously provided by the Department and the Department transfers the related funds to the tribes to administer those programs and services.

CPN is a federally recognized Indian Tribe located in the State of Oklahoma who has entered into a Compact of Self-Governance and an AFA with the Department pursuant to the Tribal Self-Governance Program provisions of the ISDA, 25 U.S.C. § 458aa-458hh. See Exhibit B – Administrative Record, Tabs 4 and 45.

Case 1:06-cv-00830-GK    Document 15    Filed 09/15/2006    Page 6 of 39

The defendants are federal officials who, among other things, administer the Department's implementation of the ISDA and resolve disputes concerning the Department's implementation of the ISDA.

This Court has jurisdiction under the ISDA, 25 U.S.C. § 450m-1(a) because this is a civil action wherein the matter in controversy arises under the provisions of the ISDA. In addition, this Court has jurisdiction over the subject matter of this case under 28 U.S.C. § 1331 because it involves a question arising under the laws of the United States. Further, because this is a civil action brought by a duly recognized Indian tribe wherein the matter in controversy arises under the laws of the United States, this Court also has jurisdiction under 28 U.S.C. § 1362.

Sovereign immunity has been waived by the United States and a claim for relief exists under both the ISDA, 25 U.S.C. § 450m-1(a) and the Administrative Procedures Act, 5 U.S.C. §§ 702-706. An actual controversy exists for purposes of the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

Accordingly, this Court should find that CPN has established a claim or right to the relief requested in its complaint.

**B.      The Evidence Before This Court Is Sufficient to Allow
         Entry of Default Judgment Against the United States**

**1.      The Standard of Review under the ISDA of
         The IBIA Decision Is De Novo**

25 U.S.C. § 450m-1(a) of the ISDA authorizes district courts to exercise "original jurisdiction" over "civil actions" under the ISDA and to order appropriate relief, including money damages and injunctive relief.   However, it fails to provide any standard of review.  Courts that have considered the issue of the appropriate standard of

review under the ISDA in a civil action in a district court have concluded that the appropriate standard is de novo. De novo review was found appropriate because Section 450m-1(a) of the ISDA grants district courts "original jurisdiction" over "civil actions" with authorization to award money damages and that this combination denotes an intention by Congress to grant the right of de novo review. See Cherokee Nation of Oklahoma v. U.S., 190 F.Supp.2d 1248 (E.D. Okla. 2001), aff'd, 311 F.3d 1054 (10th Cir. Okla. 2002), rev'd on other grounds, 543 U.S. 631, 125 S.Ct. 1172 (2005); Shoshone-Bannock Tribes of Fort Hall v. Shalala, 998 F.Supp. 1306 (D.Or. 1997).

Accordingly, this Court should find that the appropriate standard of review of the IBIA Decision in this action under the ISDA is de novo and grant this Motion for the reasons stated herein.

Even if this Court does not conclude that the appropriate standard of review is de novo but that the standard of review should be that provided for in the Administrative Procedures Act ("APA") (review limited to the administrative record to determine whether the decision at issue is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law), this Court should still grant this Motion. In this action, CPN has not asked this Court to develop its own evidence and to reach its own conclusions regarding the underlying merits of the issues raised by CPN in the IBIA proceedings. Rather, CPN asks this Court to find that the IBIA Decision at issue here is not sustainable on the basis of the existing administrative record and that the matter should be remanded back to the IBIA for further proceedings. As set out below, the IBIA Decision at issue here is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

Therefore, whether the IBIA Decision at issue here is reviewed under a de novo standard or an APA standard, this Court should grant this Motion for the reasons stated herein.

> **2.    This Court Should Find That Count I of CPN's Complaint Is Supported by Sufficient Evidence to Allow Granting of a Default Judgment**

In Count I of CPN's complaint, CPN contends that the IBIA Decision's interpretation of the Funding Formula agreement at issue here is without any support in the administrative record and is erroneous as a matter of law.  Count I of CPN's complaint also contends that, even if the IBIA Decision's interpretation of the Funding Formula agreement is supported by the record and is not found to be otherwise erroneous, the IBIA Decision's related finding that CPN failed to timely object to the Department's static application of that Funding Formula is without any support in the administrative record and is also erroneous.

The Funding Formula agreement was first created in 1988 among the five tribes served by the Shawnee Agency of the Department's Bureau of Indian Affairs.  The five Shawnee Agency tribes are (1) CPN; (2) the Absentee Shawnee Tribe of Oklahoma; (3) the Kickapoo Tribe of Oklahoma; (4) the Sac and Fox Nation; (5) and the Iowa Tribe of Oklahoma.  The Funding Formula agreement is reflected in identical tribal resolutions issued by each of the five tribes.  See Exhibit C – Declaration of Rhonda Butcher, at page 1 (¶2), and Attachments 1, 2, 3, 4,  and 5 to the declaration.  Each of the tribal resolutions provide identical factors for the Department to use in distributing funding to the five tribes and each tribal resolution states that the factors are to be used "to contract for all

Bureau of Indian Affairs provided operation and services **in FY 89 and future years**."

Id.  (Emphasis supplied.)

The tribal resolutions executed in 1988 by CPN and the four other Shawnee Agency tribes stated, among other things, the following with respect to the Funding Formula:

> A RESOLUTION OF AGREEMENT WITH [CPN, Absentee Shawnee Tribe of Oklahoma, the Kickapoo Tribe of Oklahoma, the Sac and Fox Nation, and the Iowa Tribe of Oklahoma] TO CONTRACT THE FY89 OPERATION AND SERVICE OF THE SHAWNEE AGENCY OF THE BUREAU OF INDIAN AFFAIRS
>
> *    *    *    *    *    *    *    *    *    *
>
> the Shawnee Agency tribes have agreed to a distribution of funds in the following formula:  25% equally divided, 25% in proportion to total tribal enrollment, 25% in proportion to resident tribal population within each tribe's jurisdictional area, and 25% in proportion to the amount of trust property in each tribe's jurisdiction.
>
> *    *    *    *    *    *    *    *    *    *
>
> the tribes will conform to all aspects of the CFR appropriate to the given program to be contracted by all five tribes of the Shawnee Agency
>
> *    *    *    *    *    *    *    *    *    *
>
> THEREFORE, BE IT RESOLVED, that the [CPN, Absentee Shawnee Tribe of Oklahoma, the Kickapoo Tribe of Oklahoma, the Sac and Fox Nation, and the Iowa Tribe of Oklahoma] hereby agrees with the tribes served by the Shawnee Agency to contract for all Bureau of Indian Affairs provided operation and services in FY 89 and future years.

See  Exhibit C – Declaration of Rhonda Butcher, at Attachments 1, 2, 3, 4 and 5 to the declaration.

