IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZEN POTAWATOMI NATION, ) <br> a federally recognized Indian Tribe, ) <br> 1601 S. Gordon Cooper Drive ) <br> Shawnee, Oklahoma 74801 ) <br>     Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> LYNN SCARLETT, Acting Secretary of the Interior; ) <br> KENNETH REINFELD, Acting Director of the ) <br>     Office of Self-Governance, ) <br>     Bureau of Indian Affairs ) <br> Department of the Interior ) <br> 1849 C Street, N.W. ) <br> Washington, D.C. 20240 ) <br> ) <br> STEVEN K. LINSCHEID, ) <br>   Chief Administrative Judge ) <br>   Interior Board of Indian Appeals ) <br> 801 North Quincy Street, Suit 300 ) <br> Arlington, Virginia 22203 ) <br>     Defendants. ) <br> ) | Case <br> Number: 1:06CV00830 <br><br> Judge Gladys Kessler |

# EXHIBIT G
# PART 1

# TO

# PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Contract Appeals
801 N. Quincy St. Suite 300
Arlington, VA  22203

703 235 3813                                           703 235 1281 (fax)

## APPEALS OF ABSENTEE SHAWNEE TRIBE OF OKLAHOMA

| | |
|---|---|
| IBCA 4317-4318/2001 | Decided: November 4, 2002 |
| Director, Office of Self-Governance Compact No. OSGT 820 (AFA's 2000 & 2001) | Appellant's Motion for Summary Judgment Granted |
| APPEARANCE FOR APPELLANT: | William R. Perry, Esq.<br>Sonosky, Chambers, Sachse, et al.<br>Washington, D.C. |
| APPEARANCE FOR INTERVENOR:<br>(Citizen Potawatomi Nation) | Michael Minnis, Esq.<br>Michael Minnis & Associates, P.C.<br>Oklahoma City, Oklahoma |
| APPEARANCE FOR GOVERNMENT: | Charles R. Babst, Jr., Esq.<br>Department Counsel<br>Tulsa, Oklahoma |

### OPINION BY ADMINISTRATIVE JUDGE PARRETTE

The Absentee Shawnee Indian Tribe of Oklahoma (AST or Shawnee) has appealed under 25 U.S.C. 450m-1(d) from an action by the Director, Office of Self Governance (OSG) (a unit of the Office of the Secretary of the Department), that reduced AST's allocation of funds under Annual Funding Agreements (AFA's) pursuant to the Indian Self-Determination and Education Assistance Act (ISDA), 25 U.S.C. §§450, et seq. (specifically §450j-1), on the basis of the U.S. Circuit Court's decision in Citizen Band Potawatomi Indian Tribe of Oklahoma [i.e., Citizen Potawatomi Nation, referred to here as the CPN or the Potawatomi] v. Collier, 142 F. 3d 1325 (10th Cir. 1998) (hereafter Collier), which held that the Potawatomi had exclusive use and occupancy treaty rights to the Nation's former reservation on which the Shawnee also resided. Inasmuch as the Shawnee were no longer considered to have any territorial jurisdiction over the former reservation, OSG decided in 1999 to reduce the Shawnee's service area funding by $65,521 per year and

to give those funds to the Potawatomi instead. The reduction was written into the Shawnee AFA's and implemented for calendar years (CY's) 2000 and 2001, despite the Shawnee's protests; and these appeals followed. The Board subsequently granted the Potatwatomi's motion to file briefs in the case. The Shawnee have now moved for summary judgment.

## Background

As the court explained in <u>Citizen Potawatomi Nation v. Norton,</u> 248 F 3d 993 (10th Cir. 2001) (hereafter <u>Norton</u>), under the ISDA, the United States is authorized to enter into compacts with Indian tribes. Pursuant to that Act, tribes do not contract to take over specific programs; rather, they assume comprehensive responsibility for the planning and administration of programs and services previously provided by the United States. Essentially, the Act provides for tribal self-governance.

Once the United States enters into a compact with a tribe, the parties ordinarily negotiate an Annual Funding Agreement. In 1998, however, five tribes within the Shawnee Agency of the Bureau of Indian Affairs (BIA) negotiated a formula among themselves for dividing future Federal appropriations. Those tribes included the Citizen Potawatomi, the Shawnee Tribe, the Kickapoo Tribe of Oklahoma, the Sac and Fox Nation, and the Iowa Tribe of Oklahoma. Under the negotiated formula, the tribes agreed to divide (1) twenty-five percent of the funding equally; (2) twenty-five percent in proportion to total tribal enrollment; (3) twenty-five percent in proportion to resident tribal enrollment within each tribe's jurisdictional area; and (4) twenty-five percent of the funds in proportion to the amount of trust property in each tribe's jurisdiction. The United States used this formula to determine the amount of funding awarded to the tribes in their Annual Funding Agreements.

