IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZEN POTAWATOMI NATION,<br>  a federally recognized Indian Tribe,<br>1601 S. Gordon Cooper Drive<br>Shawnee, Oklahoma 74801<br>        Plaintiff,<br><br>           v.<br><br>LYNN SCARLETT, Acting Secretary of the Interior;<br>KENNETH REINFELD, Acting Director of the<br>    Office of Self-Governance,<br>    Bureau of Indian Affairs<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>STEVEN K. LINSCHEID,<br>   Chief Administrative Judge<br>   Interior Board of Indian Appeals<br>801 North Quincy Street, Suit 300<br>Arlington, Virginia  22203<br>        Defendants. | Case<br>Number:  1:06CV00830<br><br>Judge Gladys Kessler |

# EXHIBIT G
# PART 2

# TO

# PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

At the urging of a number of tribes, the Office of Self-Governance initially looked into the matter and investigated the possibility of altering tribal funding based on <u>Collier</u>. * * * [A]fter further review and extended analysis, Sinclair [head of the OSG] formally notified the Chairman of the Citizen Potawatomi Nation that no adjustments could be made to the funding of the Absentee Shawnee Tribe based on the <u>Collier</u> case. * * *

When a tribe, such as the Absentee Shawnee, has already compacted with the federal government under a self governance compact * * * there are very limited grounds which allow DOI to reduce funding (citing 25 U.S.C. §450j-1). Thus, there is no statutory basis which allows DOI to reduce funding to the Absentee Shawnee for the grounds argued by the plaintiff. * * * In reality, the Citizen Potawatomi Nation is trying to use the <u>Collier</u> case to claim a bigger piece of the federal funding "pie." * * * An injunction altering the funding formula would necessarily divest the Absentee Shawnee Tribe of federal funds which have been earmarked and designated under an existing compact between the tribe and the United States. In essence, the plaintiff, as a third party, is seeking court intervention to impair and interfere with the United States' contractual obligations to the Absentee Shawnee Tribe under a negotiated and existing self-governance compact. * * *

The overriding goals and objectives of Congress (in appropriating the money) and the Department of Interior (in properly allocating the money) would be frustrated if the remedy of a preliminary injunction could be granted whenever one Indian tribe objected to another tribe's funding levels. <u>Indeed, the specific provisions of 25 U.S.C. §450j-1(b) specifically provide that, "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe...</u>" It would be remiss to ignore this clear Congressional directive, yet this is precisely what the plaintiff suggests.

(Exhibit 7, Appellant's Reply in Support of its Summary Judgment Motion. Emphasis added.) Similarly, William Sinclair's October 9, 1998, Declaration filed in <u>Norton</u> states:

9. The DOI has not adjusted the funding in either the Citizen Potawatomi or the Absentee Shawnee AFA because the DOI would be required to reduce the Absentee Shawnee's funding amount. It is my understanding that the DOI is legally prohibited from reducing an AFA for Absentee Shawnee unless one of the five criteria in 25 U.S.C. §450j-1(b) has been met. One of these five criteria includes

tribal authorization by the Absentee Shawnee Tribe, <u>and the Absentee Shawnee has not authorized the Office of Self-Governance to reduce its AFA.</u>

10. <u>The Office of Self-Governance cannot increase the funding of the Citizen Potawatomi Nation's AFA without breaching the terms of the Absentee Shawnee Tribe's AFA.</u>

(<u>Id.</u>, Exhibit 8. Emphasis added.)

Having already taken two diametrically opposed positions in previous documents, the Government's latest brief in this Appeal posits that the Appeal is "in reality, the story of a dispute between two Indian tribes, the Absentee Shawnee Tribe of Oklahoma ("The Shawnee"), and the Citizen Potawatomi Nation ("the Potawatomi")." Department counsel alleges that:

> the record shows that [the] Director correctly and reasonably determined [that the] Shawnee could no longer claim any of the Indians living upon those fee lands as its service area population. Under the Director's carefully considered determination, the Shawnee's service area consists of the individual and tribal lands held in trust for Shawnee members and the Shawnee Tribe, and the service area population is the Indians living on those trust lands. The record clearly reflects that Shawnee funding was reduced only to the extent absolutely necessary in response to this change. * * *
>
> Ultimately, however, the Department's position in these appeals is perhaps most closely associated with that of a stakeholder. * * * The burden of proof, therefore, is on the Appellant Shawnee to show error on the part of the Director (citing cases). * * * Additionally, so long as a departure from prior practice is clearly explained and not shown by an appellant to be either arbitrary nor capricious, the full authority of an agency to correct prior erroneous interpretations of law must be upheld (citing tangentially related IBIA cases).
>
> While the reasonableness of the Director's decision as to <u>future</u> funding cycles remains to be decided, * * * the issue of a subsequent awarding of the 2000 and 2001 funds (approximately $170,000) is moot. * * * The record clearly evidences that the federal funds for those two years, earmarked for the provision of certain federal services to Indians within the subject service area, were obligated and distributed to the Potawatomi.

