IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CITIZEN POTAWATOMI NATION,<br>  a federally recognized Indian Tribe,<br>1601 S. Gordon Cooper Drive<br>Shawnee, Oklahoma 74801<br>         Plaintiff,<br><br>              v.<br><br>LYNN SCARLETT, Acting Secretary of the Interior;<br>KENNETH REINFELD, Acting Director of the<br>    Office of Self-Governance,<br>    Bureau of Indian Affairs<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>STEVEN K. LINSCHEID,<br>   Chief Administrative Judge<br>   Interior Board of Indian Appeals<br>801 North Quincy Street, Suit 300<br>Arlington, Virginia  22203<br>         Defendants. | Case<br>Number:  1:06CV00830<br><br>Judge Gladys Kessler |

# EXHIBIT I

# TO

# PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

**\*4963** 05-1 BCA P 32919, IBCA No. 4522/04

IBCA No. 4522/04
2005 WL 729,941

IBCA

**APPEAL OF CITIZEN POTAWATOMI NATION OF OKLAHOMA**
Decided: March 22, 2005

Director, Office of Self-Government,
Bureau of Indian Affairs, AFA 2003
Sustained; Government's Motion to Dismiss Denied
APPEARANCE FOR APPELLANT: James D. Bachman, Esq.
Ron R. Hutchinson, Esq.
Doyle and Bachman, LLP
Arlington, Virginia 22203
APPEARANCE FOR GOVERNMENT: Charles R. Babst, Jr., Esq.
Department Counsel
Tulsa, Oklahoma 74145

OPINION BY ADMINISTRATIVE JUDGE PARRETTE

This Appeal concerns the latest contract funding dispute between the Citizen Potawatomi Nation of Oklahoma (Appellant or Nation) and the Director, Office of Self-Government (Director), arising out of a 1988 Indian Self-Determination and Education Assistance Act (ISDA) self-government Compact between the Director and the five tribes served by the Shawnee Agency (the Shawnee tribes) of the Bureau of Indian Affairs (BIA). The Compact provides a formula for allocating future Federal appropriations among the five Shawnee tribes, viz., the Citizen Potawatomi, the Absentee Shawnee (Shawnee), the Kickapoo, the Sac and Fox Nation, and the Iowa Tribe of Oklahoma.

At the time the Compact was entered into, all parties were under the impression that the Nation and the Shawnee shared joint territorial jurisdiction over the reservation, but a Federal Circuit Court decision, <u>Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier</u>, 142 F.3d 1325 (10th Cir. 1998) (hereafter Collier) later held that the Nation had exclusive use and occupancy treaty rights to the reservation.

On the basis of the <u>Collier</u> decision, which deprived the Shawnee of all territorial jurisdiction over the reservation, the Director in 1999 reduced the Shawnee's service area funding by $65,521 per year, and gave the funds to the Nation for the following two years. Meanwhile, the Shawnee appealed the reduction to the Board, which then restored the funds to the Shawnees because the five tribes had been receiving their allocated funding for over ten years (as reflected by the

Compact); there was no direct connection between Collier and the Director's subsequent decision to reduce Shawnee funds; and 25 U.S.C. 450j-1(b)(2) prohibited the Government from making unilateral reductions in their funding without the tribe's consent.

Once the funds had been restored to the Shawnees, however, the Director took an equal amount of funding--$65,521--away from the Nation for FY 2003, based on an alleged duplication of services. It was that fund reduction which prompted this appeal, since the $65,521 reduction in FY 2004 funds was never mutually agreed upon and was never included in the Nation's 2004 AFA. The Director's position is that available funds are limited; they must be designated for the same services regardless whether the Shawnees or the Nation performs them; that it would be illegal to pay twice for them; and that taking away the $65,521 from the Nation for FY 2003 was both necessary and the inevitable result of the Board's Absentee Shawnee decision.

## Background

The events that gave rise to Collier apparently arose in 1992 when the Nation heard that the Shawnee were requesting that a tract of commercial property be taken in trust by the United States, creating another gaming operation that would result in harmful competition for the Nation's own gaming operation. The Nation asked BIA whether such an application was pending and whether Appellant's consent would be required. BIA declined to confirm or deny the existence of the application, but believed that the Nation's consent would not be required since the tribes shared a common former reservation, as provided by 25 CFR 151.8.

The Nation then brought suit in Federal district court to prevent BIA from placing the property into trust. The court dismissed the case, and the Nation appealed the dismissal. On remand, the district court stayed the case and directed Appellant to exhaust its administrative remedies. In 28 IBIA 169 (September 12, 1995), the Board of Indian Appeals held that available evidence indicated that the Congress intended for the Shawnee to continue to have some rights in the reservation. But the district court reversed the IBIA decision, and the Tenth Circuit affirmed the district court, holding that the Nation had a right to the exclusive use and occupancy of the former reservation and that the Shawnee could no longer claim any fee lands there. BIA reduced its funding for the Shawnees by $65,523, and the tribe appealed to this Board, which found in its favor; and the money, which had been allocated to the Nation as a result of Collier, was returned to the Shawnees. The Nation then appealed to this Board.

