## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZEN POTAWATOMI NATION,    )
    )
            Plaintiff,    )
    )
          v.    )     No. 06-0830 (GK)
    )
DIRK KEMPTHORNE, et al.,    )
    )
            Defendants.    )
_____)

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Dirk Kempthorne,[1] Secretary of the Interior, Kenneth Reinfeld, Acting

Director of the Office of Self-Governance, Bureau of Indian Affairs, and Steven K. Linscheid,

Chief Administrative Judge, Interior Board of Indian Affairs, through undersigned counsel,

respectfully file this motion for summary judgment.  No genuine issue as to any material fact

exists as to the claims being made by Plaintiff, and Defendants are entitled to judgment as a

matter of law.

In support of this motion, the Court is respectfully referred to the accompanying

Statement of Material Facts as to Which There is No Genuine Issue, and Memorandum of Points

and Authorities.  A proposed Order consistent with this motion is attached hereto.

---

[1]  Although Plaintiff's complaint names Lynn Scarlett as a defendant in her official capacity as the Acting Secretary of the Interior, Dirk Kempthorne was confirmed as the Secretary of the Interior on May 26, 2006.  Accordingly, pursuant to Federal Rule of Civil Procedure 25(d)(1), he is automatically substituted as a defendant in this action.

January 3, 2007                         Respectfully submitted,


                                        _____/s/_____
                                        JEFFREY A. TAYLOR, D.C. Bar # 498610
                                        United States Attorney


                                        _____/s/_____
                                        RUDOLPH CONTRERAS, DC BAR #434122
                                        Assistant United States Attorney


                                        _____/s/_____
                                        JOHN F. HENAULT, D.C. Bar # 472590
                                        Assistant United States Attorney
                                        555 4th Street, N.W.
                                        Washington, DC 20530
                                        (202) 307-1249
                                        (202) 514-8780 (facsimile)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZEN POTAWATOMI NATION,    )
                                         )
               Plaintiff,       )
                                         )
          v.               )      No. 06-0830 (GK)
                                         )
DIRK KEMPTHORNE, et al.,     )
                                         )
             Defendants.   )
_____)

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

       Pursuant to Fed. R. Evid. 56 and Local Rule 7(h), Defendants submit the following Statement of Material Facts for which there is no genuine dispute.

       1.      The Citizen Potawatomi Nation ("CPN"), a federally recognized Indian Tribe located in the State of Oklahoma, entered into a Compact of Self-Governance and Annual Funding Agreements ("AFAs") with the U.S. Department of the Interior ("DOI" or "Department") pursuant to the Tribal Self-Governance provisions of the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. § 458aa-458hh.  A.R. at 00179; Compl. ¶ 1.

       2.      Kenneth Reinfeld is Acting Director of the Office of Self Governance ("OSG") in the Bureau of Indian Affairs ("BIA") of the DOI.  Compl. ¶ 2b.  He is the Secretary of the Interior's ("Secretary") designee to negotiate and approve compacts and AFAs between Indian tribes and the Department of Interior pursuant to the ISDA.  Compl. ¶ 2b.

       3.      The ISDA, 25 U.S.C. §§ 450, et seq., provides for self-governance by Indian tribes through compacts between the tribes and the United States.  A.R. at 00151; 00224.  Under the Act, tribes do not contract to take over specific programs but rather they assume

comprehensive responsibility for the planning and administration of programs previously

provided by the United States.  A.R. at 00151.  Once the United States enters into a compact

with a tribe, the parties ordinarily negotiate an Annual Funding Agreement ("AFAs").  A.R. at

00151.

4.      AFAs are agreements negotiated and entered into annually between a

self-governance tribe and the Department of Interior's Bureau of Indian Affairs ("BIA").  The

AFAs identify the services, functions and responsibilities to be assumed by the self-governance

tribe and the related funding to be transferred to the self-governance tribe by the DOI as part of

the tribe's participation in the Tribal Self-Governance Program.  See e.g., 2004 AFA between

CPN and DOI, A.R. at 00048-00078.

5.      In 1988, the DOI and the five tribes served by the Shawnee Agency of the Bureau

of Indian Affairs developed a funding formula to divide the funds that were available to the

Agency as a whole.  A.R. at 00206.  The five tribes are the CPN, the Absentee Shawnee Tribe of

Oklahoma ("AST"), the Kickapoo Tribe of Oklahoma, the Sac and Fox Nation, and the Iowa

Tribe of Oklahoma.  Compl. ¶ 9; A.R. at 00151.

6.      The tribal resolutions executed in 1988 by CPN and the four other

Shawnee Agency tribes agreed to distribution of funds under the following formula: 25% equally

divided, 25% in proportion to total tribal enrollment, 25% in proportion to resident tribal

population within each tribe's jurisdictional area, and 25% in proportion to the amount of trust

property in each tribe's jurisdiction.  Compl. ¶ 11; A.R. at 00063; 00151; 00206.  The DOI has

used this 1988 agreed upon funding formula since 1989 in allocating the funding for the five

tribes.  A.R. at 00206.

7.     On September 25, 1990, the AST and the United States through the Secretary of the Interior entered into a Compact of Self Governance. A.R. at 00331-00343. The term of the Compact was set to begin on January 1, 1991. A.R. at 00332.

8.     In September 16, 1998, the CPN entered into its first Compact of Self-Governance and AFA for Fiscal Year 1999 with the DOI pursuant to the Tribal Self-Governance Program provisions of the ISDA. A.R. at 00536-00550. The Compact affirmed the government-to-government relationship between a self-governance tribe and the United States and set out the general terms governing that relationship during a tribe's participation in the Tribal Self-Governance Program. A.R. at 00536-00550.

9.     In Fiscal Year 1999, the CPN began its participation in the Tribal Self-Governance Program of the ISDA and no longer entered into self-determination contracts with the DOI for the same programs and services and related funding. 25 U.S.C. §§ 450f-450n.; Compl. ¶ 13; A.R. at 00179.

10.     In 1998, CPN objected to the Department's use of 1988 data for purposes of applying the factors in the Funding Formula. CPN also objected to the Department's determination that CPN shared its jurisdictional area with the Absentee Shawnee Tribe for purposes of Factor 3 of the Funding Formula (25% in proportion to resident tribal population within each tribe's jurisdictional area). Compl. ¶ 19. Citizen Potawatomi Nation v. Director, Office of Self-Governance, 43 IBIA 160, 163 (I.B.I.A.).

11.     CPN noted its objections in its AFA for Fiscal Year 1999 and each in subsequent AFA for Fiscal Years 2000, 2001, 2002, 2003, 2004, 2005 and 2006 and attempted to reserve the right to take whatever legal action may be available against the Department to compel it to use

current and verifiably correct data in applying the specified factors of the Funding Formula and also to apply Factor 3 of the Funding Formula based on a determination that CPN does not share its jurisdictional area with the Absentee Shawnee Tribe.  Compl. ¶ 20; Citizen Potawatomi Nation v. Director, Office of Self-Governance, 43 IBIA 160, 173 (I.B.I.A.).

12.    Article II, Section 15 of the CPN's AFA for 2004 provides that "Negotiations for a successor Annual Funding Agreement shall begin no later than 120 days in advance of the conclusion of the preceding Annual Funding Agreement. . . . The Tribe is hereby assured future funding of successor Annual Funding Agreements which shall only be reduced pursuant to the provisions of Section 106(b) of Pub. L. 93-638, as amended."  A.R. at 00544-00555.

13.    On September 23, 1998, CPN filed a civil action in the United States District Court for the Western District of Oklahoma challenging the Department's determinations to (a) use 1988 data for purposes of applying the Funding Formula in Fiscal Year 1999 and future years and (b) to apply such Funding Formula based on a determination that CPN shared its jurisdictional area with the Absentee Shawnee Tribe.  A.R. 00224  The court dismissed CPN's claim pursuant to Fed. R. Civ. P. 19(a) because CPN failed to join  necessary and indispensable parties.   Citizen Potawatomi Nation v. Norton, 248 F.3d 993, 996 modified on rehearing, 257 F.3d 1158 (10th Cir. 2001).

14.    On April 25, 2001, the CPN appealed the U.S. District Court's decision in Citizen Potawatomi Nation v. Norton, 248 F.3d 993 (W.D. Okla.) to the U.S. Court of Appeals for the Tenth Circuit, which affirmed the District Court.  A.R. at 00221; 00253;  Citizen Potawatomi Nation v. Norton, 248 F.3d 993, modified on rehearing, 257 F.3d 1158 (10th Cir. 2001).

2

15.    The regulations implementing the Tribal Self-Governance Program provisions of the ISDA, which became effective on January 1, 2001, provided that a tribe may appeal pre-award disputes that arise prior to execution of an AFA or a Compact directly to the Interior Board of Indian Appeals ("IBIA"). 25 C.F.R. § 1000.432(b)(2).  Compl. ¶ 22-23.

16.    Before execution of its Fiscal Year 2004 AFA, CPN, by letter dated December 1, 2003, filed a pre-award appeal with the IBIA, pursuant to 25 C.F.R. § 1000.432(b)(2), challenging the Department's determinations to (a) continue to use outdated 1988 data for purposes of applying factors specified in the Funding Formula in Fiscal Year 2004 and (b) to continue to apply Factor 3 of the Funding Formula based on a determination that CPN shares its jurisdictional area with the Absentee Shawnee Tribe.  Citizen Potawatomi Nation v. Director, Office of Self-Governance, 43 IBIA 160, 166 (I.B.I.A.).

17.    The IBIA determined that it had jurisdiction over CPN's appeal and that it could address the merits of CPN's appeal. The IBIA docketed CPN's appeal as Docket No. IBIA 04-16-A.  Compl. ¶ 25; Citizen Potawatomi Nation v. Director, Office of Self-Governance, 43 IBIA 160, 166 (I.B.I.A.).

## CONFLICTS OVER THE CPN'S "JURISDICTIONAL AREA"

### A.    The Collier Decision

18.    The DOI has treated the CPN and the AST as sharing a joint reservation since 1872 and beyond.  A.R. at 00503.

19.    CPN has conceded in the past that the BIA treated the disputed reservation area as the shared former reservation of the two tribes throughout the twentieth century.  A.R. at 00580.

20.     The CPN sought review by the Interior Board of Indian Affairs ("IBIA") of a

September 17, 1992 letter signed by the Anadarko Area Director of the Board of Indian Affairs.

A.R. at 00563.  The case was captioned <u>Citizen Band Potawatomi Indian Tribe of Oklahoma v.</u>

<u>Anadarko Area Director, Bureau of Indian Affairs</u>, IBIA 95-45-A.  A.R. at 00563.  This letter

was written in response to the CPN's letter opposing the AST's alleged trust acquisition of lands

within the original boundaries of the CPN Reservation.  A.R. at 00564.  In his letter, the Area

Director stated "[W]e believe the Citizen Band of Potawatomi Indians and the Absentee-

Shawnee Tribe of Oklahoma share a common former reservation area for the purposes of fee

simple acquisitions, and neither is required to secure nonmember consents required by 25 Code

of Federal Regulations, 151.8."  A.R. at 00564 (internal quotations omitted).  The IBIA upheld

the Area Director's determination because it concluded that the 1891 Act[2] and its legislative

history showed that Congress intended to recognize some rights of the AST in the CPN

reservation.  A.R. at 00577.

21.     The CPN appealed to the U.S. District Court for the Western District of

Oklahoma which reversed the IBIA's decision and granted summary judgment in its favor.

<u>Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier</u>, No. CIV-92-2161-R (W.D. Okla.

May 22, 1996) (A.R. at 00562).  The District Court found that neither the language of the 1891

Act nor its legislative history abrogated the CPN's pre-existing ownership rights.  A.R. at 00558.

---

[2]  The 1891 Act confirmed a June 25, 1890 agreement with CPN and a June 26, 1890
agreement with the AST.  A.R.at  00569.  Both agreements provided for cession of all lands
within the CPN Reservation.  A.R. at 00569.  In Article IV of each agreement, the United States
agreed to make monetary payments ($160,000 to CPN and $65,000 to AST) "for making homes
and other improvements on the(ir) said allotments."  A.R. at 00569.  The Presidential
Proclamation of September 18, 1891 opened up the land ceded under the two agreements to non-
Indian settlement.  A.R. at 00569.