As indicated in the IBIA Decision, CPN contends that, based on the plain language of the tribal resolutions, the percentages of annual funds allocated to each of the five tribes each year pursuant to the Funding Formula should be recalculated annually based on the actual tribal enrollment, resident tribal population, and trust acreage that exists in that year by applying the factors specified in the Funding Formula to the current

data for that fiscal year.  <u>See</u> Exhibit A – IBIA Decision, at page 172; Exhibit C -

Declaration of Rhonda Butcher, at page 1 (¶¶ 2, 3, 4 and 5).  The administrative record

also reflects that it was undisputed that the Department has failed to apply the Funding

Formula using current data but instead has, during the past 18 years, used the same

percentages of funding that existed in Fiscal Year 1989 based on data that existed in

1988.  <u>See</u> Exhibit A – IBIA Decision, at page 173 (stating that "the record shows that

the 1988 agreement has been implemented based on a static application of the formula

since its inception.")  As indicated in the IBIA Decision, CPN contends that if the

Funding Formula is applied using current-day data, CPN's share of funding would

increase by approximately 10%.  <u>See</u> Exhibit A- IBIA Decision, at page 171 (Footnote

9); Exhibit C –Declaration of Rhonda Butcher, at pages 1-3.

     The IBIA Decision noted that CPN's argument (that the percentage of funds

allocated pursuant to the Funding Formula should not remain static but instead should be

based on current data applied to the factors of the Funding Formula) "has some force"

stating that:

> If the parties to the agreement had wished to establish a static percentage
> share for each tribe, they simply could have determined the percentages
> and set them forth in the agreement.  In addition, it would be reasonable
> for a formula to enable the allocation of funding to shift proportionally as
> the need among the tribes shifted, and it would seem that tribal enrollment,
> resident population and trust acreage provide a measure of that need.

<u>See</u> Exhibit A – IBIA Decision, at page 172.  However, the IBIA Decision goes on to

erroneously conclude that the language of the tribal resolutions "is ultimately ambiguous

on this point," concluding that:

> The agreement does not state that the formula will be recalculated.  The
> agreement does not state when or how often the formula will be
> recalculated, or how frequently a census would be required to be

> performed to determine tribal population for each AFA.  Nor do we think
> it would have been unreasonable for the parties to intend that existing data
> be applied to the formula to establish a fixed allocation for future years.

See Exhibit A – IBIA Decision, at page 172.

Based on its finding of ambiguity, the IBIA Decision goes on to rely upon

extrinsic evidence in the form of the alleged intent of the five Shawnee Agency tribes and

the knowledge and actions of CPN after 1988 up through 1998 to conclude that the

Department's position should be affirmed and that CPN's claim should be denied.  See

Exhibit A – IBIA Decision, at pages 172-173.

> (a)    The IBIA Decision's Interpretation of
> the Funding Formula Agreement
> Is Erroneous As a Matter of Law

The governing principles regarding interpretation of a contract, such as the

Funding Formula agreement at issue here, are well-established.  The plain meaning of a

contract is determined by the language used by the parties to express their agreement.

WMATA v. Mergentime Corp., 626 F.2d 959, 961 (D.C. Cir. 1980).  If that language is

unambiguous "the court may interpret it as a matter of law."  America First Inv. Corp. v.

Goland, 925 F.2d 1518, 1520 (D.C. Cir. 1991).  A contract is ambiguous when it is

"reasonably susceptible of different constructions or interpretations."  1901 Wyoming

Ave. Coop Assoc. v. Lee, 345 A.2d 456, 461 n.7 (D.C. 1975).  Only if the contract is

ambiguous may extrinsic evidence, such as the intent of the parties or the subsequent

action of the parties, be introduced to clarify the meaning of the agreement.  Consol. Gas

Transmission Corp v. FERC, 771 F.2d 1536, 1546 (D.C. Cir. 1985).

Here, the IBIA Decision concludes as a matter of law that the Funding Formula

agreement is ambiguous.  However, that finding of ambiguity relies upon an

unreasonable interpretation of the language of the agreement. Then, in order to resolve the perceived ambiguity, the IBIA Decision goes on to rely upon facts that do not exist in the administrative record to purportedly determine the intent of the parties to the agreement.

The interpretation of the Funding Formula agreement relied upon in the IBIA Decision is unreasonable since it is ignores the plain language of that agreement and otherwise renders the majority of the factors in the agreement meaningless.

The interpretation relied upon in the IBIA Decision ignores the plain terms of the tribal resolutions that comprise the agreement on the Funding Formula. Each of the tribal resolutions state plainly that funds are to be distributed based on the following formula "**in FY 89 and future years**": Factor 1 - 25% equally divided; Factor 2 - 25% in proportion to total tribal enrollment; Factor 3 - 25% in proportion to resident tribal population within each tribe's jurisdictional area; and Factor 4 - 25% in proportion to the amount of trust property in each tribe's jurisdiction. See Exhibit C- Declaration of Rhonda Butcher, at Attachments 1, 2, 3, 4 and 5 to the declaration. This plain language states that the factors specified are to be applied "in FY 89 and future years."

The strained interpretation relied upon by the IBIA in the IBIA Decision renders meaningless Factors 2, 3 and 4 specified in the tribal resolutions as to future fiscal years beyond Fiscal Year 1989. Factor 2 specifies that 25% of available funding is to be allotted in any given fiscal year in proportion to total tribal enrollment. Factor 3 specifies that 25% of available funding is to be allotted in any given fiscal year in proportion to resident tribal population within each tribe's jurisdictional area. Factor 4 specifies that 25% of available funding is to be allotted in any given fiscal year in proportion to the

amount of trust property in each tribe's jurisdiction.  Under the construction of the

Funding Formula agreement as applied by the Department and erroneously affirmed in

the IBIA Decision, there is no application of these three factors in any year other than

Fiscal Year 1989 since only 1988 data is used to establish the percentage of funds to be

distributed in all future years, including Fiscal Year 2004 at issue here.  Under this

unreasonable interpretation, the percentage of funds to be allocated to each of the five

tribes under these three factors remains static and is forever locked into place based on

1988 data.  After Fiscal Year 1989, Factors 2, 3 and 4 of the Funding Formula are

rendered meaningless.  This interpretation of the Funding Formula is unreasonable,

contrary to the plain meaning of the language, and is erroneous as a matter of law.

The interpretation of the Funding Formula agreement relied upon by the IBIA

Decision further ignores the plain terms of the tribal resolutions stating that each of the

five tribes "will conform to all aspects of the CFR appropriate to the given program to be

contracted by all five tribes of the Shawnee Agency."  See Exhibit C - Declaration of

Rhonda Butcher, at Attachments 1, 2, 3, 4 and 5 to the declaration.  Pursuant to the

provisions of the ISDA (25 U.S.C. § 458ee) and the Department's regulation's governing

the Tribal Self-Governance Program of ISDA (25 C.F.R. §§ 1000.380-382), the

Department currently requires collection, on an annual basis, of data from each tribe

indicating each tribe's tribal enrollment, resident tribal population and trust property.