As averred by Appellant, the Shawnee since 1991 have been operating a wide range of BIA funded programs under their self-governance compact. The tribes within BIA's Shawnee Agency had been receiving their allocated funding for over ten years pursuant to their agreement before OSG reduced Appellant's funding on the basis of the decision in <u>Collier</u>. The reduction is alleged here to be unlawful since Section 450j-1(b)(2) of the ISDA prohibits the Government from making unilateral reductions in any tribe's funding. The over-$65,000 reduction by OSG for each of the two years at issue is also alleged to have

2

been a significant loss for the Shawnee, whose total funding was only about $700,000 per year, and it has resulted in reductions of services for various needed programs.

The Compact that the Government entered into with the Shawnee on September 25, 1990, did not specifically contain the formula that the tribes within the Shawnee Agency had agreed upon but, rather, contained the following provisions:

>Article II, Sec. 3 - <u>Funding Amount</u>. Subject <u>only</u> to the appropriation of funds by the Congress of the United States and to adjustments pursuant to Section 106(b) of P.L. 100-472, the Secretary or his authorized representative shall provide to the Tribe the total amount specified in the Annual Agreement incorporated by reference to Article VI, Section 2 [emphasis added].

>Article VI, Sec. 2 - <u>Annual Agreement</u>. The negotiated and duly approved Annual Agreement with respect to Absentee Shawnee Tribe of Oklahoma identifying those programs, services, functions and activities to be performed, the General Budget Category assigned, and the funds to be provided, is hereby incorporated in its entirety in this Compact and attached hereto as Attachment #2. This Compact shall be in effect only during the term of any such Annual Agreement.

Section 106(b) of P.L. 100-472, codified as 25 U.S.C. §450j-1(b), provides:
(b) Reductions and increases in amount of fund [sic] provided.
   The amount of funds required by subsection (a) of this section—
(1) shall not be reduced to make funding available for contract monitoring or administration by the Secretary;
(2) <u>shall not be reduced by the Secretary in subsequent years except pursuant to</u>—
>(A) a reduction in appropriations from the previous fiscal year for the program or function to be contracted;
>(B) a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;
>(C) <u>a tribal authorization</u>; [Emphasis added]
>(D) a change in the amount of pass-through funds needed under a contract;
>or (E) completion of a contracted project, activity, or program;

3

(3) shall not be reduced by the Secretary to pay for Federal functions, including, but not limited to, Federal pay costs, Federal employee retirement benefits, automated data processing, contract technical assistance or contract monitoring;

(4) shall not be reduced by the Secretary to pay for the costs of Federal personnel displaced by a self-determination contract; and

(5) may, at the request of the tribal organization, be increased by the Secretary if necessary to carry out this subchapter or as provided in section 450j(c) of this title.

Section 450j(c) pertains only to the term of self-determination contracts and is not relevant here. Neither of the Shawnee' annual funding agreements for 2000 and 2001 specifically refers to the formula agreed upon by the Shawnee Agency tribes in June 1988, prior to the 1990 Compacts. The Compacts also omit any reference to the formula individually agreed to by the tribes. What the AFA's did contain, however, was a provision in Section 3 to the effect that:

> Both parties agree to correct <u>any mistakes in calculations</u> or <u>other mistakes as they are identified in the amount of funding</u> available to the Tribe, and such party who <u>discovers</u> the mistake shall notify the other party prior to any changes to the funding amount as stated herein. Any differences concerning any mistake that are not mutually agreed to, will be subject to re-negotiation between the parties. Failure by the parties to agree to corrections after re-negotiation will invoke the remedies available under the ISDA. (Emphasis added)

### The Collier Case

In 1992, unrelated to the Compacts, the Potawatomi brought suit against BIA Anadarko Area Director L. W. Collier seeking a declaration that BIA was required to obtain CPN consent before placing into trust land within the boundaries of the former Potawatomi reservation under 25 CFR 151.8. The lawsuit, <u>Potawatomi Indian Tribe of Oklahoma v. Collier, CIV 92-2161-R (W.D. Okla. 1996)</u>, was precipitated when the Shawnee applied to BIA to place such land in trust and BIA informed the Potawatomi that its consent was not required to do so. The Interior Department's relevant agencies all supported the AST's application, also taking the position that CPN consent was not required because the Department viewed the Shawnee as sharing the former reservation

4

with the Potawatomi. However, the 10th Circuit in 1998 ultimately upheld the CPN's position, holding that on the record before it, there was not an adequate showing that the AST ever legally shared in the former reservation and that, therefore, Potawatomi consent was required.

Although the issue in Collier was essentially whether the AST shared a common former reservation with the CPN for the purposes of trust lands acquisition, on April 15, 1999, an OSG position paper was transmitted to the Shawnee, which took the position that "the [Collier]decision strongly supports the proposition that the AST does not possess inherent historical authority over what the courts have now determined to be the exclusive former reservation of the CPN" and that the Department was "obligated to bring the service area and associated funding into conformance with the Federal Appellate Court's holding." Though the position paper acknowledged that the Secretary could not, as a matter of law, unilaterally modify the terms of the AST compact to downsize the service area population and thus reduce the level of Federal funding to the Absentee Shawnee without the Tribe's consent, it noted that bilateral negotiations could achieve that result.