9

Department counsel quotes the "mistake" provision contained in the AFA's and asserts that:

> <u>Significantly, the Shawnee's specific agreement to the Mistake Clause fulfills the requirements of the 25 U.S.C. §450j-1(b)(2)(C) "tribal authorization" exception to the general prohibition on funding reduction set forth by 25 U.S.C. §§ 450j-1(b)(1) and (2).</u> The record reflects that the Director attempted to renegotiate a resolution to the issue as required by Section 3 [of the AFA]. When that attempt proved unsuccessful, the Director made a decision and notified the Shawnee of its appeal rights. [Emphasis added.]

Counsel then characterizes <u>Norton</u> as:

> an interesting, complex, and sometimes contradictory decision [that] was decided well after the close of the Administrative Record in these appeals. Therefore <u>Norton</u> was not before the Director at the time he made his decision, could not therefore have been considered in making the decision, <u>and must not be considered by the Board in deciding these appeals</u> (citing <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 401 (sic) (1971); <u>Walter O. Boswell Memorial Hosp. v. Heckler</u>, 749 F. 2d 788 (D.C. Cir. 1984); <u>Audubon Society of Portland</u>, 128 IBLA 370, 1994 LEXIS 40 (1994). (Emphasis added.)

Finally, he avers that:

> Even if <u>Norton</u> is considered in these appeals, it does not provide the relief the Shawnee allege. The most that one takes away from a careful review of <u>Norton</u> is that the Tenth Circuit's broadly stated "<u>Collier</u> opinion did not decide whether the Shawnee and the Citizen Potawatomi share a <u>common service area</u>, clearly leaving the matter open <u>for the discretionary consideration of the Department.</u>" [Second emphasis added.]

Thus, the Department's position in this matter appears to have gone from (a) asserting a statutory prohibition against changing the existing funding formula, to (b) asserting a contrary legally "obligatory" duty to correct a funding imbalance, to (c) somewhere in between a completely hands-off position ("This appeal is, in reality, the story of a dispute between the Indian tribes") and the allegation of discretionary OSG authority to modify the funding formula unilaterally if that office sees fit to do so.

10

## The Appellant's and the Intervenor's Positions

The inconsistencies in the Government's position did not go unnoticed by either the Appellant or the Intervenor. Each filed a Reply Brief challenging the Government's new position. The difference between the two briefs is that the Intervenor alleges that <u>both</u> Appellant and OSG are "in denial" because Appellant alleges that no mistake occurred in the implementation of the agreed funding allocation formula; whereas, OSG now denies having had anything to do with what the Intervenor considers to be in fact "a dispute that OSG unilaterally created." The Potawatomi brief continues:

> * * * The Potawatomi are not disputing the Shawnee's effort to obtain as much money as possible from the OSG. The OSG has a duty imposed by statute to lawfully and faithfully negotiate and administer Annual Funding Agreements with Indian tribes. 25 U.S.C. § 450f. Whether the OSG has done so here is what is at stake, not a dispute between two tribes. The OSG cannot avoid defending its actions by mischaracterizing the dispute. * * * There is no dispute "between the parties" about the 1988 funding allocation agreement. The Absentee Shawnee have disputed the OSG's right to correct a previous mistake in implementing the "formula" to which the parties agreed. * * * The OSG's position in this litigation has nothing in common with "a stakeholder." The OSG is the decision-maker whose decisions are being challenged by the Absentee Shawnee. The OSG description of its position in this litigation is like the prosecutor who charges and incarcerates a murder suspect and then argues to the jury that he is a mere stakeholder and that the case is really a dispute between the decedent and the alleged murderer.

The Potawatomi brief, however, expressly agrees with OSG that the Shawneee claim for damages is "moot" because the monies involved have been spent.

> By contrast, the Shawnee argue that:
> This is a case in which the Department was obligated, by statute and by contract, to allocate federal funds to the Absentee Shawnee Tribe without reduction from year to year. The Department has breached that obligation * * * and the Tribe has brought this appeal, under the Contract Disputes Act, for damages.
> * * * With respect to mootness, the Department's argument also misses the mark. <u>The Indian Self-Determination Act specifically provides that Tribes which are not</u>

11

<u>paid the amounts they are entitled to under their Self-Governance Compacts and Annual Funding Agreements may bring claims for damages under the Contract Disputes Act. 25 U.S.C. § 450m-1(d).</u> The fact that a fiscal year ends or that the Department spends the contested money otherwise cannot vitiate such a damages claim. If the Department was correct in this argument, all Tribal claims for damages would be moot and subject to dismissal as soon as the Department spent the funds for any other purpose or as soon as the fiscal year had ended. That would make the damages remedy in the Self-Determination Act essentially meaningless. Indeed, if the Department was correct, no federal contractor could bring a contract claim here or in the Court of Federal Claims once the government spent the money or the year ended. * * * The Department's position that it does not matter which tribe gets the money is contrary to principles of Self-Determination, as reflected in the very Act under which the Absentee Shawnee Tribe is making its claim here. 25 U.S.C. § 450a(b) ("United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities."). (Emphasis added).