***4964** Discussion

Department counsel argues that since the Nation was a party to the Shawnee's appeal, it is bound by the Board's decision under the doctrine of res judicata, which essentially holds that the same party can't litigate the same issue twice.  As the headnote in Israel Discount Bank Ltd. v. Entin, 951 F.2d 311 (11th Cir. 1992), a case cited by the Government, states:

Res judicata will bar subsequent action if: prior decision was rendered by court of competent jurisdiction; there was a final judgment on the merits; parties were identical in both suits; and prior and present causes of action are the same.

Here, by contrast, the parties were not identical in both suits; and the prior and present causes of action also are not the same. In Absentee Shawnee, the issue was the withholding of $65,521 from the Shawnees; here it is the withholding of $65,521 from the Nation, a different party with opposing interests.  Accordingly, we reject the Government's res judicata defense as inapplicable. We also reject the Government's argument that we lack jurisdiction to decide this matter because no other Shawnee tribe has joined in the appeal as an "indispensable party," since only the Nation has been deprived of its funding, in violation of 25 U.S.C. 450j-1(b).

Section 450j-1(b) is as follows:

(b) Reductions and increases in amount of funds provided

The amount of funds required by subsection (a) of this section--

(1) shall not be reduced to make funding available for contract monitoring or administration by the Secretary;

(2) shall not be reduced by the Secretary in subsequent years except pursuant to

(A) a reduction in appropriations from the previous fiscal year for the program or function to be contracted;

(B) a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;

(C) a tribal resolution:

(D) a change in the amount of pass-through funds needed under a contract; or

(E) completion of a contracted project, activity, or program;

      (3) shall not be reduced by the Secretary to pay for Federal functions * * *

      (4) shall not be reduced by the Secretary to pay the costs of Federal personnel displaced by a self-determination contract; and

      (5) may, at the request of the tribal organization, be increased by the Secretary if necessary to carry out this subchapter or as provided in section 450j(c) * * *

Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter. (Emphasis added.)

      As the 6-page, September 25, 2003, letter from the Nation's Chairman to the Director of the Office of Self-Governance asserted, "The IBCA's decision in<u>Absentee Shawnee</u> did not address and did not decide what actions, if any, the Department should or should not take with respect to funding provided to [the Nation]." The letter goes on to say:

      [The Nation's] 2003 AFA specifically states that it is incorporated into and governed by the [Nation's] Compact and that the funding amounts set forth in Attachment 2 to [the Nation's] 2003 AFA are incorporated into the AFA. * * * Attachment 2 to [the Nation's] 2003 AFA included, among other things, the $65,521 in funds a issue here.

      [The Nation's] 2003 AFA contains a specific representation from the Department that the funds provided to [the Nation] under the 2003 AFA do not limit or reduce in any way funds that any other tribe is eligible to receive.  In this regard Section 12 "No Reduction in Programs, Functions, Services, or Activities to Other Tribes" of the Nation's 2003 AFA states:

      Pursuant to Section 406(a) of Pub. L. 103-413, as amended, the Secretary has reviewed the funding transferred to [the Nation] under this agreement, and has determined that nothing in this Agreement limits or reduces in any way the funding or programs, functions, services or activities that any other Indian Tribe or tribal organization is eligible to receive under section 102 of the Indian Self-Determination and Education Assistance Act, as amended, or any other applicable law.

      On February 3, 2005, the Board asked counsel to provide proposed findings of fact and conclusions of law that they believed should govern this appeal.  The introduction to Appellant's reply is worth quoting in part as follows:

**\*4965** The undisputed material facts establish that the Department's post-award unilateral removal of the $65,521 in funds from [the Nation's] 2003 AFA constitutes a breach of contract by the Department.  The undisputed material facts establish that in executing [the Nation's] 2003 AFA, the Department specifically agreed, among other things, that (1) [the Nation] was entitled to receive the $65,521 in funds at issue here; (2) [the Nation's] service area for purposes of funding is not shared with any other tribe, including the Absentee Shawnee tribe; and (3) that nothing in [the Nation's] 2003 AFA limits or reduces in any way the funding or programs, functions, or activities that any other Indian Tribe or tribal organization is eligible to receive.  The undisputed material facts further establish that the Department contractually agreed in [the Nation's] 2003 AFA and related Compact that the Department may not amend a self-determination contract [i.e. the Nation's 2003 AFA] without [the Nation's] consent and that the Department failed to obtain that consent.  Finally, the undisputed material facts establish that the Department has no basis to invoke the authority provided in Section 116 of the 2003 Omnibus Spending Act, Pub. L. 108-7, 117 Stat. 3 (Feb. 20, 2003) since Section 116 requires the Department to first have a reasonable basis to find that funding inequities exist due to identified, unmet needs, dual enrollment, overlapping service areas or inaccurate methodologies.  Here, the undisputed material facts establish that the Department contractually agreed when it executed [the Nation's] 2003 AFA that no such basis exists.