22.    On May 5, 1998, the AST, who had intervened in <u>Citizen Band Potawatomi</u> <u>Indian Tribe of Oklahoma v. Collier</u>, No. CIV-92-2161-R (W.D. Okla. May 22, 1996), appealed the U.S. District Court's decision to the U.S. Court of Appeals for the Tenth Circuit.  A.R. at 00553.  The Tenth Circuit upheld the District Court's grant of summary judgment to the CPN. A.R. at 00553; <u>Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier</u>, 142 F.3d 1325, 1327 (10th Cir. 1998).  The Court assessed the status of the land that comprises the former reservation vis-a-vis the AST and the CPN.  A.R. at 00553-00555; <u>Collier</u>, 142 F.3d at 1327-1329.  The Tenth Circuit concluded that the "language, legislative history, and historical circumstances of the 1891 Act do not evince a sufficiently clear Congressional intent to abrogate the Potawatomi Tribe's treaty right to exclusive use and occupancy of its former reservation. The Secretary is therefore required to under its own regulations to obtain the consent of the Potawatomi Tribe before acquiring such land in trust for the Absentee Shawnee Tribe."  A.R. at 00560; <u>Collier</u>, 142 F.3d at 1334.

**B.    Post <u>Collier</u> State of Affairs**

23.    Following the decision in <u>Citizen Band Potawatomi Indian Tribe of Oklahoma v.</u> <u>Collier</u>, 142 F.3d 1325 (10th Cir. 1998) (referred to by the DOI as "<u>Collier II</u>"), the OSG sent letters to the AST and the CPN in July 1998 asking them to "follow through with their prior commitment to negotiate an acceptable service area allocation" between them.  A.R. at 00356. Neither tribe accepted this invitation.  A.R. at 00356.

24.    OSG Director William Sinclair sent a letter, dated April 15, 1999, to the Honorable Larry Nuckolls, Governor of the AST.  A.R. at 00351.  Director Sinclair enclosed a copy of the "Absentee Shawnee Position Paper – 4/15/99."  A.R. at 00352-00365.  The Position

Paper's purpose was "to propose changes to the AFA [for the year 2000] to conform to" the Collier II decision.  A.R. at 00352.  The DOI believed that it was "obligated to bring the service area and associated funding into conformance with the Federal Appellate Court's holding in Collier II.  A.R. at 00355.  The proposed distribution to the AST was $65,521 less than in previous years.  A.R. at 00360.  The position paper also proposed changes to AST Program Operations which resulted in the vast majority of programs having "[s]ervice delivery limited to tribal members living on trust lands and alloted lands."  A.R. at 00361.

25.     The AST responded to Director Sinclair's April 15, 1999 letter in a May 6, 1999 letter to Director Sinclair.  A.R. at 00367-00375.  The AST explained its opposition to the proposed reduction and urged the DOI to reconsider its position.  A.R.  at 00367-00375.

26.     On May 13, 1999, the DOI attempted to negotiate with the AST to work out a mutually acceptable arrangement but negotiations were unsuccessful.  A.R. at 00501.

27.     In a letter, dated October 19, 1999, from William Perry, counsel for AST, to Kevin Gover, Assistant Secretary for Indian Affairs, the AST listed the important range of programs that would be cut as part of the OSG's proposed funding cuts for FY 2000.  A.R. at 00377.  These programs included (1) Services to Children, Elderly, and Families, (2) Agriculture, Real Estate Services, and Real Estate appraisals, and (3) Job Training and Placement, Economic Development, Adult Education, and Other Aid to Tribal Government. A.R. at 00377-00378.

28.     Assistant Secretary Gover responded to Mr. Perry's October 19, 1999 in a letter dated November 15, 1999.  A.R. at 0500-00502.  In that letter, Assistant Secretary Gover noted that the DOI had "offered the services of a federal mediator to the AST and CPN so that the

6

respective concerns and interests of both Tribes could be addressed in a manner that may permit resolution of the inter-tribal issues." A.R. at 00502. Assistant Secretary Gover further encouraged "the two tribes to sit down together and discuss the issues that divide them." A.R. at 00502. He concluded by stating that he agreed with the DOI's proposal "to move forward with the AST's 2000 AFA which incorporates the adjustment in the BIA Shawnee Agency funding and language which states the AST's position and reserves its right to evoke remedies which are available under 25 U.S.C. §§ 450m-1." A.R. at 00502.

29.    The DOI reduced the AST's funding for Calendar Year ("CY") 2000 by $65,521 in the AFA, executed on December 16, 1999. A.R. at 00206; 00308-00327 (2000 AFA with AST). The DOI made an identical reduction for CY 2001 in the AFA, executed on November 20, 2000. A.R. at 00206; A.R. at 00393-00410 (2001 AFA with AST). In the AFAs for each year, the AST included language specifically objecting to this reduction. A.R. at 00206; 00310 (2000 AFA); 00395 (2001 AFA).

30.    In a letter to Director Sinclair, dated July 10, 2000, AST Lieutenant Governor Kenneth Blanchard requested "data on the number of Absentee-Shawnee tribal members that received or are currently receiving services through Citizen Potawatomi Nation's (CPN) BIA programs during CY 2000." A.R. at 00473. Lieutenant Governor Blanchard stated that he "would like to be assured, by written documentation, that the Citizen Potawatomi are actually serving Absentee Shawnee tribal members with those funds." A.R. at 00473. The letter noted that the AST had begun FY 2001 AFA pre-negotiations with the Southern Plains Regional Office on June 29, 2000 and would like the information before moving forward on final

negotiations.  A.R. at 00473.  In another letter, dated August 2, 2000, the AST made a second request for this same information.  A.R. at 00470.

      31.    On August 7, 2000, OSJ faxed the AST a copy of a letter, dated July 28, 2000, in which OSG responded to AST's July 10, 2000 (AST's first request).  A.R. at 00467-00469.  In the fax cover sheet, OSG noted that it had responded to the first request on July 28, 2000 via letter and fax.  A.R. at 00467.  In the July 28, 2000 letter from Director Sinclair to the AST's Lieutenant Governor Kenneth Blanchard, he wrote "When any tribe is awarded the responsibility and funding for a set of programs under a Self-Governance agreement or a P.L. 93-638 contract, it is understood that the tribe is responsible for serving all eligible tribal members regardless of the tribal affiliation unless otherwise agreed to.  Unless we have evidence to the contrary, we assume that all Absentee-Shawnee tribal members living in Citizen Potawatomi Nation's Service Area are receiving services."  A.R. at 00468.  Director Sinclair noted that OSG has no legal authority to require the CPN or any other tribal government to provide written documentation that they are serving members from a particular tribe because Title IV of P.L. 93-638 has no reporting requirements for Self-Governance tribes.  A.R. at 00468.

      32.    On January 7, 2003, the Department and the AST entered into an AFA for CY ("Calendar Year") 2003.  A.R. at 00133-00149.  This AFA specifically noted that dispute between the Department and AST regarding the former's reduction of $65,521 in AST's CY 2000, CY2001, and CY2002 AFAs.  A.R. at 00134.  The Department made this reduction because it believed that it was required to do so under Citizen Band of Potawatomi v. Collier, 142 F.3d 1325 (10th Cir. 1998).  A.R. at 00134.  The AST noted its objections to specific reductions in Footnotes 1,3, 6, 7, 8, 9, 10, 11, and 13.  A.R. at 00135, 00146-00149.  Footnotes 9,

10, and 11 deal with the reductions in Agriculture, Real Estate Services, and Real Estate

Appraisals, respectively.  A.R. at 00147-00148.  In each of those three footnotes, the AST notes

that their lost funds were added to the CPN's AFA even though the BIA reported only 4,150.30

acres of trust and restricted acres for CPN for CY 1999 while the BIA reported 11,679.99 acres

of tribal and restricted access property for the AST for CY 1999.  A.R. at 00147-00148.

**C.**    **Absentee Shawnee Appeals**

33.    On November 21, 2000, the AST filed a  claim with the DOI for $65,521 plus

interest at the applicable rate for Calendar Year 2000.  A.R. at 00207; 00301.  On February 5,

2001, the AST  filed a claim with the DOI for $65,521 plus interest at the applicable rate for

Calendar Year 2001.  A.R. at 00207; 00277.  Both claims were brought pursuant to the

provisions fo the Contracts Disputes Act, 41 U.S.C. 601 et. seq. and pursuant to the ISDA, 25

U.S.C. 450m-1(d).  A.R. at 00277.

34.    On January 26, 2001 and March 1, 2001, James McDivitt, Deputy Assistant

Secretary of Indian Affairs, U.S. Department of Interior denied the claims for CY 2000 and CY

2001, respectively.  A.R. at 00250-00251; 00269-00270; 00292-00293.  The AST received

Deputy Assistant Secretary McDivitt's decision on March 14, 2001.  A.R. at 00250-00251.

35.    On April 25, 2001, the AST filed their appeal with the Interior Board of Contract

Appeals ("IBCA") and on that same day the Tenth Circuit issued its decision in Citizen

Potawatomi Nation v. Norton, 248 F.3d 993 (10th Cir. 2001).  A.R. at 00154;00206; 00248.  The

IBCA assigned the docket numbers of IBCA 4317-2001 and IBCA 4318-2001 to the appeals

case  Appeals of the Absentee Shawnee Tribe of Oklahoma (herein after referred to as Absentee

Shawnee Appeals) regarding the 2000 AFA and 2001 AFA respectively.  A.R. at 00231.  On

9

May 11, 2001, the DOI filed a motion to remand the issues in the case back to the Director of the OSG. A.R. at 00218. The AST opposed the remand but stated that it would agree to a stay of the appeals not exceeding sixty days in order "to enable the Director to reconsider his position." A.R. at 00216. The IBCA granted the parties a stay to enable them to determine the effect of that decision on this appeal. A.R at 00155; 00206.

36.     On September 7, 2001, the IBCA issued an Order urging Settlement Negotiations. A.R. at 00155. The parties requested a settlement judge and the IBCA granted that request on October 15, 2001. A.R. at 00155. The mediation was unsuccessful. Id.

37.     On June 24, 2002, the DOI submitted a "Notice of Interested Party" stating that the CPN was also concerned with the outcome of the appeal. A.R. at 00155. On August 9, 2002, the CPN filed an application to intervene as either a party or an amicus. A.R. at 00155. On August 19, 2002, the IBCA granted CPN's status as an Intervenor. A.R. at 00155. The CPN supported the Department's position that the AST's claim for damages was moot because the monies involved had already been spent. A.R. at 00160.

38.     On October 9, 2002, the DOI and the CPN entered into an AFA for FY 2003 in which the DOI and the CPN agreed that **based on the information presently known to the parties of the AFA,** the CPN's Service Area was the land encompassed by the boundaries of the former CPN reservation established by the Treaty of 1867, as extended by a near reservation designation, except for the lands located therein currently held by the United States in trust for the AST or an AST individual. A.R. at 00166 (emphasis added). The DOI and the CPN agreed that based on the information presently known to the parties of the AFA, the CPN did not share this service area in common with any other tribe, as determined by the courts, and the CPN

10

service area population included the American Indian population residing within the CPN

service area, excluding those persons living on lands currently held by the United States in trust

for the Absentee Shawnee Tribe (AST) or an AST individual.  Id.

39.     On November 4, 2002, Administrative Law Judge ("ALJ") Bernard V. Parette

issued his opinion in Appeals of Absentee Shawnee Tribe of Oklahoma, IBCA 4317-4318/2001.

A.R. at 00150-00164.  ALJ Parette granted summary judgment in favor of the AST and found

"there was obviously no obligation, legal or otherwise, for [the DOI] to modify the original AFA

with the Shawnee as a result of Collier." A.R. at 00163.  He determined that the AST was

"entitled to the full amount of funding agreed to in the AFAs that were in effect during the entire

decade before Collier."  Id.  The IBCA awarded AST $65,521 in damages for calendar year 2000

and 2001, with interest in accordance with the Contracts Disputes Act from the date each claim

was filed with the OSG.  A.R. at 00164.

40.     The CPN asked the IBCA to reconsider the decision in Absentee Shawnee

Appeals.  A.R. at 00046.  The DOI filed a pleading in support of this motion for reconsideration.

Id.  The CPN also requested that IBCA direct the DOI to pay $65,521 each to the AST and the

CPN.  Id.  The IBCA held that "under the facts of this Appeal, we have no authority to do so."

Id.

### D.     Post Absentee Shawnee Appeals Decision

41.     Following the IBCA's decision in the Absentee Shawnee Appeals, the

Department determined that the funding for CPN should be returned to its FY 1999 levels.  A.R.

at 00049.  This meant that the funding level in the FY 2004 AFA was $65,521 less than it was in

FY 2002 and the initial part of FY 2003.  Id.  28.