Pursuant to the tribal resolutions comprising the Funding Formula agreement, each of the

five tribes have agreed to comply with those provisions of the ISDA statute and the

Department's implementing regulations.  The Department's annual data collection

requirements are addressed in the following section of this Motion.

The IBIA Decision's interpretation of the Funding Formula agreement is not only unreasonable it also violates the Department's own regulations governing formula-driven distribution formulas, like the Funding Formula agreement at issue, here.  The Department's regulations governing formula-driven distribution formulas specifically provide, at 25 C.F.R. § 1000.98(a)(1), that "[d]istribution formulas must be reasonably related to the function or service performed by an office, and must be consistently applied to Tribes within each regional and agency office."  Under the Department's interpretation of the Funding Formula agreement as affirmed by the IBIA Decision, the percentage of funds to be allocated to each of the five tribes has remained static after Fiscal Year 1989 and has forever been locked into place based on 1988 data.  This is contrary to the Department's own regulation requiring that distribution formulas must be reasonably related to the function or service performed.  The data that existed in 1988 on tribal enrollment, tribal resident population and trust acreage is not reasonably related to the function and services performed by each tribe over 18 years later.  The functions and services of the tribes have shifted and changed materially during those 18 years based on the significant changes in tribal enrollment, tribal resident population and trust acreage.  Only current-day data can be used to reasonably determine the functions and services to be performed by each tribe during the fiscal year in which those functions and services are to be performed.

Not only does the IBIA Decision rely upon an unreasonable interpretation of the plain language of the Funding Formula agreement and ignore the Department's own governing regulations, the Decision also goes on to rely upon extrinsic evidence of the parties' alleged intent that does not exist anywhere in the administrative record.  In

resolving its finding of ambiguity, the IBIA Decision states that "[n]or do we think it would have been unreasonable **for the parties to intend** that existing data be applied to the formula to establish a fixed allocation for future years." (Emphasis supplied.) <u>See</u> Exhibit A – IBIA Decision, at page 172. However, there is no evidence in the administrative record regarding the intent of the five Shawnee Agency tribes that could rationally support a finding that their intent was that data from 1988 be forever applied by the Department to the factors specified in the Funding Formula agreement. In fact, there is no evidence at all in the administrative record as to the intent of the five Shawnee Agency tribes with respect to the Funding Formula agreement. The only evidence in the administrative record establishing the meaning of the Funding Formula agreement is the language of the agreement itself as set forth in the five tribal resolutions that comprise the agreement.

For all these reasons, this Court should find that the interpretation of the Funding Formula agreement relied upon by the IBIA in the IBIA Decision is unreasonable, relies upon facts not in the administrative record, and is erroneous as a matter of law. Further this Court should order remand of this matter back to the IBIA for further proceedings in order to (1) require the IBIA to further develop the administrative record to determine the meaning of the language of the Funding Formula agreement with respect to (a) application of the factors specified in the agreement in future fiscal years after Fiscal Year 1989 and (b) the Department's own regulations at 25 C.F.R. § 1000.98(a)(1) that require any formula-driven distribution formula used by the Department must be reasonably related to the function or service performed; (2) require that, if after further development of the administrative record the IBIA determines that the Funding Formula

agreement is not ambiguous, the IBIA should interpret that agreement, without reliance

upon extrinsic evidence, based only on the plain language of the tribal resolutions that

comprise the agreement; and (3) require that, if after further development of the

administrative record the IBIA determines that the agreement is still viewed as

ambiguous, the administrative record should be developed to determine the intent of the

parties to the Funding Formula agreement.

**(b)    The IBIA Decision Should Be Remanded
To the IBIA To Require That The
Department Supplement The Administrative
Record With the Current Data**

During the proceedings before the IBIA, CPN objected to the Department's

failure to include any data or documents relating to the factors of the Funding Formula,

including any current data for Fiscal Year 2004 on the total tribal enrollment, total tribal

resident population and total trust property for each of the five Shawnee Agency tribes.

CPN also objected to the Department's failure to provide a certification that the

administrative record contains all information and documents utilized by the deciding

official in rendering the decision appealed, as required by the IBIA's own regulations at

43 C.F.R. § 4.335(b)(3).  In an Order dated September 14, 2004, the IBIA partially

granted and partially overruled CPN's objections.  A copy of the IBIA's September 14,

2004 Order is attached hereto as Exhibit D.

With respect to CPN's objection to the Department's failure to include any data or

documents relating to the factors of the Funding Formula, the IBIA ruled that the

Department did not have to produce any such data or documents since it was the

Department's position that it was not information that the Department considered or

16

needed to consider in determining CPN's share of the disputed Fiscal Year 2004 AFA

funding.  See Exhibit D - IBIA Order, at pages 2-3.  The IBIA also noted that "[w]hether

the Director's position is correct, either as a matter of law or as a proper exercise of

discretion, is one of the issues before the Board in this appeal." See Exhibit D – IBIA

Order, at page 3.

> The IBIA's Order also stated that:
>
> To the extent that the Nation contends that the Director has committed
> legal error or abused his discretion in failing to consider updated factual
> statistics and failing to agree to adjusted funding levels to conform to
> those statistics, the Nation is not precluded from raising those arguments
> in this appeal and may append to its brief any documents or information
> that it considers appropriate for the Board to consider in reviewing the
> Director's decision.

See Exhibit D – IBIA Order, at page 3.

The IBIA's September 14, 2004 Order did require the Department to file with the

IBIA the required certification that the administrative record was complete.  See Exhibit

E – IBIA Order, at page 2.  However, the Department never filed the required

certification and the IBIA never issued any further order requiring that the Department

comply with that requirement.

In response to the IBIA's September 14, 2004 Order, CPN subsequently

submitted to the IBIA the most current data available to CPN regarding total tribal

enrollment, total tribal resident population and total trust property for each of the five

Shawnee Agency tribes.  See Exhibit C – Declaration of Rhonda Butcher, at pages 2-3.

This data showed that if the most current data available to CPN were utilized to apply

Factors 2, 3 and 4 of the Funding Formula, CPN's percentage of allotted funds would

increase by approximately 10%.  Id.

The data presented by CPN during the IBIA proceedings was the most current data available to CPN but it was not the most current data available to the Department. That current data exists and is readily available to the Department.  As set out above, it was legal error for the IBIA to conclude that the Department was not required to produce that current data and was not required to consider that current data in connection with determining CPN's AFA funding for Fiscal Year 2004.  The data is available to the Department and should be produced.