The position paper also asserted that, because the Tribe's AFA provided for correction of "mistakes" if the negotiations were unsuccessful, the Secretary would be within his authority to issue a decision in the matter, subject to appeal to this Board. Throughout the paper, the OSG insisted that the proposed change in the funding agreement was a correctable mistake under AFA clause 3; that the change was "required"; and that the Department was "obliged" by Collier to make it. The Shawnee did not agree.

The Norton Case

On the same day that the Shawnee filed their appeal with the Board, the 10th Circuit court that issued Collier also issued a decision in Citizen Potawatomi Nation v. Norton, 248 F. 3d 993 (10th Cir. 2001) (Norton), which involved a suit brought by the CPN further challenging OSG's revised service area, the static nature of the sharing formula (which the Potawatomi thought should be changed as the data changed), the refusal of OSG to fund certain CPN "residual" projects, and the "moratorium" clause, which OSG said prevented the funding of still other projects. The appellate court affirmed the district court's decision dismissing the case on the ground that the joinder of the other Shawnee Agency tribes was

5

necessary, inasmuch as they would be affected by the court's decision, although their sovereign immunity prevented making them parties to the action.

In its opinion, the court agreed with the general view of the Department (elsewhere asserted) that territorial jurisdiction and service areas are not necessarily the same. But it took issue with the CPN's contention that because of <u>Collier</u> the Shawnee had no claim to previous funding amounts. Specifically, the court stated that:

> It is true that in [<u>Collier</u>] we held that the United States had failed to adequately demonstrate that the Shawnee and the Citizen Potawatomi share a common former reservation. We did not hold, however, that the United States could not provide that proof. <u>Moreover, our Collier opinion did not decide whether the Shawnee and the Citizen Potowatomi share a common service area, which is the relevant question at issue here.</u> Accordingly, we conclude that the Shawnee do not present a "patently frivolous" claim that they share the service area with the Citizen Potawatomi Nation and thus pursuant to <u>Davis</u> [i.e., <u>Davis v. United States</u>, 192 F. 3d 951 (10th Cir. 1999)], they can claim an interest in the Citizen Potawatomis' action. (<u>Id</u> at 999. Emphasis added)

## Procedural History

As mentioned above, the present appeal was filed on the same day that <u>Norton</u> was decided. The Board therefore granted the parties a stay to enable them to determine the effect of that decision on this appeal. However, no resolution of the dispute was achieved. On September 7, 2001, after the pleadings were filed, the Board issued an Order urging settlement negotiations. On October 5, 2001, the parties jointly requested the appointment of a settlement judge, and the Board granted the request on October 15. The resulting mediation process proved to be lengthy but unsuccessful. Subsequently, on June 24, 2002, the Government submitted a "Notice of Interested Party," pointing out that the Potawatomi were also concerned with the outcome of the appeal; and on August 9, 2002, the CPN filed an application to intervene as either a party or an amicus. On August 19, the Board granted the Potawatomi status as an Intervenor and established a briefing schedule. The fifth and final brief was received by the Board on October 21, 2002.

### The Government's Positions

The Government's Answer to Appellant's Complaint consisted almost entirely of denials, but the Board was able to obtain the Government's substantive stance from its original position paper contained in the Appeal (Rule 4) File. In summary, that position was (a) that the Collier decision required a reallocation of funds from the Shawnee to the Potawatomi; (b) that the Tribes' assent to the funding formula constituted a tribal authorization for such a change under 25 U.S.C. §450j-1(b)(2)(C); and (c) that the parties' assumption of the existence of joint Potawatomi/Shawnee jurisdiction over the former reservation area was a sufficient "mistake" of law to warrant correction, even in the absence of AST's consent that a mistake existed.

However, as Appellant has pointed out, the position paper was inconsistent with the Government's filings in earlier litigation. In CPN v. Babbitt [later: CPN v. Norton, cited above], for example, the Government had averred that:

> In actuality, the Collier case had nothing to do with federal funding, but it rather involved the question of whether the Secretary of Interior could take additional land into trust for the Absentee Shawnee Tribe in light of 25 CFR 151.8. The Citizen Potawatomi Nation contended that 25 CFR 151.8 required the Potawatomi's consent before lands could be taken into trust for the Absentee Shawnee Tribe.
> * * * [T]he district court ultimately ruled that, for purposes of 25 CFR 151.8, approval of the Citizen Potawatomi Nation was required before additional land could be taken into trust for the Absentee Shawnee because the court determined that the Absentee Shawnee did not have a common "former reservation" with the Potawatomi. It is important to note that the Collier case only concerned the specific federal regulation at issue and not the federal funding jurisdictional areas or the service areas of the tribes. * * *
> It is evident that the Collier decision dealt only [with] 25 CFR 151.8, not any other board issues regarding federal funding of the Absentee Shawnee vis a vis the Citizen Potawatomi. Yet the Citizen Potawatomi Nation is suggesting that federal funding criteria for the Absentee Shawnee and other various entities connected with that Tribe (such as the state chartered Absentee Shawnee Housing Authority) was determined in Collier. In actuality, those issues were not addressed or even raised in Collier. * * *

7