As to OSG's latest argument that the change in funding is discretionary, Appellant urges that:

> "The notion that the Director may exercise his discretion to violate his legal obligations—simply by calling his exercise of discretion a correction of a mistake—must be rejected. * * * [T]he common law relied upon by the Potawatomi [that federal common law permits mutual mistakes in government contracts to be corrected] addresses reformation of rights under <u>contracts</u>–and does not provide a basis for escaping the force of express <u>statutory</u> duties like the non-reduction provision of the Indian Self-Determination Act. The Potawatomi cite no case suggesting that a statutory duty may be escaped because of a mistake."

Appellant's Reply Brief goes on to cite numerous cases to the effect that the doctrine of mutual mistake applies only to matters negotiated between the parties <u>at the time they entered into a contract.</u> "The doctrine does not apply to matters which the parties did not bargain about–<u>particularly matters the parties could not have considered at all, because they had not yet occurred</u>" (Emphasis added).

12

## Discussion

Both case law and common sense clearly support Appellant's position in this matter. For reasons totally unknown, OSG drastically changed its position on the meaning of 25 U.S.C. 450j-1(b) at some point in time between the filing of its brief in Norton, October 29, 1998, and the transmittal of its new "position paper" to the Governor of the Absentee Shawnee Tribe on April 15, 1999. The record contains no explanation or justification of that change. It is equally unclear why OSG chose not to reconsider its new position on the basis of Norton, which, as we have noted, was decided on the very day that Appellant filed its appeal, and expressly negates OSG's alleged reason for changing Appellant's funding formula---particularly after the Board granted a stay in these proceedings to permit such reconsideration. Despite the clarity of Norton on the very point at issue, which should have put the matter to rest, the Government's position has remained unchanged.

OSG's "mistake" argument simply doesn't fly. Appellant's Reply Brief points out that the principles involved "are well described in Atlas Corporation v. United States, 895 F. 2d 745 (Fed. Cir. 1990), in which the Court held that there could be no mistake about a matter that the parties did not contemplate at the time of the contract." The Potawatomi cite Westinghouse Electric Corp. v. United States, 41 Fed. Cl. 229 (1998) to the contrary, but even that case (which relies on both Atlas and Dairyland Power Cooperative v. United States, 16 F. 3d 1197 (Fed. Cir. 1994)), makes clear that "where the existence of a fact is unknowable"---in this case, the fact that the Shawnee were later adjudged not to share jurisdiction over the former reservation area with the Potawatomi, a decision that surprised virtually everyone, as discussed below---"the parties cannot make a mistake about it." Id. at 237, citing Atlas at 751.

See also Ralden Partnership v. United States, 891 F. 2d 1575, 1578, citing Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381 (the interpretation of a statute by an agency charged with its administration "should be followed unless there are compelling indications that it is wrong"). Here, all parties believed at the time the funding agreements were entered into that the two tribes had concurrent jurisdiction over the former Potawatomi reservation. It was not until the decision in Collier that they learned otherwise. Not only was the contrary possibility not within the parties' contemplation at the time of the Compact, but Norton made clear that the door was still open for the United States to offer

13

proof of joint jurisdiction. Thus, there was obviously no obligation, legal or otherwise, for OSG to modify the original AFA with the Shawnee as a result of <u>Collier</u>, contrary to OSG's assertions. Moreover, OSG's contention that the Shawnee had constructively authorized a reduction in funding by OSG pursuant to 25 U.S.C. 450j-1(b)(2)(C) by agreeing to the essentially mathematical "mistake correction" language of the AFA is totally unpersuasive and clearly contrary to its previous position. The Shawnee's consent was to the funding arrangement it originally entered into, not to a unilateral OSG modification ten years later that would deprive them of funds to which they were legally and historically entitled. It is simply not credible that the outcome of the <u>Collier</u> case can accurately be characterized as the "identification" of a "mistake" in the amount of funding allocated to the Shawnee Tribe, on the basis of a reed as slim as the actual wording of Section 3 of the AFA and without the Tribe's consent.

We find no merit in the Government's arguments, and nothing in the Intervenor's briefs sufficient to alter our conclusion. The Shawnee are entitled to the full amount of funding agreed to in the AFA's that were in effect during the entire decade before <u>Collier</u>. <u>Norton</u> itself made clear that <u>Collier</u> had nothing to do with funding arrangements, and the reasons for OSG's effort to hold otherwise remain unclear. Summary judgment for the Appellant is clearly appropriate in this matter because there are no factual issues in dispute. <u>Mingus Constructors, Inc. v. United States</u>, 812 F. 2d 1387, 1390 (Fed. Cir. 1987)

14

**Decision**

Accordingly, Appellant's motion for summary judgment is granted. Appellant is awarded $65,521 in damages for calendar year 2000 and the same amount for calendar year 2001, with interest in accordance with the Contract Disputes Act from the date each claim was filed with the OSG. Appellant's claim for attorney fees, however, is dismissed without prejudice pending expiration of the Government's 120-day appeal period in accordance with 41 U.S.C. § 607(g)(1)(B).

I concur:

*Candida Steel*

Candida S. Steel
Chief Administrative Judge

*Bernard V. Parrette*

Bernard V. Parrette
Administrative Judge

15