\* \* \* The Indian Self-Determination and Education Assistance Act, 25 U.S.C. 450j-1(b)(2) expressly prohibits the Department's unilateral reduction in funding under [the Nation's] 2003 AFA, absent narrowly defined exceptions, none of which apply here.  The Department's own regulations implementing the Act at 25 CFR 1000.109 similarly prohibit the Department's unilateral reduction in funding under [the Nation's] 2003 AFA, absent narrowly defined conditions, none of which apply here.  The Department's post-award unilateral action removing the $65,521 in funds from [the Nation's] 2003 AFA funding violates these applicable laws and regulations.

It is also important not to lose sight of the fact that these are Indian affairs and Indian contracts that we are dealing with here.  Since Indian Self-Determination contracts are clearly contracts, they must be treated as contracts, as the Supreme Court periodically reminds us.  Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. \_\_ (2005).  It may also be useful to remind ourselves of the view the Supreme Court has taken in the past, and continues to take today, of similarly close issues in other Indian cases.  That view is well summarized in various textbooks dealing with Indian law, such as Felix Cohen's Handbook of Federal Indian Law (1982 ed.) at pp. 274-75, as follows:

To carry out the policies underlying treaties with Indians and protective federal statutes, the Supreme Court has followed several related rules of construction which bear importantly on the scope of preemption of state laws.  Treaties and other bilateral agreements with Indians are interpreted as the Indians would have understood them.  Treaties and federal Indian statutes are interpreted in favor of retained tribal self-government and property rights as against competing claims under state law.  Doubts or ambiguities in treaties or statutes are resolved in the Indians' favor.  Federal Indian laws are interpreted liberally toward carrying out their protective purposes.

The Supreme Court's preemption decisions indicate that respect for the independent role of the states in the federal system is an important policy consideration counseling against a finding of preemption in doubtful cases.  <u>This policy has significantly less impact when tribal self-government is concerned because the tribes are also distinct political entities within the constitutional system.</u>

A separate policy consideration in Indian law preemption is the degree of active federal administrative involvement in Indian affairs.  There has been direct and comprehensive federal regulatory activity from the beginning, at first mostly in interracial matters, later over the Indians themselves.  Federal limitations on the alienation of Indian property have been so continuous and comprehensive that application of state laws would often impact directly upon the federal government itself.

Finally, the "tradition of sovereignty" tracing to <u>Worcester v. Georgia</u> has been the law of the land for generations.  Congress has legislated on the assumption that federal laws and treaties broadly preempt state laws, particularly in Indian country, and the Supreme Court has emphasized that fact in its decisions. * * *  In many circumstances the Court has held state laws preempted based on implications from the general purposes of federal treaties and statutes, and has not required explicit language ousting state jurisdiction.

   **\*4966** * * * General federal action establishing Indian country also preempts state laws interfering with tribal laws governing the relations of Indians with others and governing non-Indian uses of tribal property and resources.  State laws may be enforced against non-Indians in Indian country only "up to the point where tribal self-government would be affected."(Emphasis added; footnotes omitted)

Although the foregoing summary focuses on tribal/state relations, it is increasingly common for federal health, safety, environmental, and similar programs to treat Indian tribes as the equivalent of states in terms of program eligibility and constraints.  And just as a state cannot be sued without its consent, and none of the five Shawnee tribes involved here can be

sued without their consent, so too it is conceivable that other cases dealing with matters similar to those in this case may arise again, as this one did after Absentee Shawnee was decided. If so, as always, their outcome will turn on the facts involved. Here, it could be argued that the Office of Self-Governance also has a fiduciary relationship to the Nation in this matter.

Appellant makes a strong case that the unilateral removal of $65,521 from the Nation's 2003 AFA funding account was in fact a breach of contract and constituted a violation of 25 U.S.C. 450j-1(b)(2). The Government's counter argument, that the reduction was legally necessary because of the unforeseen $65,521 awarded by our decision in Absentee Shawnee, is simply unpersuasive, because the two actions are legally unrelated under contract law, although we acknowledge the Director's concern that the dispute might also be considered to involve appropriations law principles as well. Thus, the real issue in this appeal is what law is controlling.

In an early decision involving Indian tribes, this Board noted that Grotius, one of the notable early legal writers and sometimes considered the father of international law, argued that the first principle of international law was "Pacta servanda sunt" ; that is, that treaties must be kept. Treaties and contracts with Indian tribes also should not be subject to unilateral Government exceptions. Here, the Government's violation of the Nation's AFA is clear and beyond dispute, as contrasted with the alleged but unclear and unproven violation of appropriations law if the $65,521 were returned to the Nation.

## Decision

Accordingly, we conclude that the Nation is entitled to have its disputed contract entitlement of $65,521 for FY 2003 restored. It is so ordered.

Bernard V. Parrette
Administrative Judge

I concur:
Candida S. Steel
Chief Administrative Judge