42.     In a letter to CPN Chairman Barrett, dated July 9, 2003, William Sinclair, Director of the Office of Self-Governance ("OSG"), informed Chairman John A. Barrett that the decision in the <u>Absentee Shawnee Appeals</u> required the DOI to reduce funding to CPN by $65,521.  A.R. at 00130.  The DOI had taken these funds from the AST in 1999 and given them to CPN after determining that the AST did not have territorial jurisdiction over the former reservation.  A.R. at 00130.  The DOI was now required to return the funds to the AST for 2000, 2001, and future years.  <u>Id.</u>  The letter listed the amount from each program (Social Services, Adult Education, Agriculture, etc.) that was being transferred from the CPN to the AST.  <u>Id.</u> These amounts were identical to the ones transferred from the AST to the CPN in the beginning of 2000.  <u>Id.</u>  Director Sinclair determined that it was not possible to allow the CPN to keep the funding in FY 2003 since this would result in OSG providing duplicate funding for the same services.  A.R. at 00131.  No other funding was available to transfer to the AST.  <u>Id.</u> The Department enclosed a written agreement modifying CPN's FY 2003 AFA and requested that the CPN please sign this agreement.  <u>Id.</u>

43.     In a Memorandum, dated September 3, 2003, William A. Sinclair, Director of the Office of Self-Governance, authorized Arlene Brown, Financial Manager for Office of Self Governance, to "withdraw $65,521 from the balances owed to the Citizen Potawatomi Nation, including contract support, and award the same amount to the Absentee Shawnee Tribe in 2003." A.R. at 00129.  Director Sinclair noted that this action was being taken pursuant to <u>Absentee Shawnee Appeals</u>.  A.R. at 00129.

44.     On September 8, 2003, William A. Sinclair, Director of the Office of Self-Governance, wrote a letter to the Honorable John A. Barrett, Jr., Chairman of the CPN informing

him that the Department would reduce the amount of the CPN's Trust Account by $65, 521.

A.R. at 00128. Director Sinclair stated that his July 9, 2003 letter to the CPN had requested that

they return two signed amendments to the Nation's FY2003 Annual Funding Agreement by July

21, 2003. Id. The Department had not received the requested amendments so it had to take this

action. Id. This letter reiterated that the decision in Absentee Shawnee Appeals required that

funds be transferred from the CPN to the AST. Id.

    45.    On September 25, 2003, the CPN responded by letter to Director Sinclair

claiming the "right of immediate payment" of $65,521 pursuant to the following:  (1) FY 2003

AFA, (2) its 1998 Compact of Self Governance, and (3) Section 106(a) of the Indian Self-

Determination and Education Assistance Act ("ISDA"), 25 U.S.C. § 450j-1. A.R. at 00122.

    46.    On October 4, 2003, the Department and the AST entered into an Annual Funding

Agreement for FY 2004. A.R. at 00113. Several areas of the Reprogramming Request showed

that 2001 funds were restored pursuant to Absentee Shawnee Appeals, IBCA 4317/4318 (Nov. 4,

2002). A.R. at 00117.

    47.    The CPN and the United States of America entered into an Annual Funding

Agreement for Fiscal Year 2004 ("2004 AFA"). See A.R. at 00048-00078. The AFA is

incorporated into and governed by the Compact of Self-Governance entered into between the

Citizen Potawatomi Nation and the Secretary of the Department of the Interior on October 1,

1998. A.R. at 00048. The funding amounts set forth specific line items in "FY 2004

Reprogramming Request" and incorporated them into this Agreement. A.R. at 00048.

48.     The CPN's FY 2004 AFA explicitly noted the disagreement between the CPN and the United States regarding the Department's return to FY 1999 funding levels.  A.R. at 00048.

49.     The Secretary of the Interior understood that CPN's funding levels had been returned to 1999 levels and, pursuant to the Absentee Shawnee Appeals decision, determined that the FY 2004 AFA with the CPN did not limit or reduce the funding, programs, functions, or services that any other Indian tribe or tribal organization was eligible to receive under section 102 of the Indian Self Determination and Education Assistance Act.  A.R. 00050.

50.     As required by 25 C.F.R. § 1000.422(a)-(b), the parties had attempted to resolve their disagreement over the funding levels through negotiation and government to government discourse, however they were unable to resolve the dispute before the execution of FY 2004 AFA.  A.R. at 00049.

51.     Although the CPN was authorized to accept the funding for tribal shares in the AFA, it considered the amount of funding in that agreement to be a compromised amount.  A.R. at 00050.  Neither the CPN nor the DOI accepted the method of allocation proposed by the other.  Id.

52.     On December 1, 2003, the CPN appealed this pre-award dispute to the Interior Board of Indian Appeals ("IBIA") pursuant to 25 C.F.R. § 1000.432(b)(2).  A.R. at 00049; Citizen Potawatomi Nation v. Director, Office of Self-Governance, 42 IBIA 160, 166 (IBIA 2006).

53.     In Citizen Potawatomi Nation v. Director, Office of Self-Governance, the IBIA

14

"affirm[ed] the Director's pre-award decisions not to include the disputed $65,521 in the Citizen

Potawatomi's 2004 AFA and not to alter the application of the 1988 formula based on current

data regarding tribal enrollment, tribal population, and acreage of land in trust."   42 IBIA at 173,

2006 WL 581170 at *11.

     54.     The CPN appealed the IBIA's decision to this Court and filed the instant case.

(Pacer Dkt. No. 1, 06-00830 (GK)); Compl at ¶¶ 39-66 (Counts I-III).

January 3, 2007                                 Respectfully submitted,


      /s/
_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


      /s/
_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


      /s/
_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-1249
(202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CITIZEN POTAWATOMI NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-0830 (GK) |
| | ) | |
| DIRK KEMPTHORNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On December 1, 2003, the Citizen Potawatomi Nation (hereinafter "CPN," "Citizen

Potawatomi" or "Potawatomi") filed an appeal with the Interior Board of Indian Appeals

("IBIA"), pursuant to 25 C.F.R. § 1000.432(b)(2), seeking review of a pre-award dispute with

the OSG Director regarding its 2004 Annual Funding Agreement ("AFA") with the Department

of the Interior (hereinafter "Department" or "DOI").  Citizen Potawatomi Nation v. Director,

Office of Self-Governance, 42 IBIA 160, 166 2006 WL 581170 at *6  (I.B.I.A. January 25,

2006) (hereinafter "Citizen Potawatomi Nation.").  The CPN disputed the Director's static

application of a funding formula agreed to in 1988 by the five Shawnee Agency tribes of the

Bureau of Indian Affairs ("BIA") and the Director's determination not to include $65,521 in the

2004 AFA that CPN claimed is owed to them.  Id.

By decision dated January 25, 2006, the IBIA rejected the CPN's appeal and affirmed

the Director of the Office of Self-Governance's ("OSG") decisions to continue the static

application of the 1988 funding formula agreed to by the five Shawnee Agency tribes and not to

include $65,521 in the 2004 AFA with the CPN.  Citizen Potawatomi Nation, 42 IBIA 160, 173 ,

2006 WL 581170 at *11 (I.B.I.A.).  The CPN appeals that decision to this Court and seeks the

following relief: (1) a declaration that the January 25, 2006 decision of the IBIA is erroneous or, in the alternative arbitrary and capricious, (2) an injunction against the Department of the Interior ("DOI" or "Department") to prevent implementation of this decision as a final agency action; and (3) a remand to the IBIA to further develop the record on several points including *inter alia* static application of the 1988 funding formula and the apportionment of funding under Factor 3 of the Funding Formula based on the number of tribe members that the CPN and the Absentee Shawnee Tribe (hereinafter "AST" or "Shawnee" or "Absentee Shawnee") had in 1988 in the CPN's former reservation boundaries.  Compl. at Prayer for Relief  ¶¶ A-C.

## SUMMARY OF ARGUMENT

This is a pre-award dispute under 25 C.F.R. § 1000.104(b). A.R. at  00049.  The U.S. District Court for the Western District of Oklahoma and the Interior Board of Contract Appeals previously ordered the Department to return the CPN's funding to FY 1999 levels.  A.R. at 00053.  The 1988 agreement between the Department and the Shawnee Agency tribes addressed the issues of the CPN's service area and service area population.  A.R. at 00058.  Those issues have not been addressed since that agreement.  A.R. at 00058.  The decisions of the U.S. District Court for the Western District of Oklahoma and the Interior Board of Contract Appeals require that the 1988 agreement ***not*** be altered without renewed negotiations between the DOI, the CPN, and all of the other Shawnee Agency tribes.  A.R. at 00058.  The Tenth Circuit's decision in Norton and the IBCA's decision in the Shawnee Appeals have indicated that the Collier case was only about 25 CFR § 151.8 and trust acquisitions.  A.R. at 00088.  Norton requires that this case be dismissed under Fed. R. Civ. P. 19(a) because the CPN has failed to join indispensable parties: the four other tribes of the Shawnee Agency.

2

Review of the IBIA's decision in this case proceeds under the arbitrary and capricious standard of the Administrative Procedure Act.  Under that standard, substantial evidence supports the IBIA's conclusion that DOI properly applied the Funding Formula in the 1988 agreement among the tribes and, thus, the IBIA's decision is not arbitrary or capricious.

## ARGUMENT

**I.    APA AND SUMMARY JUDGMENT STANDARD**

The CPN brought this action pursuant to both the ISDA, 25 U.S.C. § 450m-1(a) and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702-706.  The ISDA provides **no** standard of review.  Cherokee Nation of Oklahoma v. U.S., 190 F.Supp.2d 1254 (E.D. Okla. 2001), aff'd, 311 F.3d 1054 (10th Cir. Okla. 2002), rev'd on other grounds, 543 U.S. 631, 125 S.Ct. 1172 (2005); Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala, 988 F.Supp. 1306, 1313 (D.Or. 1997).  When a statute provides for judicial review but fails to set-forth the standards for that review, it is well accepted that the court looks to the APA for guidance. United States v. Carlo Bianchi & Company, 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).  See also Sierra Club v. Glickman, 67 F.3d 90, 96 (5th Cir.1995).

Since the ISDA does not set forth the standard of review, the APA's arbitrary and capricious standard (hereinafter the "APA") is the appropriate standard.  See  Al-Fayed v. C.I.A., 254 F.3d 300, 304 (D.C. Cir. 2001) (quoting Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 n. 12 (D.C.Cir.1995) and citing Workplace Health & Safety Council v. Reich, 56 F.3d 1465, 1467 (D.C.Cir.1995) ("The APA, however, 'provides a default standard of judicial review . . . where a statute does not otherwise provide a standard.'")).  In fact, at least two Courts in this jurisdiction have applied the APA's arbitrary and capricious standard to challenges of IBIA decisions.  See Ransom v. Babbitt, 69 F. Supp. 2d 141, 149 (D.D.C. 1999) (reviewing under the APA a decision issued by the IBIA and applying the arbitrary and capricious standard) ; Feezor v. Babbitt, 953 F. Supp. 1 (D.D.C. 1996) (same).  Although the district court in Cherokee Nation of Oklahoma, rejected this standard of review for an ISDA case, it noted that several courts had adopted the

arbitrary and capricious standard of review for cases brought under ISDA. 190 F.Supp.2d at

1255 (citing <u>Suquamish Tribe v. Ada Deer</u>, C-96-5468 (RJB) (W.D. Wash., September 2, 1997),

<u>California Rural Indian Health Board, Inc., v. Donna Shalala</u>, C-96-3526 (DLJ) (N.D. Cal. April

24, 1997) and <u>Yukon-Kuskokwim Health Corporation v. Shalala</u>, A-96-155 (JWS) (D. Alaska

April 15, 1997)).  According to the U.S. District Court for the Eastern District of Oklahoma,

these cases considered the appropriate standard of review under the ISDA to be ambiguous and

held that the APA standard of review controls.  <u>Cherokee Nation of Oklahoma</u>, 190 F. Supp. 2d

at 1255-56 n. 3.

The APA standard of review requires a court to determine if the decision was "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §

706(2)(A).  It also limits review to the administrative record. 5 U.S.C. § 706.  Under the APA,

"[a]rbitrary and capricious review requires the court to 'consider whether the decision was based

on a consideration of the relevant factors and whether there has been a clear error in judgment.'"

<u>McDonnell Douglas Corp. v. Dep't of the Air Force</u>, 215 F. Supp. 2d 200, 204 (D.D.C. 2002)

(internal citation omitted). This review is highly deferential and presumes the validity of agency

action.  <u>See</u> <u>Kisser v. Cisneros</u>, 14 F.3d 615, 618 (D.C. Cir. 1994);  <u>American Horse Protection

Ass'n, Inc. v. Yeutter</u>, 917 F.2d 594, 596 (D.C. Cir. 1990).  The Court must determine whether

the agency has articulated a "rational connection between the facts found and the choice made."

<u>Bowman Transportation v. Arkansas-Best Freight Sys.</u>, 419 U.S. 281, 285 (1974) (quoting

<u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962)).

The Court may reverse only if the agency's decision is not supported by substantial

evidence, or the agency has made a clear error in judgment.  <u>Citizens to Preserve Overton Park v.</u>

Volpe, 401 U.S. 402, 415-416 (1971); see also Motor Vehicle Mfgs. Ass'n v. State Farm Automobile Ins. Co., 463 U.S. 29, 43 (1983) (a court is not to substitute its judgment for that of the agency).  "[T]he key to the arbitrary and capricious standard is its requirement of reasoned decisionmaking: [the Court] will uphold the [agency's] decision if, but only if, [it] can discern a reasoned path from the facts and considerations before the [agency] to the decision it reached." Neighborhood TV Co. v. FCC, 742 F.2d 629, 639 (D.C. Cir.1984).