Each year, the Department's Bureau of Indian Affairs sends out a request to every tribe participating in the Tribal Self-Governance Program and requests that the tribe complete and send back to the Department a form containing, among other things, current data on each tribe's tribal enrollment, resident tribal population and trust property.   A copy of the Department's most recent annual request dated January 10, 2006 to the tribes is attached hereto as Exhibit E – Office of Self-Governance Annual Data Request to Tribes.   The Department's most recent annual letter states, among other things, that:

> The purpose of this memorandum is to ask self-governance tribes to provide the Office of Self-Governance (OSG) with information on their 2005 tribal self-governance activities by May 15, 2006.
>
> This information is needed for the Secretary to meet the requirements of Section 405 of Pub. L. 93-638, as amended, as they relate to the submission of the 2004 annual report to Congress on the relative costs and benefits of self-governance, as well as implementing regulations contained in 25 CFR § 1000.380 to 382.
>
> *      *      *      *      *      *      *      *      *      *
>
> Please be advised that Reatha Tom of the Self-Governance Communication & Education Tribal Consortium (SGCETC) will be sending a copy of the 2005 minimum data collection form to you via e-mail for your use.  In addition, the form has been posted on and can be downloaded for your use from the SGCETC website at http://www.tribalselfgov.org.

See Exhibit E - Office of Self-Governance Annual Data Request to Tribes attached

hereto.  A copy of the 2005 minimum data collection form that is referenced in the

Department's January 10, 2006 letter is attached hereto as Exhibit F – Self-Governance

Minimum Data Collection Form.  As set forth in the Self-Governance Minimum Data

Collection Form, the Department requires each tribe to provide data on, among other

things, (1) total tribal enrollment, (2) total tribal resident Indian population (TRIP), and

(3) total amount of trust/restricted acres of land.  See Exhibit F –Self-Governance

Minimum Data Collection, at page 1 (Tribal Demographics & Enrollment).

As these documents establish, the Department annually collects current data

needed to apply Factors 2, 3 and 4 of the Funding Formula in any given fiscal year.  The

Department can and should be required to produce that current data as part of the

administrative record.

Without consideration of this current data (whether or not the data is actually

applied to the factors of the Funding Formula agreement to allocate funding), there is no

basis in the administrative record to conclude that the Department complied with its own

regulations governing the Tribal Self-Governance Program of the ISDA.  As indicated

above, the Department's governing regulations at 25 C.F.R. § 1000.98(a)(1) require that

any formula-driven distribution formula, like the Funding Formula agreement at issue

here, must be reasonably related to the function or service performed.  Without some

consideration and review of current data for a given fiscal year on tribal enrollment, tribal

resident population and trust acreage, there is no basis for the IBIA or the Department to

conclude that the funds that were actually allocated by the Department in Fiscal Year

2004 to the five Shawnee Agency tribes reasonably relate to functions and services performed by the five Shawnee Agency tribes in any given fiscal year, including Fiscal Year 2004 at issue here. This is especially true here, where the Department continues to utilize data that is over 18 years old to allocate funding under the Funding Formula agreement.

For all these reasons, this Court should order remand of the IBIA Decision back to the IBIA with specific instructions requiring that the IBIA require the Department to supplement the existing administrative record with current data for Fiscal Year 2004 on each of the five tribe's tribal enrollment, resident tribal population and trust property in order to establish a basis in the administrative record to allow the IBIA to rationally determine whether the Department has complied with its governing regulation at 25 C.F.R. § 1000.98(a)(1) regarding formula-driven distribution formulas.

<blockquote>
**(c)**     **Even if This Court Upholds the IBIA Decision's Ambiguity Finding, this Court Should Still Find That the IBIA Decision Is Erroneous Because The Extrinsic Evidence Relied Upon by the IBIA <u>Did Not Exist In the Administrative Record</u>**
</blockquote>

Even if the IBIA Decision's conclusion of law that the Funding Formula is ambiguous is upheld by this Court, the IBIA Decision should still be found to be erroneous. In resolving the alleged ambiguity in the Funding Formula agreement, the IBIA Decision relies upon extrinsic evidence relating to the alleged knowledge and actions of CPN that does not exist in the administrative record. Specifically, the IBIA Decision states the following:

> Looking to the parties' performance, the record shows that the 1988 agreement has been implemented based on a static application of the formula since its inception. This performance has been rendered with the

knowledge of the nature of the performance and opportunity for objection, but it was not until 1998 that the Citizen Potawatomi objected to this reading of the agreement.  None of the other parties has come forward to support the Citizen Potawatomi's reading of the agreement. [Footnote omitted.]  Thus, we conclude that the Director did not err in determining that the parties to the 1988 agreement intended for the formula to apply in a static manner unless and until the parties agreed otherwise and thus did not abuse his discretion in applying the formula in that way.

See Exhibit A – IBIA Decision, at page 173.  The IBIA Decision fails to cite any evidence contained in the administrative record in support of its factual conclusion that CPN had knowledge of and opportunity to object to the Department's static application of the Funding Formula prior to 1998.  That is because there is no such evidence.

The issue of CPN's knowledge of and opportunity to object to the Department's actions prior to 1998 was not raised by the Department or by CPN.  No evidence was introduced during the IBIA proceedings by any party on this issue because the issue was never raised.  The IBIA raised this issue sua sponte for the first time in its final decision without any evidence in the record.  If the IBIA had adequately developed the administrative record on this issue, the record would show that CPN had no knowledge of or opportunity to object to the Department's actions prior to 1998.

It was not until September 1998 that CPN entered into its first Compact of Self-Governance and AFA with the Department pursuant to the Tribal Self-Governance Program provisions of the ISDA.  See Exhibit B – Administrative Record, at Tab 45.

Prior to Fiscal Year 1999, CPN did not participate in the Tribal Self-Governance Program under the ISDA, but, instead, had entered into self-determination contracts with the Department pursuant to the Indian Self-Determination provisions of the ISDA, 25 U.S.C. §§ 450f-450n.  Self-determination contracts entered into by a tribe under the Self-Determination provisions of the ISDA, 25 U.S.C. §§ 450f-450n, and the Department's

implementing regulations at 25 C.F.R. Part 900, are materially different from Compacts and AFAs entered into by tribes under the Self-Governance Program provisions of the ISDA, 25 U.S.C. §§ 458aa-458hh, and the Department's implementing regulations at 25 C.F.R. Part 1000.

Under the Self-Determination provisions of the ISDA and its implementing regulations, a tribe submits a contract proposal to the Department and the Department either accepts the proposal and provides the funds requested in the proposal or declines to accept the proposal.   See 25 C.F.R. Part 900.  In contrast, under the Self-Governance Program provisions of the ISDA and its implementing regulations, a tribe and the Department enter into negotiations for a Compact of Self-Governance and then, in each year, the tribe negotiates an AFA to provide funding to the tribe.  See 25 C.F.R. Part 1000.  During negotiations under the Self-Governance Program, a tribe negotiates with the Department regarding the specific levels of funding and gains insight into how the Department determines the level of funds.  See 25 C.F.R. §§ 1000.91 through 1000.104.