    "'When a final agency action is challenged under the APA in district court, if the relevant substantive statute does not provide for direct review in the court of appeals, the district court does not perform its normal role' but instead 'sits as an appellate tribunal.'"  PPG Indus., Inc. v. United States, 52 F.3d 363, 365 (D.C. Cir. 1995) (quoting Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1225 (D.C. Cir. 1993)); accord James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) ("Generally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions."), cert. denied, 519 U.S. 1077 (1997).  Thus, in this case, the District Court applies the arbitrary and capricious standard to the facts to determine whether or not the challenged decision is supported by the administrative record.

## II.    THE IBIA'S DECISION TO DENY THE PLAINTIFF RELIEF WAS WELL-SUPPORTED BY THE ADMINISTRATIVE RECORD

### A.    The Administrative Record Provides Ample Support for the IBIA's Interpretation of the Funding Formula Agreement Regarding the Use of the 1988 Statistics

    IBIA correctly affirmed the Director's pre-award decisions not to alter the application of the 1988 formula based on current data regarding tribal enrollment, tribal population, and acreage of land in trust. The IBIA stated that the 1988 formula constituted an agreement among

6

the tribes so it applied rules of contract interpretation to the formula. <u>Citizen Potawatomi Nation v. Director, Office of Self-Governance</u>, 42 IBIA 160, 172 , 2006 WL 581170 at *10 (I.B.I.A.). The IBIA found the agreement to be ambiguous on that issue because it failed to state the following:  (1) whether the formula will be recalculated; (2) when or how often the formula will be recalculated; and (3)  how frequently a census would be required to be performed to determine tribal population for each AFA.  <u>Id.</u> at 172.  Furthermore, the IBIA concluded that it would ***not*** have been "unreasonable for the parties to intend that existing data be applied to the formula to establish a fixed allocation for future years."  <u>Id.</u>

After identifying this ambiguity, the IBIA resolved it through principles of contract interpretation.  <u>Id.</u> at 172-73.  The IBIA began its analysis with a statement of the applicable rule: "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."  <u>Id.</u> at 173 (quoting Restatement (Second) of Contracts § 202(4)).  The IBIA then noted the material facts in the record for this analysis.  <u>Id.</u> at 174.  The record showed that the DOI had implemented the 1988 agreement based on a static application of the formula since its inception.  <u>Id.</u> at 174.  The IBIA found that CPN knew of the static application (performance) but failed to object until 1998.  <u>Id.</u> at 174.  None of the other parties to the 1988 agreement expressed support for recalculation even though the CPN's calculations showed that one other tribe, the Iowa Tribe, would see its allocation increase under a non-static application of the 1988 formula from 7.56 percent to 10.71 percent.  <u>Id.</u> at 174 n. 11.

Given the agreement's ambiguity and the parties' repeated past performance, the IBIA concluded that the Director did not err in determining that the parties to the 1988 agreement intended for the formula to apply in a static manner unless and until the parties agreed otherwise and did not abuse his discretion in applying the formula in that way.  Id. at 174.

The applicable law and the administrative record clearly show that the IBIA's decision was neither erroneous nor arbitrary and capricious.  The Secretary shall not revise or amend a self-determination contract with a tribal organization without the tribal organization's consent. 25 U.S.C.A. § 450m-1 (b).  A self-determination contract is a contract between a tribal organization and the appropriate Secretary for the planning, conduct, and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law.  25 U.S.C.A. § 450b(l).  See also Demontiney v. U.S. 54 Fed.Cl. 780, 786 (Fed.Cl. 2002) (self-determination contracts can only be formed between a Tribe and the United States government).  The 1988 agreement between the DOI and the Shawnee Agency tribes is a self-determination contract because each of the five Shawnee Agency tribes passed tribal resolutions which incorporated that agreement.  Plaintiff's Motion for Default Judgment (hereinafter "Plff. MDJ" at Exhibit C, Attachments 1-5 ; See also A.R. at 00146-00149 (funding calculations based on 1988 formula in AFA with the AST); A.R. at 00063 (AFA with the CPN). Furthermore, the 1988 agreement divides funds for the administration of programs otherwise provided to Indian tribes and their members pursuant to Federal law.  Because the 1988 agreement is a self-determination contract, the Secretary cannot revise or amend it without the consent of the five Shawnee Agency tribes.

As the IBIA correctly observed, the language of the 1988 agreement did not specifically state that its factors should be recalculated annually.  See  Citizen Potawatomi Nation , 42 IBIA at 172.  Indeed, the IBIA provided several cogent reasons to support its conclusion that  the agreement was ambiguous on this issue.  Id.  While observing that the CPN's argument for recalculation had "some force," it also found several specific reasons supporting a static application.  Id. at 172.

The IBIA examined the parties' practice of consistently applying static 1988 figures.  Id. at 173.  It noted that the static application had continued for over a decade and that no tribe objected until the CPN objected in 1988.  Id.  None of the other Shawnee Agency tribes supported the CPN's proposed interpretation.   Id.  Indeed the administrative record amply supports this conclusion.  The AST has both explicitly and implicitly favored the static application of the 1988 funding formula.  The AST explicitly endorsed the use of 1988 statistics when it stated, "[T]he parties agreed to a fixed formula, as to which there was, and is, no mistake.  The parties intended to provide a measure for allocating funds among the five tribes based on circumstances at an agreed upon time – 1988.  The parties did not contemplate, and did not provide for, revisiting the populations or other factors each year or two and readjusting the allocation.  The parties intended to provide a stable basis for their ongoing funding, not a makeshift arrangement that would require constant attention, revision, and controversy each year."  A.R. at 00372-00373.  The AST also implicitly endorsed the DOI's use of 1988 statistics regarding Factor 3 ("resident tribal enrollment within each tribe's jurisdictional area").  See A.R. at 00371 (In opposition to the DOI's reduction in funds to it, the AST rejected using "an ***estimate*** of the number of AST members who lived on Absentee Shawnee trust land in 1988 and instead

stated that the Funding Formula required that Factor 3 be determined based on the ***actual***

***number*** who ***lived*** in the area historically served by the AST") (emphasis added).

In fact, Tribal resolutions state that tribe "contract[s] for all Bureau of Indian Affairs

provided operation and services for FY 89 and future years." Plff. MDJ, Exhibit C, Attachments

1- 5. This language is not indicative of any intent that the figures used in the formula change

from year to year. It merely states that the formula will be employed for a time period extending

beginning in FY 1989 and continuing in future years. The language does nothing to rectify the

ambiguity identified by the IBIA.

Both 25 U.S.C.A. § 458ee and 25 C.F.R. § 1000.381 provide that the DOI shall submit

an annual report to Congress concerning self-governance. The relative costs and benefits of

Self-Governance and the funds transferred to each Self-Governance tribe are among the items

that must be included in the report. 25 U.S.C.A. § 458ee (b). The report will be based on, *inter*

*alia*, audit reports routinely submitted by Tribes/Consortia and an annual report submitted to the

Secretary by each Tribe/Consortium. 25 C.F.R. § 1000.381 (a) & (f). The purpose of the report

is "to provide the Department with information necessary to meet its Congressional reporting

responsibilities and to fulfill its responsibility as an advocate for self-governance." 25 C.F.R. §

1000.382 (b). Plaintiff argues that these statutes and regulations as well as the DOI's data

request forms to the tribes (Exhibits E and F of the Plaintiff's Motion for Default Judgment)

require that current data should be used in calculating funding under the formula. See Plff. MDJ

at 13-14, 18-19. The statutes and regulations require no such result. They ***only*** concern data

collected for statutory reporting requirements. Although 25 U.S.C.A. § 458ee(d) mentions

"develop[ing] a funding formula to determine the individual tribal share of funds controlled by

the Central Office of the Bureau of Indian Affairs for inclusion in the Self-Governance

compacts," it makes **no** connection between those formulas and tribal statistics such as tribal

enrollment, tribal resident population, and trust acreage.

25 C.F.R. § 1000.98(a)(1) provides that "Distribution formulas must be reasonably

related to the function or service performed by an office, and must be consistently applied to all

Tribes within each regional and agency office."  The use of a static formula is not unreasonable

because as the IBIA noted, it would **not** have been "unreasonable for the parties to intend that

existing data be applied to the formula to establish a fixed allocation for future years."  Citizen

Potawatomi Nation, 42 IBIA at 172.  Such a formula would not necessitate constant revision but

at the same time could be renegotiated if the tribes found the formula to be inadequate.  The

DOI's decision to, as much as possible, defer to the tribes' judgment regarding their needs is a

key part of self-determination and self-governance.

The IBIA's conclusions should be readily affirmed under the arbitrary and capricious

standard of review because the decision making process more than adequately followed the rules

of contract interpretation and its resulting conclusion was more than reasonable in light of the

strict prohibition against unilateral revision of self-determination contracts  by the DOI under 25

U.S.C.A. § 450m-1 (b).[1]

## III.    COLLATERAL ESTOPPEL PRECLUDES CPN FROM LITIGATING THE LOSS OF $65,521 IN FUNDS FOR FY 2004

The IBIA held that the CPN is collaterally estopped by the 2002 IBCA decision in

Appeals of the Absentee Shawnee Tribe of Oklahoma, IBCA 4317/4318 (Nov. 4, 2002) from

---

[1]  Similarly, even if this Court were to apply a *de novo* standard, judgment in defendant's
favor is still appropriate.

relitigating the question of the effect of the Collier decision on the 1988 formula.  Citizen

Potawatomi Nation v. Director, Office of Self-Governance, 42 IBIA 160, 167 , 2006 WL 581170

at *7 (I.B.I.A.).  Thus, collateral estoppel precludes the CPN from arguing that it is entitled to

$65, 541 in funds for Fiscal Year 2004 and thereafter.  The CPN  intervened in Appeals of the

Absentee Shawnee Tribe of Oklahoma, IBCA 4317/4318 (Nov. 4, 2002) ("Shawnee appeals")

A.R. at 00046.  The CPN supported the Department's position that funding for the AST should

be reduced in their 2000 and 2001 AFAs.  Id.  The IBCA, however, ruled in favor of the AST

and found "there was obviously no obligation, legal or otherwise, for [the Department] to modify

the original AFA with the Shawnee as a result of Collier."  Id.

        "When an issue of fact or law is actually litigated and determined by a valid and final

judgment, and the determination is essential to the judgment, the determination is conclusive in a

subsequent action between the parties, whether on the same or a different claim." See

Restatement (Second) of Judgments § 27 (1981); see also Consolidated Edison of N.Y., Inc. v.

Bodman, ___ F.3d ___ , 2006 WL 1563568, Slip Op. at 3 (D.C. Cir. June 9, 2006); Otherson v.

Department of Justice, INS, 711 F.2d 267, 273 (D.C. Cir.1983); 18 Charles Alan Wright, Arthur

R. Miller, Edward H. Cooper, Federal Practice and Procedure §§ 4416-ff (1981), as cited in Fogg

v. Ashcroft, 254 F.3d 103, 111 (D.C. Cir. 2001).  "The doctrine of collateral estoppel, or as it is

now commonly called 'issue preclusion,' provides that 'once an issue is actually and necessarily

determined by a court of competent jurisdiction, that determination is conclusive in subsequent

suits based on a different cause of action involving a party to the prior litigation.'"  Thomas v.

Powell, 247 F.3d 260, 262-263 (D.C. Cir.), quoting  Montana v. United States, 440 U.S. 147,

153 (1979), cert. denied, 534 U.S. 951 (2001) (internal citations omitted); see also McLaughlin

12

v. Bradlee, 803 F.2d 1197, 1201-02 & n. 1 (D.C. Cir.1986). "Whereas claim preclusion forecloses all that which might have been litigated previously, issue preclusion treats as final only those questions actually and necessarily decided in the prior suit." I.A.M. Natl. Pension Fund v. Industrial Gear Manufacturing Co., 723 F.2d 944, 949 (D.C. Cir. 1983).[2] Jack Faucett Assocs. v. Am. Tel. & Tel. Co., 744 F.2d 118 (D.C. Cir.1984); Freeman United Coal Mining Co. v. Office of Workers' Comp. Program, 20 F.3d 289 (7th Cir.1994).

Application of the doctrine of collateral estoppel "represents a decision that the needs of judicial finality and efficiency outweigh the possible gains of fairness or accuracy from continued litigation of an issue that previously has been considered by a competent tribunal." Nasem v. Brown, 595 F.2d 801, 806 (D.C. Cir. 1979). Application of the doctrine thereby serves to relieve parties of the burdens attending multiple lawsuits; conserves judicial resources; minimizes the risk of forum-shopping, piecemeal litigation, and inconsistent decisions; and provides finality in the resolution of disputes. United States v. Mendoza, 464 U.S. 154, 158 (1984); Cutler v. Hayes, 549 F. Supp. at 1343; see Hardison v. Alexander, 655 F.2d 1281, 1288 (D.C. Cir. 1981).