If the IBIA had adequately developed the administrative record as to this issue, rather than raise the issue sua sponte for the first time in its final decision, the record would establish the following facts.  Prior to 1998 in connection with award of its self-determination contracts, CPN had no basis to know whether the Department had utilized outdated data from 1988 for purposes of providing funding of CPN's self-determination contracts.  It was not until 1998, in connection with negotiation of CPN's first Compact of Self-Governance and Fiscal Year 1999 AFA under the Self-Governance Program of the ISDA, when CPN first became aware that the Department was utilizing outdated data from 1988 for purposes of determining the percentages of funding allotted to CPN under

the Funding Formula. It was then, in 1998, after first becoming aware of the

Department's erroneous application of the Funding Formula that CPN objected. In each

year thereafter, CPN raised this objection, including in connection with its Fiscal Year

2004 AFA at issue here and in its subsequent AFAs for Fiscal Years 2005 and 2006.

Therefore, for all these reasons, even if this Court should find that the IBIA

Decision's conclusion of law that the Funding Formula is ambiguous, this Court should

still find that the IBIA Decision is erroneous since the Decision relies upon extrinsic

evidence that does not exist in the administrative record to support its conclusion that

CPN failed to timely object to the Department's erroneous interpretation of the Funding

Formula.

Accordingly, if this Court upholds the IBIA Decision's conclusion of ambiguity

regarding the Funding Formula, this Court should still overturn the IBIA Decision and

order remand of the matter back to the IBIA to further develop the administrative record

regarding CPN's knowledge and actions prior to 1998 with respect to the Department's

repeated use of 1988 data to determine the percentages of funding allotments under the

Funding Formula for each fiscal year after 1988 up through 1998.

### 3. This Court Should Find That Count II of CPN's Complaint Is Supported by Sufficient Evidence to Allow Granting of a Default Judgment

In Count II of CPN's complaint, CPN contends that the IBIA Decision's holding

is erroneous as a matter of law that CPN is collaterally estopped from litigating the issue

of CPN's entitlement to at least $65,521 in funds for Fiscal Year 2004 under Factor 3 of

the Funding Formula agreement. See Exhibit A – IBIA Decision, at pages 167-170. The

Department's position is that CPN and the Absentee Shawnee tribe share a jurisdictional

area and, that as a result, under Factor 3 of the Funding Formula – 25% in proportion to resident tribal population within each tribe's jurisdictional area – CPN's funding must be reduced by $65,521.  CPN contends that it does not share a jurisdictional area with the Absentee Shawnee and that, as a result, the Department has illegally and continues to illegally withhold at least $65,521 in funding from CPN in Fiscal Year 2004 and each fiscal year thereafter.

The IBIA Decision's holding of collateral estoppel is strained, convoluted and ignores several material facts.  The IBIA Decision's collateral estoppel ruling is based entirely on a separate unrelated and materially different matter that was adjudicated by the Interior Board of Contract Appeals ("IBCA") in <u>Appeals of Absentee Shawnee Tribe of Oklahoma</u>, IBCA 4317-4318/2001, 35 IBCA 52 (2002) (the "<u>Absentee Shawnee</u> Decision").  The <u>Absentee Shawnee</u> Decision involved a post-award contract dispute between the Department and the Absentee Shawnee tribe with respect to the Absentee Shawnee's previously executed AFAs for Fiscal Years 2000 and 2001.  The IBCA's holding was limited to the finding that the Department had failed to establish sufficient grounds to permit a unilateral reduction of $65,521 in funds from the Absentee Shawnee by the Department in funding previously agreed to with the Absentee Shawnees in their AFAs for Fiscal Years 2000 and 2001.  A copy of the IBCA's <u>Absentee Shawnee</u> Decision is attached hereto as Exhibit G.  Nothing in the <u>Absentee Shawnee</u> Decision dealt with or resolved CPN's entitlement to funds under Factor 3 of the Funding Formula in future fiscal years, including CPN's entitlement to the $65,521 in Fiscal Year 2004 funds at issue here.  Nor did anything in the <u>Absentee Shawnee</u> Decision establish or hold that the CPN and the Absentee Shawnee share a jurisdictional area for purposes of

allocating funds under Factor 3 of the Funding Formula – 25% in proportion to resident tribal population within each tribe's jurisdictional area.

In addition, the IBIA Decision's holding of collateral estoppel completely ignores the fact that, after issuance of the IBCA's <u>Absentee Shawnee</u> Decision, CPN moved the IBCA to award CPN the same amount as was awarded to the Absentee Shawnee -- $65,521 – based on the argument that the IBCA's <u>Absentee Shawnee</u> Decision would likely cause the Department to withhold the same amount from CPN in the future and that the Department is prohibited from doing so.  In <u>Appeals of Absentee Shawnee Tribe of Oklahoma</u>, IBCA No. 4317R-4318R/02 (January 14, 2003), 2003 WL 133,274 (the "<u>Absentee Shawnee II</u> Decision"), the IBCA rejected CPN's request ruling that the issue of CPN's entitlement to the $65,521 in funding under Factor 3 was not an issue litigated before the IBCA in that action.  A copy of the IBCA's <u>Absentee Shawnee II</u> Decision is attached hereto as Exhibit H.  The IBCA's <u>Absentee Shawnee II</u> Decision made clear that CPN's claim and entitlement to the $65,521 in funding based on the issue of the shared jurisdictional area with the Absentee Shawnee tribe was not an issue litigated or decided in the initial <u>Absentee Shawnee</u> Decision.

Most significantly, the IBIA Decision ignores the fact that in a subsequent post-award contract dispute action brought by CPN under its Fiscal Year 2003 AFA before the same IBCA administrative judge (Administrative Judge Parrette) who issued the <u>Absentee Shawnee</u> and <u>Absentee Shawnee II</u> Decisions, the IBCA conclusively held that CPN was not barred from litigating CPN's entitlement to the $65,521 in funding in connection with CPN's Fiscal Year 2003 AFA and that CPN was entitled to the $65,532 in funds under Factor 3 of the Funding Formula agreement in Fiscal Year 2003.  In

Appeal of Citizen Potawatomi Nation of Oklahoma, IBCA No. 4522/04, 35 IBCA 207, 05-1 BCA ¶ 32,919 (March 22, 2005) (the "CPN Decision"), the IBCA held that the Department's withdrawal of the $65,521 in funds from CPN's Fiscal Year 2003 AFA funding was a breach of contract and ordered that those funds be restored to CPN.  A copy of the IBCA's CPN Decision is attached hereto as Exhibit I.