The IBIA went through each of the elements of collateral estoppel and concluded that this doctrine served as a bar to the relitigation of factor 3. Citizen Potawatomi Nation, 42 IBIA 167-68. First, it stated that the CPN was raising the same issue that was involved in the

---

[2] "'The law of collateral estoppel,' of which issue preclusion is a part, see Jack Faucett Assocs. v. Am. Tel. & Tel. Co., 744 F.2d 118, 124 (D.C. Cir.1984), 'is intended to protect the parties from the burden of relitigating the same issue following a final judgment and to promote judicial economy by preventing needless litigation.' " Consolidated Edison of N.Y., Inc. v. Bodman, ___ F.3d ___, 2006 WL 1563568, Slip Op. at 3 (D.C. Cir. June 9, 2006), citing Freeman United Coal Mining Co. v. Office of Workers' Comp. Program, 20 F.3d 289, 294 (7th Cir. 1994).

Absentee Shawnee Appeals – "whether Collier requires the Department to recalculate factor 3 of the 1988 formula." Id. at 168. The IBIA's analysis was certainly correct. At the beginning of his opinion, Administrative Law Judge ("ALJ") Parrette stated that the OSG had reduced the AST's funding based on Collier's holding that the AST no longer had any territorial jurisdiction over the former reservation and that the AST was appealing this decision. A.R. at 00150. Near the end of his opinion, ALJ Parrette restates the issue: "The Shawnee are entitled to the full amount of funding agreed to in the AFA's [sic] that were in effect during the entire decade before Collier. Norton itself made clear that Collier had nothing to do with funding arrangements, and the reasons for OSG's effort to hold otherwise remain unclear." A.R. at 00163. The effect of Collier on factor 3 of the 1988 funding formula was the issue before the IBCA in Citizen Potawatomi Nation, 42 IBIA 160. The CPN's argument in favor of altering factor 3 based on Collier is thus, the same issue. Thus, the IBIA properly determined that the first element of collateral estoppel was established.

The IBIA also correctly decided that the second element of collateral estoppel (issue was actually litigated in prior proceeding) was met. Citizen Potawatomi Nation, 42 IBIA at 168. It noted that the parties briefed the issue and the IBCA expressly decided that the Collier decision did not require the Director to alter funding allocations that were based on the 1988 formula and incorporated into the original AFAs. Id. The IBIA found that the IBCA in Absentee Shawnee Appeals reached the issue of whether Collier required the Department to alter its interpretation of the funding formula that was embodied in its compact and AFA with the Absentee Shawnee. Id. at 168.

14

The record provides ample support for IBIA's determination regarding the second element of collateral estoppel because the impact of Collier on funding arrangements figured predominantly into several arguments advanced by different parties.  ALJ Parrette's decision in Absentee Shawnee Appeals clearly explained the  arguments advanced by the Department, the AST, and the CPN (intervenor).  A.R. at 00156-00161.  He divided up the arguments into sections entitled "The Government's Positions" (A.R. at 00156-00160) and "The Appellant and Intervenor's Positions" (A.R. at 00160-00161).  ALJ Parrette summarized the Government's positions  into three arguments.  A.R. at 00156.  Two of these arguments were: "[1] that the Collier decision required a reallocation of funds from the Shawnee to the Potawatomi . . . and [2] that the parties' assumption of the existence of joint Potawatomi/Shawnee jurisdiction over the former reservation area was a sufficient 'mistake' of law to warrant correction . . . ."  A.R. at 00156.  According to ALJ Parrette, the AST's Reply Brief disputed the Department's contention that the determination in Collier concerning territorial jurisdiction allowed it to claim mutual mistake under contract  law  and therefore permitted a  reduction in funds.  A.R. at 00161.  The arguments regarding the ramifications of Collier on funding allocations were  prevalent throughout the opinion in Absentee Shawnee Appeals.  This prevalence clearly supports the IBIA's conclusion that the issue of whether Collier required the Department to alter its interpretation of the funding formula was actually litigated in Absentee Shawnee Appeals and that the second element of collateral estoppel was established.

In further support of its assertion that the issue of Collier's impact on funding was actually litigated in Absentee Shawnee Appeals, the IBIA noted that the IBCA recently reiterated its rationale for Absentee Shawnee Appeals when it considered the CPN's appeal for the

15

reduction of funding in its 2003 AFA in <u>Appeal of Citizen Potawatomi Nation of Oklahoma</u>, IBCA No. 4522/04, 2005 WL 729,941 (Mar. 22, 2005).  <u>Citizen Potawatomi Nation</u>, 42 IBIA at 169.  When considering that appeal by the CPN, the IBCA explained that it restored the funding that the Department had withdrawn from the AST for three reasons: (1) the five tribes had been receiving their allocated funding for over ten years (as reflected by the Compact); (2) there was no direct connection between <u>Collier</u> and the Director's subsequent decision to reduce Shawnee funds; and (3) 25 U.S.C. 450j-1 (b)(2) prohibited the Government from making unilateral reductions in their funding without the tribe's consent.  <u>Id.</u> at 169 (citing <u>Appeal of Citizen Potawatomi Nation of Oklahoma</u>); Exhibit I, Plff. MDJ at 2-3.

The IBIA found that the third criterion for collateral estoppel was met because the issue was determined as part of a valid and final judgment issued by the IBCA.  <u>Id.</u> at 169.  ALJ Parrette discussed extensively the issue of the effect of <u>Collier</u> on the OSG's funding levels for the AST  throughout his decision and  ultimately determined that it had no effect on funding levels.  A.R. at 00163. ("<u>Norton</u> itself made clear that <u>Collier</u> had nothing to do with funding arrangements.").   Clearly, ALJ Parrette determined this issue of the impact of <u>Collier</u> as part of its valid, final judgment in <u>Absentee Shawnee Appeals</u>.  Neither party contests the validity or the finality of <u>Absentee Shawnee Appeals</u>.

The IBIA noted that the fourth element for collateral estoppel -- that the determination of the issue was essential to the judgment – was a "closer question."  <u>Citizen Potawatomi Nation</u>, 42 IBIA at 169.  The IBCA held that the Director erred in making unilateral reductions in the Absentee Shawnee's AFAs in response to the <u>Collier</u> decision.  <u>Id.</u>  However, the IBCA's decision in favor of the AST rested on two alternative rulings: (1) that the Collier decision did

not require a change in the Absentee Shawnee's "jurisdictional area" as understood by the parties to the 1988 formula; and (2) that, even if the Collier decision did require such a change, the Director lacked authority under ISDA to unilaterally reduce the Absentee Shawnee's funding based on a change in the understanding of the legal extent of the Absentee Shawnee's jurisdictional area. Id.

The IBIA resolved this close question in favor of an application of collateral estoppel and provided valid reasons for its decision. "The IBCA is the highest adjudicatory body that could hear the Citizen Potawatomi's claim in the Absentee Shawnee case, so the concerns about the effects of further administrative appeals were inapplicable. Furthermore, in this particular case, there also can be no concern about the effect collateral estoppel would have with respect to federal court litigation, because the dismissal in Norton precludes litigating the question of the effect of Collier on the Shawnee Agency AFAs in federal court." Id. at 170. Both of these reasons are eminently valid. 25 U.S.C. § 450m-1(d) provides that all administrative appeals relating to self-determination contracts shall be heard by the IBCA. As discussed below in Section A. 4, Norton held that the AST was a necessary and indispensable party to the litigation and dismissed the CPN's suit under Fed. R. Civ. P. 19. Citizen Potawatomi Nation v. Norton, 248 F.3d 993, 997 (10th Cir. 2001). Even though the AST could not be joined as a defendant because of its sovereign immunity, any federal litigation concerning the effect of Collier on Shawnee Agency AFAs (such as the AFA with the AST) would have to include the AST as a party. See Bryson v. Gere, 268 F. Supp. 2d 46, 60 (D.D.C. 2003) (noting that the necessary to judgment element "serves to prevent preclusion based on mere dictum or other portions of the judgment which were not necessary to the judgment" and finding that element was satisfied

17

when issues "so central to the dispute that the arbitrator was obliged to, and did, consider

them."). In order to rule on the reduction in funding to the AST, the IBCA had to and did

consider the effect of factor 3.  See A.R. at 00163 ("Norton itself made clear that Collier had

nothing to do with funding arrangements.").  Thus, IBIA properly determined that the fourth

factor had been satisfied.

The CPN had an opportunity to seek judicial review of the IBCA's determination in

Absentee Shawnee Appeals  but it failed to do so and thus collateral estoppel precludes

relitigation of this determination.  On December 4, 2002, the CPN submitted a motion to the

IBCA to reconsider the decision in Absentee Shawnee Appeals.  A.R. at 00046; Exhibit H to

Plff. MDJ at 2; Defendant's Statement of Material Facts ("DSOMF") at ¶ 40.  The Department

filed a pleading in support of this motion for reconsideration.  A.R. 00046.  CPN also requested

that IBCA direct the Department to pay $65,521 each to the AST and the CPN.  A.R. 00046;

Exhibit H to Plff. MDJ at 3.

The IBCA began its analysis of CPN's motion to reconsider by noting that under 43 CFR

4.315, it may only grant reconsideration in extraordinary circumstances.  Exhibit H to Plff. MDJ

at 3.  These circumstances included either new evidence or factual or legal errors.  Id.  In the

context of this motion for reconsideration, the IBCA noted that the issue of withholding funds to

the CPN was not before the Board so it was not a circumstance justifying reconsideration.  Id.

Thus, the IBCA held that "under the facts of this Appeal," it had no authority to award $65,521

to the CPN.  Id.; Plff. MDJ at 3; DSOM at ¶ 40.  Appeals of the Absentee Shawnee concerned

reduction in AST's funding.  The CPN had not raised the specific issue of *its* funding being

taken away in future years until its motion for reconsideration, Plff. MDJ at 3, however it did

18

raise the issue of recalculation of factor 3 based on Collier.  See Plff. MDJ at Exhibit G, page 11

(CPN noting that the AST disputed "the OSG's right to correct a previous mistake in

implementing the "formula" to which the parties agreed.").

      When the DOI subsequently withdrew $65,521 in funds from the CPN's FY 2003 AFA,

the CPN challenged this action before the IBCA.  See Appeal of Citizen Potawatomi Nation of

Oklahoma, IBCA No. 4522/04, 2005 WL 729,941 (Plff. MDJ at Exhibit I, page 3) (hereinafter

"Appeal of Citizen Potawatomi").  The IBCA stated that *res judicata* did not bar the issue of

"withholding of $65,521 from the [Citizen Potawatomi] Nation" because Absentee Shawnee

Appeals involved "withholding of $65,521 from the Shawnees."  See Id. at 4.  The IBCA then

decided that the CPN was entitled to $65,521 for FY 2003.  Id. at 8.  Although the opinion

mentioned Collier in the first two pages, the brief discussion of Collier served mainly as

background.  See Id. at 2.  The IBCA did not mention using Collier to recalculate factor 3.  The

basis of the IBCA's decision rested primarily on contract law.  See Id. at 6 ("The undisputed

material facts establish that the Department's post-award unilateral removal of the $65,521 funds

from [the Nation's] 2003 AFA constitutes a breach of contract by the Department."); Id. at 8

("Appellant makes a strong case that the unilateral removal of $65,521 from the Nation's 2003

AFA funding account was in fact a breach of contract . . .").  Furthermore, the IBCA's rejection

of res judicata did not necessarily foreclose the application of collateral estoppel.  See Defenders

of Wildlife v. Andrus, 77 F.R.D. 448, 453 (D.D.C. 1978) ("The characterization of the doctrine

as collateral estoppel rather than res judicata is significant, since a court has more discretion in

determining whether or not to apply collateral estoppel than res judicata.").  Thus, the IBCA

could hear the CPN's challenge to DOI's withholding of the $65,521 because the issue

concerned breach of contract based on removing funds already promised (post award) not a pre-award dispute concerning the applicability of Collier to factor 3.

In contrast to Appeal of Citizen Potawatomi Nation, the CPN raises the same issues in the instant case that it raised and lost in Absentee Shawnee Appeals: correcting the same alleged mistake- the DOI's failure to revise factor 3 according to Collier. See e.g., Compl. at ¶ 62 ("The IBIA Decision ignores the fact that the Collier decision held the CPN and the Absentee Shawnee do not share a common reservation area . . ."); Compl.at ¶ 63 ('[T]he Department was acting on the conclusion of law that the Absentee Shawnee shared a common former reservation area with CPN. That legal conclusion was subsequently held incorrect by the Collier decision.); Compl. at ¶ 65 ("[T]he IBIA erroneously concludes that the Collier decision has no impact on Factor 3 of the Funding Formula.").   Thus, under the doctrine of collateral estoppel, Plaintiff is precluded from relitigating this pre-award issue of applying Collier to factor 3.