In the IBCA's CPN Decision, the Department had argued that CPN was barred from litigating its entitlement to the $65,521 in funds under the doctrine of res judicata based on the IBCA's Absentee Shawnee Decision (Exhibit G attached hereto).  The IBCA rejected the Department's argument and held that the doctrine of res judicata did not apply and did not bar CPN from litigating its entitlement to the $65,521 in funds at issue, stating:

> Department counsel argues that since the Nation was a party to the Shawnee's appeal, it is bound by the Board's decision under the doctrine of res judicata, which essentially holds that the same party can't litigate the same issue twice.  As the headnote in Israel Discount Bank Ltd v. Entin, 951 F.2d 311 (11th Cir. 1992), a case cited by the Government, states:
>
>> Res judicata will bar subsequent action if:  prior decision was rendered by court of competent jurisdiction; there was a final judgment on the merits; parties were identical in both suits; and prior and present causes of action are the same.
>
> Here, by contrast, the parties are not identical in both suits; and the prior and present causes of action also are not the same.  In Absentee Shawnee, the issue was the withholding of $65,521 from the Shawnees; here it is the withholding of $65,521 from the Nation, a different party with opposing interests.  Accordingly, we reject the Government's res judicata defense as inapplicable.

See Exhibit I – CPN Decision, at page 3.

This is the same issue raised in CPN's pre-award appeal under its Fiscal 2004 AFA that was before the IBIA and addressed in the IBIA Decision. The very same IBCA administrative judge who issued the <u>Absentee Shawnee</u> Decision ruled that CPN was not subsequently barred from litigating that issue in a post-award action at the IBCA with respect to the same $65,521 in funding under CPN's Fiscal Year 2003 AFA and held that CPN was entitled to those funds for Fiscal Year 2003. It is irrational for the IBIA to now conclude in its IBIA Decision, based on the IBCA's <u>Absentee Shawnee</u> Decision, that CPN is collaterally estopped from raising this same issue regarding CPN's entitlement to at least the $65,521 with respect to Fiscal Year 2004.

The grounds justifying application of the doctrine of <u>res judicata</u> are materially the same as the grounds justifying application of the doctrine of collateral estoppel. The same IBCA judge who issued the <u>Absentee Shawnee</u> Decision held that CPN was not barred by <u>res judicata</u> from litigating its entitlement to the $65,521 in funds for its Fiscal Year 2003 AFA. But yet, the IBIA in its IBIA Decision interprets that same <u>Absentee Shawnee</u> Decision to conclude that CPN is collaterally estopped from litigating its entitlement to at least the same $65,521 in funds with respect to its Fiscal Year 2004 AFA. There is no legal or factual basis for the IBIA to have concluded that CPN is collaterally estopped from litigating its entitlement to at least the $65,521 in funds for Fiscal Year 2004 in its action before the IBIA.

Therefore, for all these reasons, the IBIA Decision's collateral estoppel conclusion that the issue of CPN's entitlement to the $65,521 in funds for Fiscal Year 204 was actually litigated and decided in the <u>Absentee Shawnee</u> Decision is factually and legally erroneous as a matter of law. Accordingly, this Court should overturn the IBIA

Decision's holding of collateral estoppel and order remand of this issue back to the IBIA

for further proceedings as to the merits of this issue.

> **4.    This Court Should Find That Count III of CPN's
> Complaint Is Supported by Sufficient Evidence to
> <u>Allow Granting of a Default Judgment</u>**

Even though the IBIA Decision concluded that CPN was collaterally estopped

from litigating its entitlement to at least the $65,521 in funds withheld for Fiscal Year

2004 by the Department under Factor 3 (25% in proportion to resident tribal population

within each tribe's jurisdictional area) of the Funding Formula, the IBIA Decision went

ahead and addressed the merits of CPN's claim and concluded, in an abbreviated fashion,

that CPN is not entitled to those funds.  In Count III of its complaint, CPN contends that

the IBIA Decision's finding that CPN is not entitled to at least the $65,521 in funds under

Factor 3 is erroneous as a matter of law and is contradicted by evidence in the

administrative record.

Without any explanation or citation to the administrative record, the IBIA

Decision summarily concluded that the Tenth Circuit's decision in <u>Citizen Band</u>

<u>Potawatomi Indian Tribe of Oklahoma v. Collier</u>, 142 F.3d 1325 (10th Cir.1998) (the

"<u>Collier</u> Decision") has no impact upon how the $65,521 in funds are to be distributed to

CPN under Factor 3 of the Funding Formula agreement.  The IBIA Decision states that

"**it appears** that factor 3 of the agreement contemplated, with respect to the Citizen

Potawatomi and the Absentee Shawnee, that funding would be apportioned based on the

number of tribal members **each** tribe had within the former reservation boundaries" and

that "<u>Collier</u> does nothing to alter this **intent**."  (Emphasis supplied.)  <u>See</u> Exhibit A –

IBIA Decision, at page 171.  This summary conclusion of the IBIA Decision simply

restates what the Department had incorrectly assumed in 1988 – that CPN and the Absentee Shawnee share a common former reservation – and further perpetuates the Department's erroneous position that all funding percentages under the Funding Formula are to be forever locked into place based on data that existed in 1988.

This summary conclusion of the IBIA Decision is without any support in the administrative record. As indicated above, the administrative record does not contain any evidence that could rationally support the IBIA Decision's conclusion that all funding percentages under the Funding Formula agreement are to be forever locked into place based on data and events that existed or were understood to exist in 1988. The IBIA Decision's conclusion that the Collier Decision has no impact on how funds are to be apportioned to CPN under Factor 3 of the Funding Formula is erroneous as a matter of law and contradicts the evidence in the administrative record.

In addition, the IBIA Decision fails to explain the fact that the Collier Decision held that the CPN and the Absentee Shawnee do not share a common former reservation area and that the Absentee Shawnee has no jurisdiction over the CPN's exclusive former reservation area. See Collier, supra, 142 F.3d at 1334 (where the Court concluded that "[i]n sum, we conclude that the language, legislative history, and historical circumstances of the 1891 Act do not evince a sufficiently clear Congressional intent to abrogate the Potawatomi Tribe's treaty right to the **exclusive use and occupancy of its former reservation.**" (Emphasis supplied)).

The 10th Circuit's subsequent decision in Citizen Potawatomi Nation v. Norton, 248 F.3d 993 (10th Cir. 2001), modified on rehearing, 257 F.3d 1158 (10th Cir. 2001) (the "Norton Decision"), which is relied upon in the IBIA Decision, did not state that its

holding in the <u>Collier</u> Decision had no impact on the issue of how funds are to be apportioned to CPN under Factor 3 of the Funding Formula agreement, which was raised by CPN as an issue in the <u>Norton</u> action. The <u>Norton</u> Decision dismissed the action without addressing the merits of the issues raised. In dismissing the action, the Court in <u>Norton</u> merely clarified that its holding in the <u>Collier</u> Decision had not decided whether or not the CPN and the Absentee Shawnee share a common service area for purposes of Factor 3 of the Funding Formula agreement. See <u>Norton</u>, <u>supra</u>, 248 F.3d at 999 (where the Court stated that "[m]oreover, our *Collier* opinion did not decide whether the Shawnee and the Citizen Potawatomi share a *common service area*, which is the relevant question at issue here.") This issue was left unresolved by both the <u>Collier</u> Decision and the <u>Norton</u> Decision.