Accordingly, the IBIA properly concluded the doctrine of collateral estoppel was applicable to the issue regarding the recalculation of factor 3 because all four factors of that doctrine had been satisfied. Citizen Potawatomi Nation, 42 IBIA at 170.   Thus, the CPN is barred from relitigating the issue of the effect of Collier on the 1988 formula in this appeal. Id.

**IV.   THE IBIA PROPERLY CONCLUDED FUNDING UNDER FACTOR 3 SHOULD BE APPORTIONED USING 1988 NUMBERS RELATING TO TRIBAL MEMBERS**

### A.   The Record Supports the IBIA's interpretation of Factor 3

The IBIA concluded that, even if collateral estoppel did not bar the CPN  from litigating the Factor 3 funding issue, "the 1988 formula does not apportion funding to the Citizen Potawatomi and the Absentee Shawnee based on legal determinations regarding the extent of

their territorial jurisdiction, and thus the Director did not abuse his discretion in determining to

apply the original funding percentages with respect to factor 3 of the formula." Citizen

Potawatomi Nation, 42 IBIA at 167, 170; Exhibit A, Plff MDJ at 9, 12. It arrived at this

conclusion based on the principles of contract interpretation. The IBIA looked at the 1988

agreement's language in the context of the situation as it existed at that time to determine the

meaning of the language concerning Factor 3. "[F]actor 3 contemplated that, in carrying out

duties contracted under ISDA, the Citizen Potawatomi and the Absentee Shawnee each would

serve their own tribal members. Factor 3 provides for the allocation of a portion of funds based

on the 'tribal population within each tribe's jurisdictional area.'" Citizen Potawatomi Nation, 42

IBIA at 170; Exhibit A, Plff MDJ at 12.

The IBIA noted that typically the language of factor 3 would refer to a certain

geographical area and each tribe would serve whatever tribal members resided within that area.

Id. However, the IBIA stated that the CPN and the AST had an unusual situation and that a

typical interpretation of the language "could lead to an anomalous and implausible result." Id.

When the agreement was signed, all parties believed that the CPN and the AST shared a

"'jurisdictional area' represented by the boundaries of the former reservation." Id. These

circumstances mandated that the usual understanding of "jurisdictional area" should not apply to

these unusual circumstances because that definition would fail to "provide a basis for

apportioning funds between the two tribes." Id. If factor 3 was read literally, "funding [would]

be apportioned to both tribes based on the entire tribal population within the former reservation

boundaries, thus covering each tribal member twice." Id. The IBIA properly found such an

interpretation of the parties' intent to be "implausible." Citizen Potawatomi Nation, 42 IBIA at

170-71; Exhibit A, Plff MDJ at 12-13. The IBIA found such an interpretation to be "inconsistent with past practice, because the record shows that the two tribes were apportioned different percentages of funds under factor 3, with the Citizen Potawatomi allocated approximately 36 percent (of the 25 percent of total funding allocated pursuant to factor 3), and the Absentee Shawnee approximately 22 percent." Id. (internal citations omitted). In view of practical results and past practices, the IBIA determined that the parties intended factor 3 to mean that funding would be apportioned between the CPN and the AST based on the number of tribal members each tribe had within the former reservation boundaries. Id. Collier had no effect on this intent. Id.

The record provides ample evidence to fully support the IBIA's interpretation of factor 3. Factor 3 makes no reference to "service area population." A.R. at 00371. The best indicator of the Shawnee Agency tribe's intent with regard to Factor 3 is the longstanding conduct of the parties. A.R. at 00372. This conduct reflects the basis on which the five tribes agreed to divide the agency's funds. A.R. at 00372.

In Oklahoma, the DOI uses the external boundaries of the former reservations in order to define the parameters of tribal service areas. A.R. at 00210. However, while these exterior boundaries may generally set the outer limits of the service area, the former reservation and service area are not always the same defined area for purposes of all federal funding. A.R. at 00210. There are designated and approved service areas for tribes who do not have a reservation or former reservation. A.R. at 00210. The OSG does not create a service area for a tribe but rather a tribe proposes a service area and OSG may approve it or disapprove it. A.R. at 00210.

In July 2001, the AST asserted that the 1988 Agreement's reference to the resident tribal population in the tribe's "jurisdictional area," pertains to the tribe's service area and not its

22

territorial jurisdiction. A.R. at 00208. The AST argued that this definition was the only reasonable definition because some tribal members, who needed services, resided on fee lands and no tribe in Oklahoma has territorial jurisdiction over fee lands. A.R. at 00208. If the DOI reduced the funds available to the AST, it would force several hundred AST members who are now served by their tribe to seek BIA funded services from CPN or go without services entirely. A.R. at 00208. The CPN has had a history of animosity with the AST that extends to the present day. A.R. at 00208; 00504. In fact, a November 10, 1999 letter to Secretary Gover, AST Governor James Lee Edwards stated that CPN's leaders have been "openly hostile" to the AST and its members. A.R. at 00504. Self-Determination is based on the notion that tribes as governments are the entities best situated to provide governmental services to their people. A.R. at 00374. The ISDA is designed to provide assurances to tribes that they will be provided with federal funds to enable them to provide a better life for their members. A.R. at 00374.

Thus, the IBIA's interpretation that the parties intended funding under factor 3 to be apportioned between the CPN and the AST based on the number of tribal members each tribe had within the former reservation boundaries is more than reasonable because both practical considerations and past practice dictate such a result.

### B. Legal precedent clearly supports the IBIA's interpretation of factor 3

Legal precedent also greatly supports the IBIA's interpretation of factor 3. The two key precedents are Potawatomi Indian Tribe of Oklahoma v. Collier, CIV 92-2161-R (W.D. Okla. 1996) and Citizen Potawatomi Nation v. Norton, 248 F.3d 993 (10th Cir. 2001). Norton's interpretation of the Collier decision strengthens the DOI's decision to interpret factor 3 according to its meaning in 1988. In Absentee Shawnee Appeals, the IBCA relied on Norton when it

determined that <u>Collier</u> did not mandate the DOI to reduce the AST's funding.  A.R.at  00163

("The Shawnee are entitled to the full amount of funding agreed to in the AFA's [sic] that were in

effect during the entire decade before <u>Collier</u>.  <u>Norton</u> itself made clear that <u>Collier</u> had nothing to

do with the funding arrangements . . .").

 Despite much apparent confusion to the contrary, <u>Collier</u> only concerned  interpretation of

trust acquisition under 25 CFR 151.8.   In 1992, the CPN brought suit against BIA Anadarko Area

Director L.W. Collier.  A.R. at 00555.  DSOMF at ¶ 21.  The AST had applied to place land,

which was in the boundaries of the former CPN reservation, into trust land.  <u>Id.</u>  The BIA informed

the CPN that the CPN's consent was not required to place this land into trust land.  <u>Id.</u>  The

Department believed that it did not require the CPN's consent because it viewed the AST as

sharing the former reservation with the CPN.  <u>Id.</u>  The CPN sought a declaration that the BIA was

required to obtain its consent before placing into trust land within the boundaries of the former

Potawatomi reservation under 25 CFR 151.8.  A.R. at 00153.  In 1998,  the Tenth Circuit

determined that there was an inadequate showing that AST ever legally shared the former

reservation and that Potawatomi consent was required.  A.R. at 00154, 00206; DSOMF at 22.

As a result of the <u>Collier</u> decision, the OSG believed that it was necessary to reduce the

AST's funding.  A.R. at 00154.  Specifically, an OSG position paper, transmitted to the AST on

April 15, 1999 stated that <u>Collier</u> required it to "bring the service area and the associated funding

into conformance with the Federal Appellate Court's holding."  A.R. at 00154.  However, the

IBCA in <u>Absentee Shawnee Appeals</u> disagreed.  A.R. at 00207.

For the purposes of trust acquisition, 25 CFR 151.2(f) defines "Indian reservation" in the

State of Oklahoma as "that area of land constituting the former reservation of the tribe as defined

by the Secretary." Citizen Band Potawatomi Indian Tribe of Oklahoma v. Anadarko Area Director, 28 IBIA 169, 177 (September 12, 1995); A.R. at 00571.  However, when the Secretary defines a former reservation under 25 CFR 151.2(f), he or she does not create a true reservation or vest the defined area with the attributes of reservation status for jurisdictional purposes. Id.; A.R. at 00571.

Collier did not determine that the former reservation area was the same as the service area. A.R. at 00208.  In Citizen Potawatomi Nation v. Norton, the  Tenth Circuit agreed with the DOI that the territorial jurisdiction and the service areas are not necessarily the same.  248 F.3d 993, 999 (10th Circuit 2001); A.R. at 00227.  It disagreed with the CPN's contention that the AST had no claim to previous funding amounts.  Norton, 248 F.3d at 999; A.R. at 00227-00228 ("[O]ur Collier opinion did not decide whether the Shawnee and the Citizen Potowatomi share a common service area, which is the relevant question at issue.  Accordingly, we conclude that the Shawnee . . . can claim an interest in the Citizen Potawatomis' action." (Citizen Potawatomi Nation v. Norton, 248 F.3d at 999)).  Id.  Collier only concerned the specific federal regulation at issue, 25 CFR § 151.8.  A.R. at 00208.  It concerned neither federal funding, jurisdictional areas or the service area of the tribes.  A.R. at 00208.  The ISDA neither mentions "former reservation" nor makes it a stipulation for the distribution of funds.  A.R. at 00504. Thus, Collier did not require any change in the service area of the AST.  A.R. at 00209.

Collier could not have had any effect on jurisdiction over fee lands in the former reservation.  A.R. at 00278; 00379.  The tribes in Oklahoma have territorial jurisdiction only with respect to trust lands, not with respect to fee lands.  A.R. at 00278; 00379.  Whether an area is a

former reservation or not, a tribe in Oklahoma has no jurisdiction over fee lands. A.R. at 00278; 00379.

In <u>Douglas Indian Association v. Juneau Area Director</u>, 1996 I.D. LEXIS 81, 30 IBIA 48 (October 16, 1996), the DOI allocated funds in manner that best allowed each of two competing tribal entities to serve its own members, rather than basing its ruling on geography or territorial jurisdiction. A.R. at 00210. The IBIA stated that "the underlying purpose of self-determination will be furthered" when a service area population is defined in a manner that allows the maximum number of tribal members to be served by their own tribe. A.R. at 00210.

The DOI's decision to provide $65, 521 to the AST is certainly reasonable in light of <u>Douglas Indian Association</u>. AST members have lived in the area in question for over 150 years. A.R. at 00210; 00380. The area in question was occupied by the AST long before any Potawatomi were there. A.R. at 00370; <u>See</u> also A.R. at 00578 (In 1891, the DOI furnished documents to Congress in which it noted that the AST had occupied the lands exclusively before the arrival of the CPN.). In 1867, the United States entered into a treaty with the CPN in which the CPN and the DOI would visit the disputed area. A.R. at 00553-000554. The AST had already settled on a portion of the land selected as the CPN reservation. A.R. at 00554. The federal government signed treaties with the CPN and the AST within two weeks of each other in 1867. A.R. at 00503. The CPN treaty was ratified but the AST treaty, through no fault of the AST, was never ratified. A.R. at 00503. Presently, the area is the focus of Absentee Shawnee Tribal life. A.R. at 00370. Subsequent Congressional acts in 1872 and 1887 authorized allotments of land within the reservation to members of both tribes. A.R. at 00554. For a long time, the BIA administered this area as a reservation shared by AST and CPN. A.R. at 000370. The DOI has treated the CPN and

the AST as sharing a joint reservation since 1872 and beyond.  A.R. at 00503; 00567.  Indeed, the

CPN has conceded in the past  that the BIA has treated the disputed reservation area as the shared

former reservation of the two tribes throughout the twentieth century.  A.R. at 00580.  The DOI

had undertaken to allot members of the two tribes in different parts of the reservation so that the

AST could control their part of the reservation.  A.R.  at 00578.  The DOI's Self Governance

Compact with the AST, entered into on September 25, 1990, provides for funding of law

enforcement and tribal courts, thus indicating that the DOI recognized AST's authority to exercise

some degree of territorial jurisdiction.  A.R. 00578 (Anadarko); See also A.R. at 00478 (2000 AFA

listing Tribal Courts and law enforcement in the AST's Budget Categories);  A.R. at 00394 (2001

AFA listing Tribal Courts and law enforcement in the AST's Budget Categories); A.R. at 00134

(2003 AFA listing Tribal Courts and law enforcement in the AST's Budget Categories).