However, the <u>Norton</u> Decision, as modified upon rehearing en banc, did make clear that the United States was further prevented from attempting to offer any further proof of joint jurisdiction by CPN and the Absentee Shawnee over CPN's former reservation. See, <u>Norton</u>, <u>supra</u>, 257 F.3d 1158 (where the Court, on rehearing en banc, modified its opinion to remove the sentence stating: "We did not hold, however, that the United States could not provide that proof.")

Therefore, both the <u>Collier</u> Decision and the <u>Norton</u> Decision establish conclusively that the CPN and the Absentee Shawnee do not share a common former reservation area and that the Absentee Shawnee has no jurisdiction over the CPN's exclusive former reservation area. The issue that did not get resolved in either of those decisions is whether the holding in the <u>Collier</u> Decision (that CPN has the right to the exclusive use and occupancy of its former reservation) means that CPN and the Absentee

Shawnee also do not share a common service area for purposes of allocating funding under Factor 3 of the Funding Formula agreement.  That is the issue that CPN raised in the proceedings before the IBIA.   But rather than rationally address the merits of this issue, the IBIA Decision summarily concluded, with no explanation, that the holding of the <u>Collier</u> Decision has no impact on how funds are to be allocated to CPN under Factor 3 of the Funding Formula agreement.

Not only did the IBIA Decision fail to explain its summary conclusion that the <u>Collier</u> Decision has no impact on Factor 3 of the Funding Formula agreement, it also erroneously ignored contradictory evidence in the administrative record establishing the opposite.  The evidence in the administrative record establishes that in developing Factor 3 (25% in proportion to resident tribal population within each tribe's jurisdictional area) of the Funding Formula, a tribe's former reservation boundaries were used to define the tribe's jurisdictional area for purposes of allocating funding under Factor 3 and that jurisdictional area and service area were co-extensive.  In a 1999 memorandum prepared by the Department itself, the Department explained that although service area and territorial jurisdiction are not necessarily co-extensive, in the case of the five Shawnee Agency tribes and the 1988 inter-tribal resolutions, the Department determined that the service area designations were made with specific and exclusive reference to territorial jurisdiction under Factor 3 of the Funding Formula.  <u>See</u> Exhibit B – Administrative Record, at Tab 44, pages 2-3.

In addition, even the Department's Assistant Secretary for Indian Affairs at the time (Mr. Kevin Gover) asserted this same position.  In a letter dated November 15, 1999, he explained that although jurisdictional area and service area under the ISDA do

not have to be synonymous, the Department has discretion to take former reservation boundaries into account to define service area for purposes of contracting and compacting Bureau of Indian Affairs programs under the ISDA.  He further explained that the situation in Oklahoma is unique in that there are no present reservation boundaries and that in developing Factor 3 of the Funding Formula, the former reservation boundaries were taken into account to define a tribe's jurisdictional area.  He also specifically stated that:

> When the Department took "former reservation boundaries" into account in determining "jurisdictional area" under prong (3) of the formula, it was acting on the conclusion of law that the AST [Absentee Shawnee] shared a common former reservation area with Citizen Potawatomi Nation (CPN).  That legal conclusion was subsequently held incorrect by the federal courts in <u>Collier</u>.

 <u>See</u> Exhibit B – Administrative Record, at Tab 40.

In 1988, the Department was acting on the erroneous conclusion that the Absentee Shawnee shared a common former reservation area with CPN and, on that erroneous conclusion, apportioned funding under Factor 3 of the Funding Formula based on the number of tribal members each tribe had within CPN's former reservation boundaries.  The conclusion reached in 1988 that CPN and the Absentee Shawnee share a common former reservation was subsequently held to be incorrect in <u>Collier</u>, <u>supra</u> 142 F.3d 1325, 1334, which definitively established that CPN has the "right to the **exclusive use and occupancy of its former reservation**".  (Emphasis supplied.)  Now that the <u>Collier</u> Decision has established that the CPN and the Absentee Shawnee do not share a common former reservation and that CPN has the exclusive territorial jurisdiction over its former reservation, the impact of the <u>Collier</u> Decision on the "jurisdictional area" portion of Factor 3 of the Funding Formula cannot rationally be denied.

Further, since the IBIA refused to require the Department to produce any current data as to any of the factors in the Funding Formula, including the number of resident tribal population within each tribe's jurisdictional area for purposes of Factor 3, the administrative record is incomplete as to how much additional funding CPN is due under Factor 3 if current data is applied.  CPN has claimed at least the $65,521 in funding that the Department has withdrawn.  But if current data is utilized, the amount of funding due CPN under Factor 3 could well be greater than $65,521.

Accordingly, for all these reasons, this Court should find that the IBIA Decision's ruling that CPN is not entitled to at least the $65,521 claimed with respect to Factor 3 of the Funding Formula is erroneous as a matter of law and must be overturned.  This Court should find that the IBIA Decision's summary conclusion that the Collier Decision has no impact on Factor 3 of the Funding Formula agrement is inadequate and without any support in the administrative record.

This Court should order remand of this issue back to the IBIA to develop the administrative record with respect to (1) the intent of the parties with respect to Factor 3 of the Funding Formula agreement, and (2) the effect on the "territorial jurisdiction" element of Factor 3 of the Funding Formula of the Collier Decision's holding that CPN has the exclusive use and occupancy of its former reservation.  Further, this Court should order that, if after further development of the administrative record the IBIA determines that CPN's territorial jurisdiction for purposes of allocating funding under Factor 3 is defined by its former reservation boundaries, the administrative record must be further supplemented to include current data establishing the number of total resident tribal

population (both members of CPN and members of other tribes) in CPN's territorial jurisdiction as defined by its former reservation boundaries.

> **C.    There Are No Indispensable Party Issues That Could Affect This Court's Ability to Grant This Motion For Default Judgment Against the Government**

Although involving similar underlying issues on the merits, this action in this Court by CPN is materially different from the action addressed in the Norton Decision, supra, 248 F.3d 993, modified on rehearing, 257 F.3d 1158, where the court affirmed dismissal of CPN's action because CPN was unable to join as necessary and indispensable parties other tribes participating in the Funding Formula agreement.