Based on the AST's representations, the DOI's decision in this case could allow the AST to

serve several hundred of its members who reside on fee lands in the former reservation.  See  A.R.

at 00210.  If this Court  upheld the DOI's instant determination regarding funding to the AST, the

policy goals of self determination would be accomplished, as the very purpose of Self-

Determination is to allow tribes to run governmental programs to serve their people.  A.R. at

00210.

The DOI's departure from prior practice is clearly explained and shown to be neither

arbitrary nor capricious because it was attempting to correct erroneous interpretations of the law.

The DOI erroneously interpreted the law – Collier and the language of the 1988 funding formula –

when it reduced the AST's funding in three AFAs.  See A.R. 00479 (funding reduced in 2000

AFA); A.R. 00395 (funding reduced in 2001 AFA); A.R. 00134-00135 (funding reduced in 2003

27

AFA).  While this practice departed from several years of  prior practice, the DOI's return of

$65,521 to the AST is hardly a radical change in policy.  In fact, it is more in keeping with its prior

practice of providing these funds to the AST.  The DOI provided those funds to the AST under the

1988 agreement  for more than a decade.  The DOI, including the IBIA, bears a trust responsibility

to both the CPN and the AST which requires them to consider the rights of both tribes.  See

Citizen Band of Potawatomi Indian Tribe of Oklahoma v. Anadarko Area Director, 28 IBIA 169,

172 n.4 (1995); A.R. at 00566.  The precedents of Norton and Appeals of the Absentee Shawnee

provide a clear and more than adequate explanation for any possible slight deviation from past

practice by the DOI.

    Pursuant to 25 U.S.C. 450j-1(a)(1) , "The amount of funds provided under the **terms of**

**self-determination contracts** . . . shall not be less than the appropriate Secretary would have

otherwise provided for operation of the programs or portions thereof for the period covered by the

contract."  25 U.S.C. 450j-1(a)(1) (emphasis added).  Thus, under 25 U.S.C. 450j-1(b)(2), DOI

*cannot* reduce the amount of funds required 25 U.S.C. 450j-1(a) in subsequent years unless at least

one of five exceptions apply.  The DOI and the Shawnee Agency tribes agreed to the allocation of

funds based on the 1988 funding formula so that formula determined "the amount of funds

provided under the terms of the self-determination contract."  Thus, under 450j-1(b)(2), the DOI

cannot unilaterally modify the terms of the funding formula in AST compact to downsize **the**

**service population agreed to in the compact**.  A.R. at 00211.  A revision of this material

provision of the compact would unilaterally reduce the level of funding to the AST, without the

tribe's consent.  A.R. at 00211.   25 U.S.C. 450j-1(b)(2) precluded the unilateral reduction of the

AST's AFA.  See A.R. at 00211.  In contrast, 25 U.S.C. 450j-1(b)(2) would not prohibit a

reduction in the CPN's AFA because the DOI is merely correctly applying the "terms of the self determination contract" and thus, it is providing the funds required under 25 U.S.C. 450j-1(a)(1) instead of reducing such funds.  The 2004 AFA between the DOI and the CPN contained the 1988 funding formula which did not entitle the CPN to the $65,521.  Therefore, since the self-determination contract did not provide those funds to CPN, those funds are required under 25 U.S.C. 450j-1(a)(1) so the DOI cannot be unlawfully reducing those funds under 25 U.S.C. 450j-1(b)(2).  Accordingly, the DOI's 2004 decision to reallocate funds from the CPN to the AST is lawful under federal statute.

The funding to the AST in the years before 2000 was based on a funding formula that the five tribes had agreed upon.  A.R. at 00211.  The agreement was not conditioned upon the AST having a particular interest in the former Reservation area.  A.R. at 00212.  The parties clearly intended the allocation of Shawnee Agency funds to be based on circumstances at the time of the agreement- 1988.  A.R. at 00212.

When the DOI restored the $65,521 to the AST, it returned to the status quo of 1999.  A.R. at 00212.  This was consistent with agreement of the tribes of the Shawnee Agency and the DOI's practice for over a decade.  A.R. at 00212.  That agreement did *not* provide the DOI with any authority to unilaterally alter the application of that agreement's terms.  A.R. at 00279 (emphasis added).  To reduce the funding to the AST would unilaterally breach the intertribal agreement among the tribes funded through the Shawnee Agency.  A.R. 00250-00251.

The facts in the administrative record and the relevant statutes, administrative decisions, and federal case precedent amply support the IBIA's decision upholding the Director's interpretation of factor 3.  Therefore, this Court should affirm the IBIA's decision upholding the

Director's reduction of funding to the CPN based on his interpretation that factor 3 should be applied according to the parties' intent at the time of the 1988 funding agreement.

**V.    PLAINTIFF'S CLAIMS MUST BE DISMISSED FOR FAILURE TO JOIN NECESSARY AND INDISPENSABLE PARTIES**

The issues regarding the CPN's service Area and the CPN's service area population were last addressed in the 1988 agreement between the DOI and the Shawnee Agency tribes. This agreement cannot be altered absent renewed negotiations involving the DOI, the CPN, and other Shawnee Agency tribes.

The CPN has not joined the four other tribes of the Shawnee Agency as parties in this lawsuit. These four other tribes are participants in the funding agreement between DOI and the five tribes of the Shawnee Agency. As such, those tribes are indispensable parties. The other tribes are sovereign nations so sovereign immunity thus protects the other tribes from suit. Fletcher v. United States, 116 F.3d 1315, 1324 (10th Cir.1997) ("Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories.... As an aspect of this sovereign immunity, suits against tribes are barred in the absence of an unequivocally expressed waiver by the tribe or abrogation by Congress.") (citing Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991)). Thus, CPN cannot join these indispensable parties and so the Court should dismiss this action under Fed. R. Civ. P. 19.

On September 25, 1998, the CPN brought an action in the U.S. District Court for the Western District of Oklahoma against then DOI Secretary Gail Norton and OSG Director William Sinclair challenging their methods for calculating funding the Citizen Potawatomi Nation receives under its tribal self-governance compact. Citizen Potawatomi Nation v. Norton, 248 F.3d 993, 995-96 (10th Cir. 2001); A.R. at 00223. CPN sought a "mandatory injunction in the nature of mandamus" against federal officials of the United States Department of the Interior and challenged

their methods for calculating the funding that it received under the Self-Governance Compact.  Id. at 995; A.R. at 00223.  Specifically, CPN challenged the (1) the DOI's determination that the Shawnee Tribe and the Citizen Potawatomi shared the same service area and, therefore, the funds provided to that area;  (2) the DOI's determination that the 1988 formula was static and thus did not change as the data changed.  Id. at 996; A.R. at 00224.

The DOI moved to dismiss the action under Fed. R. Civ. P. 19(a) on the ground that the Citizen Potawatomi were unable to join three "necessary" and "indispensable" parties, tribal participants in the funding agreement.  Id.  The district court applied the three part test under Fed. R. Civ. P. 19 to determine whether or not to dismiss a case unde that rule.  Id.  The three prongs of the test are: (1) whether  the absent party is necessary; (2) if the party is necessary, whether the joinder is feasible; and (3) if the joinder is not feasible whether or not the party is indispensable. Id.  Each prong of this three part test- necessary, feasible, and indispensable- has its own meaning. "A person is necessary if:  (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."  Id. at 97 (citing United States v. Bowen, 172 F.3d 682, 688 (9th Cir.1999)).  If the absent party is necessary, then the court must then determine whether joinder is "feasible."   See Fed.R.Civ.P. 19(a)-(b). If joinder is not feasible, the court must decide whether the absent person is "indispensable," i.e., whether in "equity and good conscience" the action can continue in his absence.  Norton, 248 F.3d at 997; A.R. at 00225-00226.  The

factors the court considers include: (1) the extent to which a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; and  (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.  Fed.R.Civ.P. 19(b).  "While Rule 19(b) sets forth four non-exclusive factors for the court to consider, this court has observed that 'there is very little room for balancing of other factors' set out in Rule 19(b) where a necessary party under Rule 19(a) is immune from suit because immunity may be viewed as one of those interests 'compelling by themselves.'" Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt, 43 F.3d 1491, 1496-97 (D.C. Cir. 1995) (citing Wichita and Affiliated Tribes of Okla. v. Hodel, 788 F.2d 765, 777 n. 13 (D.C. Cir. 1986) (citation omitted); Enterprise Management Consultants v. United States ex rel. Hodel, 883 F.2d 890, 894 (10th Cir.1989); Adams v. Bell, 711 F.2d 161, 171 n. 42 (D.C.Cir.1983) (en banc), cert. denied, 465 U.S. 1021 (1984); Wright, Miller & Kane, § 1617, at 257.

        After applying this three part test (necessary, feasible, and indispensable), the Court determined that the Defendant's motion should be granted because *the absent tribes were necessary and indispensable parties*.  Norton, 248 F.3d at 996.  First, the district court ruled that the absent tribes were necessary.  Id.  Complete relief was not possible without them since the lawsuit could have resulted in a possible increase in the CPN's funding allocation.  Id.  This, in turn, would cause the remaining tribes to suffer detriment from which they could seek collateral relief from the Plaintiff CPN or the federal defendants.  Id.  Furthermore, the absent tribes had an interest in the funding allocations.  Id.  Second, the district court determined that joinder was not

feasible because the absent parties possessed sovereign immunity.  Id.  Third, the absent tribes were indispensable for several reasons: (1) they would suffer substantial prejudice if the action proceeded without them; (2) there was no way to lessen the prejudice; (3) a judgment without the tribes would be inadequate; and (4) the CPN had an adequate alternative remedy in Congress.  Id.

       This court has a duty to raise *sua sponte* the issue of whether the absent persons or entities are indispensable parties.  See Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. at 102, 106, 111, 88 S.Ct. 733, 736, 738-39, 19 L.Ed.2d 936 (1968); Wichita & Affiliated Tribes of Okla. v. Hodel, 788 F.2d 765, 772 n. 6 (D.C. Cir.1986); Weisberg v. United States Dep't of Justice, 631 F.2d 824, 826-30 & n. 40 (D.C. Cir.1980).  Determinations of whether parties must be joined are reviewed for an abuse of discretion, while the underlying legal conclusions supporting such determinations are reviewed de novo.  Id. at 996.  See also Kickapoo Tribe, 43 F.3d at 1495 (D.C. Cir. 1995) (citing  Cloverleaf Standardbred Owners Ass'n. v. National Bank of Wash., 699 F.2d 1274, 1276 (D.C. Cir.1983)) ("We review the district court's determination that Kansas was not an indispensable party under Rule 19(b) for abuse of discretion.").  "The district court  has substantial discretion in considering which factors to weigh and how heavily to emphasize certain considerations in deciding whether the action should go forward." Kickapoo Tribe, 43 F.3d at 1494.

       The Tenth Circuit affirmed the District Court's decision which dismissed the case because the joinder of the other Shawnee Agency tribes was necessary because the Court's decision would affect them even though their sovereign immunity prevented making them parties to the action. Norton 248 F.3d at 997; A.R. at 00229-00230.  The Court noted that the CPN's challenge to DOI's determination that the 1988 formula was static could alter the future funding for the absent

tribes and so the tribes could claim interests relating to the subject of the action.  <u>Id.</u> at 997; A.R. at

00026 (citing  <u>Manygoats v. Kleppe</u>, 558 F.2d 556, 558 (10th Cir.1977) ).  The tribes' stake in the

outcome of the case was a protected interest, not a mere expectancy or inchoate interest, because

the 1988 agreement regarding a funding formula transformed the funding decisions from a mere

expectancy to a protected interest. <u>Norton</u>, 248 F.3d at 998; A.R. at 00226.  "Rule 19, by its plain

language, does not require the absent party to actually **possess** an interest; it only requires the

movant to show that the absent party '**claims an interest** relating to the subject of the action.' "

(emphasis in original)  <u>Davis v. United States</u>, 192 F.3d 951, 958 (10th Cir.1999) (quoting

Fed.R.Civ.P. 19(a)(2)).

      The Tenth Circuit also found that the absent tribes were necessary parties because the

United States could not  adequately represent these varied and potentially conflicting interests.