The action at issue in the Norton Decision was an original action directly filed in U.S. district court and was not proceeded by any administrative appeal process available at the Department.  Nor was there any remand available to the district court in which to send the matter back to an administrative board, like the IBIA, for resolution of the merits.  In the Norton action, CPN sought resolution by the court of the merits of the issues raised by CPN regarding the Department's application of the Funding Formula agreement and the shared service area issue.  As indicated in the Norton Decision, the action brought by CPN in that instance was one for a 'mandatory injunction in the nature of mandamus'".  Norton, supra, 248 F.3d at 995.  In Norton, the district court ruled that it could not address the merits of CPN's action due to the lack of indispensable parties and dismissed CPN's action on those grounds.  The appellate court affirmed the district court's dismissal.  Id.

At the time that CPN initiated its action resulting in the Norton Decision, there were no regulations implementing the Self-Governance Program provisions of the ISDA.

Nor were there any administrative remedies available under the Self-Governance Program of the ISDA in which to bring an administrative pre-award action at the Department.   It was not until December 2000 when the Department issued, for the first time, regulations implementing the Self-Governance Program provisions of the ISDA. Those regulations became effective January 1, 2001.  65 Fed. Reg. 78,688 (Dec. 15, 2000).  Among other things, the regulations implementing the Self-Governance Program provisions of the ISDA provide that a tribe may appeal pre-award disputes that arise prior to execution of an AFA or a Compact directly to the IBIA.  25 C.F.R. § 1000.432(b)(2).

The pre-award dispute concerning CPN's Fiscal Year 2004 AFA that is the subject of the IBIA Decision at issue in this action was filed by CPN under 25 C.F.R. § 1000.432(b)(2) (which allows for pre-award appeals of disputes regarding AFAs directly to the IBIA).  The IBIA Decision is considered final for the Department.  See 43 C.F.R. § 4.312.  Under the provisions of the ISDA at 25 U.S.C. § 450m-1(a), CPN has the right to seek review in this Court of any final action of the Department, which includes the IBIA Decision at issue here.  Remand from a federal court back to the IBIA is also specifically provided for in the Department's regulations governing the IBIA appeal process at 43 C.F.R. § 4.316 (addressing IBIA procedures whenever any matter is remanded from any federal court to the IBIA for further proceedings).

As indicated above, in this action, CPN seeks review by this Court of the IBIA Decision and a ruling from this Court holding that the IBIA Decision is without any support in the administrative record and is otherwise erroneous.  However, in contrast to the action addressed in the Norton Decision, the underlying merits of the issues raised by CPN at the IBIA and addressed by the IBIA Decision are not before this Court and will

not be resolved in this Court by this action.   This Court is not asked by CPN to develop

its own evidence and to reach its own conclusions regarding the underlying merits of the

issues raised by CPN in the IBIA proceedings.  Rather, CPN asks this Court to find that

the conclusions reached by the IBIA Decision are without any support in the

administrative record and otherwise erroneous as a matter of law.  The relief requested by

CPN is for this Court to remand the matter back to the IBIA for further proceedings in

order to supplement the administrative record so that the IBIA may reasonably and

rationally resolve the merits of the issues raised based on the supplemented record.

      The IBIA has long recognized that it is not required and does not invoke

traditional rules of joinder and of necessary or indispensable parties.  See, e.g., Indians of

the Quinault Reservation v. Commissioner of Indian Affairs, 9 IBIA 63 (Oct. 15, 1981)

(citing to National Licorice Co. v. NLRB, 309 U.S. 350 (1960)).  The IBIA may proceed

to resolve the merits of the issues raised by exercising its trust responsibility to both the

appellant and any alleged absent indispensable party.  This trust responsibility obligates

the IBIA to consider the rights of all tribes, regardless of their participation, or lack

thereof.  Indeed, the IBIA did so in connection with the instant appeal that resulted in the

IBIA Decision at issue here.  See Exhibit A – IBIA Decision, at page 171 (Footnote 10).

      Other courts that have reviewed IBIA decisions involving potential issues of the

joinder of indispensable parties have been able to afford some review of the IBIA

decision while limiting the relief granted to remand of the decision back to the IBIA for

further proceedings on the merits of the issues.  See, e.g., Feezor v. Babbit, 953 F.Supp.

1, 6 (Footnote 4) (D.D.C. 1996) (where the court reviewed a decision by the IBIA and

limited the remedy to remand back to the IBIA for further proceedings and noted that, by

doing so, the question of the absence of a potential indispensable party need not be addressed.)  In other cases, the courts reviewing an IBIA decision have been able to conclude that, even though non-party Indian tribes might be affected by the court's review, their joinder was unnecessary for the court to conduct its review.  See, e.g., Ransom v. Babbitt, 69 F.Supp.2d 141, 148 (D.D.C. 1999) (where the court found that a non-party Indian tribal government was not an indispensable party even though it might be affected by the court's review of the agency's actions, including review of an IBIA decision.)

Here, by not seeking resolution by this Court of the underlying merits of the issues raised in the IBIA proceedings and by limiting the remedy in this action to remand back to the IBIA for further proceedings as requested herein, the issue of any alleged indispensable party need not be addressed or otherwise resolved in this action.  On remand from this Court, the IBIA will be able to address the merits of the issues raised by CPN without the constraints of any indispensable party issues.  Therefore, joinder of any other party that might have an interest in this action, including the other four Shawnee Agency tribes, is not necessary or required for this Court to conduct its review and grant the relief requested.

Accordingly, for all these reasons, this Court should conclude that the issue of joinder of any indispensable party need not be addressed or otherwise resolved in order to grant this Motion by CPN in this action.

## CONCLUSION

For all these reasons, CPN respectfully requests that this Court grant this Motion and grant CPN the following relief:

A.    Declare that the IBIA Decision is erroneous for the reasons stated herein;

B.    Enjoin the Department from implementing the IBIA Decision as final agency action;

C.    Remand this matter back to the IBIA for further proceedings as requested herein; and,

D.    Grant all other relief that this Court deems just and appropriate.

Respectfully submitted,

CITIZEN POTAWATOMI NATION


By: ___/s/ James D. Bachman___
        James D. Bachman
        D.C. Bar No. 332650

        Ron R. Hutchinson
        D.C. Bar No. 428039

        Doyle & Bachman, LLP
        4350 N. Fairfax Drive
        Suite 420
        Arlington, Virginia  22203
        (703) 465-5440
        Fax:  (703) 465-5593

Dated:  September 15, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September, 2006, I caused to be delivered

the following by first class mail, postage prepaid a copy of Plaintiff's Motion for Default

Judgment along with all Exhibits:

Lynn Scarlett
Acting Secretary of the Interior
Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240

Kenneth Reinfeld
Acting Director of the Office of Self
Governance
Bureau of Indian Affairs
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Steven K. Linscheid
Chief Administrative Judge
Interior Board of Indian Appeals
801 N. Quincy Street, Suite 300
Arlington, Virginia  22203

Kenneth Wainstein
United States Attorney
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C.  20530

Alberto Gonzales
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530-0001


/s/ James D. Bachman
James D. Bachman