<u>Norton</u>, 248 F.3d at 999.  It noted that "the United States may adequately represent a tribe's

interests; however this representation is permissible only so long as "no conflict exists between the

United States and the nonparty beneficiaries."  <u>Id.</u> (citing <u>Ramah Navajo Sch. Bd. v. Babbitt</u>, 87

F.3d 1338, 1351 (D.C.Cir.1996)).  The Tenth Circuit observed that "some tribes may gain, while

some tribes may lose if the Citizen Potawatomi prevail."  <u>Id.</u>

      The Court concluded that the DOI sufficiently demonstrated that the absent tribes can

claim an interest in the application of the funding formulas and that Defendants cannot adequately

represent their varied interests.  <u>Id.</u>  Thus, it concluded that  the district court did not abuse its

discretion by ruling that the absent tribes were "necessary" for purposes of the CPN's claim

concerning the funding formula.  <u>Id.</u>

The Tenth Circuit then addressed whether the AST was a necessary party regarding the CPN's allegation that DOI improperly provided a shared service area for the CPN and the AST and improperly awarded excess funds to AST.  Id.  The Court found that AST was a necessary party for several reasons: (1) the AST had an unquestionable interest in the funding that it would receive based on the shared service area and (2) the AST did not frivolously claim an interest in the service area because the Tenth Circuit's decision in Collier, 17 F.3d at 1294 (10th Cir.1994) did not address the issue of common service area.  Id. at 999-1000.  The Court explicitly stated that Collier merely held that the United States had failed to adequately demonstrate that the AST and the CPN shared a common former reservation.  Id. at 999.  It further stated that "Nothing in Collier compels a conclusion that service areas are defined by reservation boundaries."  Id. at 999 n.1.

The Court also found that the AST was a necessary party because the United States could not  adequately represent the AST's conflicting interest.  Id. at 1000.  While noting that this representation issue differed from representation in the context of the funding formula, the Court stated that the relevant inquiry under Fed. R. Civ. P. 19(a) was whether the United States and the AST "share the same interest."   It determined that the two interests were "not necessarily the same."  Id.  DOI has a duty to implement national Native American policy while the AST has an interest in receiving the funds.  Id.  Given these conflicting interests, the United States could not adequately represent the AST.  Id.  The Court concluded that the district court did not abuse its discretion by holding that the United States could not adequately represent the AST's interest.  Id.

Thus, the district court did not abuse its discretion by deciding that the AST were "necessary" for the purposes of the shared service claim.[3]  Id.

The Court then addressed whether the absent parties were "indispensable."  Id.  This issue involved sovereign immunity since the absent parties were Indian tribes.  The legal ruling on when a party can assert its sovereign immunity is reviewed de novo.  Norton, 248 F.3d at 997 (citing Fletcher v. United States, 116 F.3d, 1315, 1323-24 (10th Cir.1997).  See also El-Hadad v. United Arab Emirates, 216 F.3d 29, 31 (D.C. Cir. 2000) (when a district court decides a foreign state's motion to dismiss, pursuant to an assertion of sovereign immunity, on the pleadings, the Court of Appeals' standard of review is de novo).

The CPN argued that they had no alternative remedy if their action was dismissed because the absent tribes' sovereign immunity prevented the CPN from pursuing these claims in an alternative legal forum.  Norton, 248 F.3d at 1000.  The Court acknowledged this argument while noting that there is the "strong policy favoring dismissal when a court cannot join a tribe because of sovereign immunity."  Id. at 1000-01 (citing Davis, 192 F.3d at 960).  See also Wichita and

---

[3]  The analysis in Norton regarding Fed. R. Civ. P. 19 fully comports with the precedent concerning this rule in this Circuit.  In Cherokee Nation of Oklahoma v. Babbitt, 117 F.3d 1489, 1492 (D.C. Cir. 1997), the Cherokee Nation of Oklahoma challenged the DOI's formal recognition of the Delaware Indian tribe.  The Court of Appeals for the District of Columbia found that the District Court did not abuse its discretion when it determined that the Delawares were indispensable.  Id. at 1497.  It further determined that even though the DOI took the same position regarding the Delaware's sovereignty, it could not adequately represent the Delawares' interests for two reasons:  (1) the DOI had reversed its position on this issue twice since 1940 and (2) it potentially could do so again.  Id.  Furthermore, the Court of Appeals found the Delawares' participation as an amicus curiae to be insufficient to protect its intersts because the DOI might decide not to appeal any unfavorable decision and the Delawares would have no right to appeal.  Id.  With regard to the instant case, the DOI has taken different positions regarding the allocation of the $65,521 between the AST and the CPN.  Indeed, that change in policy prompted the present lawsuit.  As explained previously, however, judicial decisions both prompted and support the change.

Affiliated Tribes of Oklahoma v. Hodel, 788 F.2d 765, 776 (D.C. Cir. 1986) (rejecting the argument that the Wichitas' ability to intervene as defendants in the cross-claim mitigated the prejudice of proceeding in their absence because intevention would have required the Wichitas to waive their tribal immunity and stating that such argument "is wholly at odds with the policy of tribal immunity to put the tribe to this Hobson's choice between waiving its immunity or waiving its right not to have a case proceed without it."). The district court ruled that the absent tribes would suffer substantial prejudice if the action proceeded without them and there was no way to lessen that prejudice. Id. at 1001. Thus, the Tenth Circuit found that the district court did not abuse its discretion when it dismissed the action, even though the district court's decision meant there is no way to challenge the conduct in question. Id.

Citizen Potawatomi Nation v. Norton, 248 F.3d 993 (10th Cir. 2001) is virtually indistinguishable from the instant case. It involved the same issues (the use of 1988 statistics in the funding formula and territorial jurisdiction (as defined in the 1988 funding agreement)), the same parties (the DOI and the CPN), and the same absent parties (AST and the other tribes of the Shawnee Agency) as the instant case. For the same reasons cited in Norton, the absent tribes in the instant case are necessary, their joinder is not feasible, and they are indispensable to this case. Accordingly, this Court should dismiss this case under Fed. R. Civ. P. 19.

In an attempt to avoid dismissal under Fed. R. Civ. P. 19, the CPN argues that the form of its requested remedy (remand back to the IBIA for further proceedings in order to supplement the record and allow the IBIA to resolve the merits based on a supplemental record) allows this Court to review the IBIA's decision in the absence of the five tribes. Plff. MDJ at 36-37. The CPN cites two cases, Feezor v. Babbit, 953 F. Supp. 1 (D.D.C. 1996) and Ransom v. Babbitt, 69 F. Supp. 2d

141 (D.D.C. 1999) to support this proposition. Those cases are clearly distinguishable from the instant case.

Feezor v. Babbit states "There is no need to address the question of the absence of the Community as an indispensable party, as defendants concede that the question arises only if the Court awards relief beyond remand to IBIA." 953 F. Supp. at 6 n. 4 (emphasis added). Thus, this Court did not hold in Feezor that, as matter of law, remand to the IBIA precludes consideration of an indispensable party but rather did not address the issue because the defendants conceded it. In fact, this Circuit has stated a position contrary to that assertion. In Wichita & Affiliated Tribes of Oklahoma, 788 F.2d at 776 , the Court of Appeals noted that "while a remand might be a bit less prejudicial than a judgment ordering immediate redistributions, there would still be substantial prejudice to the Wichitas [absent tribe]." The Court contrasted Witchita & Affiliated Tribes of Oklahoma to cases where the remand is for reevaluation in light of a procedural defect. Id. It found that a remand "would be premised on a holding that the agency made a substantive mistake"and that holding would in effect be "binding on the agency." The Court, thus concluded that the remand "would not in fact mitigate the prejudice to the Wichitas." Id. In essence, the Court found that, remand in Witchita & Affiliated Tribes of Oklahoma was in effect "relief beyond remand to IBIA." In the instant case, a remand to IBIA would also be in effect "relief beyond remand to IBIA" because it would be premised on a holding that the IBIA made a substantive mistake regarding the factors in the Funding Formula. Thus, the CPN's assertion that the remand remedy would allow this Court to award them relief without the presence of the absent but indispensable Shawnee Agency tribes is contrary to this Circuit's precedent.

The CPN's reliance on <u>Ransom v. Babbitt</u>, 69 F.Supp.2d 141, 148 (D.D.C. 1999) is likewise factually distinguishable from the case at bar.  In <u>Ransom</u>, the plaintiffs stated that they comprised the Three Chief System Tribal Council ("Three Chief System"), which they asserted was the governing body of the Saint Regis Mohawk Tribe.  <u>Id.</u> at 142.  The plaintiffs challenged the defedants' (BIA's and IBIA's) decision not to recognize the Three Chief System Tribal Council as the legitimate government of the Saint Regis Mohawk Tribe but instead to recognize an entity referred to as the Constitutional Government.  <u>Id.</u> at 142, 144-146.  The Defendants moved to Amend their Answer in order to incorporate an affirmative defense of failure to join a necessary or indispensable party (the Constitutional Government).  <u>Id.</u> at 148.   This Court held that it was not necessary to join  the Constitutional Government even though it "might be affected by this Court's review of BIA's actions."  <u>Id.</u> at 148 (internal citations omitted).  However, the Court noted several characteristics of  the Constitutional Government that materially distinguished it from the absent tribes in the instant case: (1) it took "no interest in this proceeding"; (2) the plaintiffs were leaders of the Constitutional Government; and (3) the defendants would adequately represent any interests that the Constitutional Government might have in this case.  <u>Id.</u>  In contrast, <u>Norton</u> explained why the absent tribes in the case at bar had an interest in the litigation and why the parties in that suit could not represent their interests.  It determined that the Defendant DOI did not adequately represent the interests of  the absent tribes on the issues regarding interpretation of the 1988 funding formula.  <u>Norton</u>, 248 F.3d at 1000.  Furthermore, the AST has shown an interest in related proceedings such as <u>Collier</u> (AST as an intervenor A.R. at 00553) and <u>Absentee Shawnee Appeals</u>.  Thus, contrary to Plaintiff's assertion, this Court's determination in <u>Ransom</u> is inapplicable to the instant case.

While Rule 19(b) sets forth four non-exclusive factors for the court to consider, this court has observed that 'there is very little room for balancing of other factors' set out in Rule 19(b) where a necessary party under Rule 19(a) is immune from suit because immunity may be viewed as one of those interests 'compelling by themselves.'" <u>Kickapoo Tribe</u>, 43 F.3d at 1496-97.  The four absent tribes are both necessary and immune from suit.  Thus, this Court, especially in view of the <u>Norton</u> decision and the strong interests of the sovereign tribes, should dismiss this case under Federal Rule of Civil Procedure 19 for failure to join these indispensable parties.

## VI.     THE JANUARY 25, 2006 IBIA DECISION WAS SUPPORTED BY THE ADMINISTRATIVE RECORD AND WAS NOT ARBITRARY OR CAPRICIOUS

As explained previously, the administrative record provides ample support for the IBIA's decision that affirmed the Director's pre-award decisions not to alter the application of the 1988 formula based on current data regarding tribal enrollment, tribal population, and acreage of land in trust and not to include the disputed $65,521 in the Citizen Potawatomi's 2004 AFA.  <u>Citizen Potawatomi Nation v. Director, Office of Self-Governance</u>, 42 IBIA at 173, 2006 WL 581170 at *11.  The IBIA properly found that the parties to the funding formula intended a static application of the 1988 funding formula.  Such an application is reasonable.  Nothing in the administrative record refutes this finding.  No law mandates the use of current statistics in funding formulas.  No law prohibits the use of a fixed year data set in funding formulas.  The IBIA's findings regarding the application of the 1988 data can be sustained under either a de novo or arbitrary and capricious standard of review.[4]

---

[4]As noted in Section II A., the Defendants maintain that arbitrary and capricious is the proper standard of review for the IBIA's decision.

Likewise, the IBIA properly upheld the withholding of funds based on factor 3. The doctrine of collateral estoppel clearly barred the relitigation of the issue of <u>Collier</u>'s applicability to factor 3. Even if the doctrine of collateral estoppel did not apply, the administrative record fully supports the IBIA's conclusion that the parties did not intend the DOI to unilaterally alter their understanding of factor 3 as it was in 1988. Once again the facts and the law are clearly on the IBIA's side so their determination regarding factor 3 can be sustained under either a de novo or arbitrary and capricious standard of review.

Thus, the IBIA correctly affirmed the Director's entire decision not to alter the application of the 1988 formula based on current data regarding tribal enrollment, tribal population, and acreage of land in trust and not to include the disputed $65,521 in the Citizen Potawatomi's 2004 AFA.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should dismiss Plaintiff's claims and grant summary judgment in favor of the Defendants because the IBIA's decision was rational, fully supported by the administrative record, and legally valid under applicable precedent.

42

January 3, 2007                          Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-1249
(202) 514-8780 (facsimile)

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that service of the foregoing Defendants' Motion for Summary

Judgment, Statement of Material Facts Not In Dispute, Memorandum Of Points And Authorities In

Support Thereof, and a proposed order was made by first class mail, postage prepaid on this 3rd

day of January, 2007[5] to:


James D. Bachman
DOYLE & BACHMAN, LLP
4350 North Fairfax Drive
Suite 420
Arlington, VA 22203

Attorney for Plaintiff



     /s/
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-1249
(202) 514-8780 (facsimile)

---

 [5] Although the Local Civil Rules do not require materials filed by electronic filing to be served by mail, defendant's exhibits are being filed in hard copy only and, accordingly, will be sent together with this motion by mail to plaintiff.