## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZEN POTAWATOMI NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-0830 (GK) |
| | ) | |
| DIRK KEMPTHORNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
|  _____ | ) | |

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Pursuant to Federal Rule of Civil Procedure. 56 and Local Civil Rule 7(h), Defendants submit the following Opposition to Plaintiff's Statement of Material Facts Not in Genuine Dispute:

1.      Defendants do not dispute this assertion.

2.      Defendants do not dispute this assertion.

3.      Defendants do not dispute this assertion.

4.      Defendants dispute Plaintiff's assertion that "the *only* evidence contained in the administrative record in CPN's appeal docketed as IBIA 04-16-A with respect to the meaning of the Funding Formula agreement is (1) the language of the agreement itself as set forth in the five tribal resolutions that comprise the agreement (Exhibit A hereto – AR – Tab 60 – CPN Opening Brief – Declaration of Rhonda Butcher, at Attachments 1 through 5); (2) the evidence submitted by CPN indicating that the intent was that the factors specified in the Funding Formula must be applied each year by the Department based on the current, actual tribal enrollment, resident tribal population and trust acreage that exists in that year (Plaintiff's Administrative Record (hereinafter "Plff. A.R.") at Tab 4 – CPN's AFA for Fiscal Year 2004 (at Section 3and Footnotes

A and W); Tab 60 – CPN Opening Brief – Exhibit A to CPN Brief –Declaration of Rhonda

Butcher; Tab 66 – IBIA Decision, at page 173 (noting that none of the other four tribal parties

came forward to support or deny CPN's interpretation of the Funding Formula agreement); (3) a

letter dated November 15, 1999 from the Interior Assistant Secretary-Indian Affairs (Plff. A.R.

at Tab 40); and (4) a letter dated April 15, 1999 from the Director, Office of Self-Governance,

Bureau of Indian Affairs (Plaintiff A.R. at Tab 44).  Defendant asserts that the Annual Funding

Agreements ("AFAs") between the Department of Interior  (hereinafter "DOI" or "Department")

and the Absentee Shawnee Tribe (hereinafter "AST") show that at least one of the five tribes

accepted the level of funding based on static application of the 1988 Agreement.  See e.g.,

Defendants' Administrative Record (hereinafter Deft. A.R.) at 00107-00121, 2004 AFA between

DOI and AST).  This acceptance without protest by all five tribes for over a decade is evidence

of the intent of the parties with regard to the meaning of the Funding Formula.  In addition,

IBCA's opinion in Appeals of the Absentee Shawnee also provides some evidence of the

Funding Formula's meaning.  Plff. A.R. at Tab 16, pages 13-14.  Furthermore, the four pieces of

evidence cited by Plaintiff either do not reveal the meaning of the Funding Formula or provide a

meaning consistent with the IBIA's decision at issue and Defendants' assertions on this issue,

Citizen Potawatomi Nation v. Director, Office of Self-Governance, Bureau of Indian Affairs,

IBIA 04-16A.  (Plff. A.R. at Tab 66).

        5.      Defendants do not dispute that a 1999 memorandum prepared by the Department

explained that service area and territorial jurisdiction are not necessarily coextensive.

Defendants assert that the DOI memorandum further stated, however, that "in the case of the

BIA Shawnee Agency, the service area designations were made with specific and exclusive

reference to the territorial jurisdiction *as it was known at the time of the tribal contracts*." Plff. A.R. at Tab 44, pages 2-3 (emphasis added).

      6.      Defendants do not dispute this assertion.

      7.      Defendants do not dispute this assertion.

      8.      Defendants do not dispute this assertion.

      9.      Defendants do not dispute this assertion.

      10.      Defendants do not dispute this assertion.

      11.      Defendants do not dispute this assertion. Defendants note, however, that the court dismissed CPN's claim pursuant to Fed. R. Civ. P. 19(a) because CPN failed to join necessary and indispensable parties. Citizen Potawatomi Nation v. Norton, 248 F.3d 993, 996 modified on rehearing, 257 F.3d 1158 (10th Cir. 2001).

      12.      Defendants do not dispute this assertion.

      13.      Defendants do not dispute this assertion.

      14.      Defendants do not dispute this assertion. Defendants note, however, that the CPN signed the Fiscal Year 2004 AFA on December 1, 2003, the same date that it filed its pre-award appeal. Plff. A.R. at Tab 66, IBIA decision, dated January 25, 2006 at page 166; Deft. A.R. at 00073 (CPN 2004 AFA). However, the Department did not sign until January 7, 2004. Deft. A.R. at 00073. Thus, the 2004 AFA was not executed until January 7, 2004.

      15.      Defendants do not dispute this assertion.

      16.      Defendants do not dispute this assertion.

      17.      Defendants do not dispute this assertion. Defendants add, however, that when the IBIA ruled that the Department was not required to produce any documents relating to tribal

enrollment, resident tribal population and trust property, it noted that CPN had not demonstrated

that there were documents that the Director actually utilized or relied upon in making his

decision concerning the disputed 2004 AFA funding." Plff. A.R. at Tab 58, pages 2-3.

18. Defendants do not dispute this assertion.

19. Defendants do not dispute this assertion, but Defendants assert that certification

of the administrative record is irrelevant at this point in the proceedings. Neither party alleges

that the other party has submitted an administrative record that is false or incomplete.

20. Defendants do not dispute this assertion.

21. Defendants do not dispute this assertion.

22. Defendants do not dispute this assertion.

23. Defendants do not dispute this assertion.

24. Defendants do not dispute this assertion.

25. Defendants do not dispute this assertion. Defendants add, however, that Footnote

11 of the quoted paragraph stated that "According to the Citizen Potawatomi's calculations, one

tribe, the Iowa tribe would see its allocation increase under a non-static application of the 1988

formula (from 7.56 percent to 10.71 percent)." Plff. A.R. at Tab 66 (42 IBIA 173)..

26. Defendants dispute Plaintiff's assertion that the administrative record shows that

CPN had no knowledge or opportunity to object to the Department's application of the Funding

Formula until 1998. To the contrary, Defendants maintain that the administrative record shows

that five tribes, including CPN, agreed to a Funding Formula in 1988. The administrative record

does not indicate that any tribe objected to the Department's application of the Funding Formula

until CPN voiced its objections in 1998 almost a decade later. Plaintiff has not provided any

admissible evidence showing that it either lacked knowledge of the Formula's application or did not have an opportunity to object to the application before 1998.

27.     Defendants do not dispute this assertion.  Defendants add, however, that the IBIA also stated that even if collateral estoppel did bar litigation of the application of <u>Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier</u>, 142 F.3d 1325 (10th Cir. 1998) to Factor 3 of the Funding Formula, <u>Collier</u> still did not require Defendants to alter the application of the 1988 formula.  Plff. A.R. Tab 66 (42 IBIA 170).

28.     Defendants do not dispute this assertion.

29.     Defendants do not dispute this assertion.

30.     Defendants do not dispute this assertion.

31.     Defendants do not dispute this assertion.

32.     Defendants do not dispute this assertion.

33.     Defendant does not dispute that IBCA stated that the CPN "was not a party to the Appeal" before the IBCA.  Plaintiff's Motion for Summary Judgment ("Plff. MSJ")Exhibit D at page 1.  Nonetheless, Defendant asserts that this conclusion was incorrect in view of Federal Rules of Civil Procedure 19, 20, and 24 which all speak of intervention of *parties*.  When a person or entity intervenes, this act of intervention renders them a party.  Defendant avers that the IBCA specifically stated "The Intervenor complains only that awarding money to Appellant [AST] is likely to cause the Government to withhold the same amount from the Intervenor in the future, an issue that was not before the Board.  It therefore asks that the Board award a similar amount to the Intervenor as well. But under the facts of this Appeal we have no authority to do so."  <u>Id.</u> at 2.  Defendant notes that this analysis was conducted when the IBCA ruled on

Plaintiff's motion to reconsider in <u>Appeals of the Absentee Shawnee Tribeof Oklahoma</u>, IBCA 4317-4318/2001, 35 IBCA 52 (2002) ("Absentee Shawnee Decision"). Plff A.R. at Tab 66, IBIA Decision dated Jan. 25, 2006, at pages 167-170.

     34.    Defendants do not dispute this assertion except to state that the IBIA decision found that "<u>Collier</u> does nothing to alter ***this intent***." Plff. A.R. at Tab 66 (42 IBIA 171) (emphasis added). The parties intended to define jurisdictional area for CPN and AST based on their understanding in 1988 that those tribes shared a jurisdictional area. <u>See</u> <u>Id.</u> (42 IBIA 170-71). This is what the parties actually intended in 1988, their intent was real, not perceived.

February 1, 2007                              Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 489610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-1249
(202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZEN POTAWATOMI NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-0830 (GK) |
| | ) | |
| DIRK KEMPTHORNE, <u>et</u> <u>al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>DEFENDANT'S OPPOSITION TO SUMMARY JUDGMENT</u>

Plaintiff's Motion for Summary Judgment should be denied because Plaintiff offers no valid arguments for granting this relief. Plaintiff asserts that the IBIA's decision in <u>Citizen Potawatomi Nation v. Director, Office of Self-Governance</u>, 42 IBIA 160 (January 25, 2006) (hereinafter the "IBIA Decision") should be reversed because "(1) it erroneously ignores and fails to address material evidence in the administrative record; (2) it is contrary to material evidence in the administrative record; and (3) assumes and relies upon evidence that is not contained anywhere in the administrative record." Plaintiff's Motion for Summary Judgment (hereinafter "Plff. MSJ") at 7.

Plaintiff puts forth four arguments in support of its Motion for Summary Judgment. First, Plaintiff argues that the IBIA's holding in favor of the Defendants' static application of the 1988 Funding Formula is "arbitrary, capricious, and otherwise erroneous" because (1) the IBIA improperly found that the funding formula agreement was ambiguous (Plff. MSJ at 8-20) and (2) even if the record supports the IBIA's finding of ambiguity, the administrative record does not support the IBIA's related holding that Plaintiff failed to timely object to Defendants' static application of the formula (Plff. MSJ at 20-24). Second, Plaintiff states that the IBIA's ruling

that CPN is collaterally estopped from litigating its entitlement to $65,521 in funds for Fiscal Year 2004 is "erroneous as a matter of law." Plff. MSJ at 24-33. Third, Plaintiff asserts that material facts contradict the IBIA's interpretation of Factor 3 of the Funding Formula (tribe's jurisdictional area). Plff. MSJ at 33-40. Finally, Plaintiff argues that "there are no indispensable party issues that affect this Court's ability to grant this Motion for Summary Judgment against the Government." Plff. MSJ at 40-43

All of Plaintiff's arguments are invalid and unsupported by the undisputed facts of this case and applicable law. Review of the IBIA's decision in this case proceeds under the arbitrary and capricious standard of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702-706. Under that standard, substantial evidence supports the IBIA's conclusion that Defendants properly applied the Funding Formula in the 1988 agreement and thus the IBIA's decision is not arbitrary or capricious. The IBIA properly held that the Plaintiff is collaterally estopped by the IBCA's decision in Appeals of the Absentee Shawnee Tribe of Oklahoma, IBCA 4317/4318 (Nov. 4, 2002) from relitigating the question of the effect of the Collier decision on the 1988 formula. Citizen Potawatomi Nation v. Director, Office of Self-Governance, 42 IBIA 160, 167 , 2006 WL 581170 at *7 (I.B.I.A.). Furthermore, this Court should dismiss this case under Federal Rule of Civil Procedure 19 because the absent tribes of the Shawnee Agency are necessary, their joinder is not feasible, and they are indispensable to this case. Thus, this Court should deny Plaintiff's Motion for Summary Judgment.

## ARGUMENT

**I.    THE IBIA'S DECISION WAS NEITHER ARBITRARY NOR CAPRICIOUS**

**A.    The Arbitrary and Capricious Standard of Review Applies**

Plaintiff asserts that <u>de novo</u> review is appropriate because Section 450m-1(a) of the ISDA grants district courts "original jurisdiction" over "civil actions" with authorization to award money damages and that this combination denotes an intention by Congress to grant the right of <u>de novo</u> review.  In its motion, Plaintiff cites to two cases to support its assertion regarding the standard of review: (1) <u>Cherokee Nation of Oklahoma v. U.S.</u>, 190 F. Supp. 2d 1248 (E.D. Okla. 2001), <u>aff'd</u>, 311 F.3d 1054 (10th Cir. Okla. 2002), <u>rev'd on other grounds</u>, 543 U.S. 631 (2005), and (2) <u>Shoshone-Bannock Tribes of Fort Hall v. Shalala</u>, 998 F.Supp. 1306 (D.Or. 1997).  Plff MSJ at 4-5.  Neither of these cases support the proposition that a court reviewing an APA challenge to agency action, when faced with a statute with no standard of review, should apply a <u>de novo</u> standard.

There is no dispute that Plaintiff brought this action pursuant to both the APA and the ISDA.  <u>See</u> Complaint at ¶ 5; Plff MSJ at 3 ("[A] claim for relief exists under both the ISDA, and the Administrative Procedures Act.") (internal citations omitted).  Both <u>Cherokee Nation of Oklahoma</u>, 190 F.Supp. at 1254, and <u>Shoshone-Bannock Tribes of the Fort Hall Reservation</u>, 988 F.Supp. at 1313 (D.Or. 1997) state that ISDA provides ***no*** standard of review.  When a statute provides for judicial review but fails to set-forth the standards for that review, it is well accepted that the court looks to the APA for guidance.  <u>United States v. Carlo Bianchi & Company</u>, 373 U.S. 709, 715 (1963). <u>See also</u> <u>Sierra Club v. Glickman</u>, 67 F.3d 90, 96 (5th Cir.1995).

3

Thus, since the ISDA does ***not*** set forth the standard of review, the APA's arbitrary and capricious standard is the appropriate standard.  See Al-Fayed v. C.I.A., 254 F.3d 300, 304 (D.C. Cir. 2001) (quoting Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 n. 12 (D.C.Cir.1995) and citing Workplace Health & Safety Council v. Reich, 56 F.3d 1465, 1467 (D.C.Cir.1995) ("The APA, however, 'provides a default standard of judicial review . . . where a statute does not otherwise provide a standard.'")).  In fact, the Plaintiff acknowledges that at least two Courts in this jurisdiction have applied the APA's arbitrary and capricious standard to challenges of IBIA decisions. Plff. MSJ at 3, 5 (citing Ransom v. Babbitt, 69 F. Supp. 2d 141, 149 (D.D.C. 1999) and  Feezor v. Babbitt, 953 F. Supp. 1 (D.D.C. 1996)).  Thus, in this case, the District Court applies the arbitrary and capricious standard to the facts to determine whether or not the challenged decision is supported by the administrative record.

**B.      The IBIA's Findings Are Supported By Substantial Evidence**

Plaintiff asserts that "[i]t cannot be disputed that the IBIA Decision at issue here (1) erroneously ignores and fails to address material evidence in the administrative record; (2) is contrary to material evidence in the administrative record; and (3) assumes and relies upon evidence that is not contained anywhere in the administrative record."  Plff. MSJ at 7.  These assertions have no basis in law or fact.

**1.      Undisputed Material Facts Do Not Support Plaintiff's Argument for Count I**

Plaintiff asserts that the IBIA's interpretation of the Funding Formula was erroneous as a matter of law.  Plff. MSJ. At 7. Plaintiff offers a two-part argument in support of this proposition:  (1) the IBIA Decision that the Funding Formula agreement at issue is ambiguous fails to address evidence in the administrative record, assumes evidence not contained in the

4

administrative record and is otherwise erroneous as a matter of law and (2) even if the holding of

ambiguity is supported by the record and is not found to be otherwise erroneous, the IBIA

Decision's related holding that CPN failed to timely object to the Department's static application

of that Funding Formula is without any support in the administrative record and is also

erroneous.  Plff. MSJ at 7.

        a.      **That Administrative Record Fully Supports the IBIA's Holding**

Plaintiff bases his argument that the Funding Formula was not ambiguous on two

premises.  First,  each tribal resolution states that the Funding Formula is to be used "to contract

for all Bureau of Indian Affairs provided operation and services in FY 89 and future years."  Plff.

MSJ at 9.  Second, each tribal resolution states that "the tribes will conform to all aspects of the

CFR appropriate to the given program to be contracted by all five tribes of the Shawnee

Agency."  Plff. MSJ at 9.  Neither of these assertions show the contract to be unambiguous.

The tribal resolutions for each of the five tribes of the Shawnee Agency provides that the

tribes agree "to contract for all Bureau of Indian Affairs ("BIA") provided operation and services

in FY 89 and future years."  Plaintiff's Administrative Record (hereinafter "Plff. A.R.") at Tab

60, Attachments 1-5.  This language expresses a commitment by the tribes to enter into contracts

for services instead of having the BIA provide these services to them.  The duration of this

commitment would begin in FY1989 and continue indefinitely.  Other language in these

resolutions clearly support this interpretation.  See e.g., Plff. A.R., Tab 60, Attachment 1"[T]he

Citizen Band Potawatomi Indian Tribe of Oklahoma is eligible under PL 63-638 to contract for

the operation of BIA provided services"; Plff. A.R., Tab 60, Attachment 1 "[T]he Citizen Band

Potawatomi Indian Tribe of Oklahoma . . .  believes that it is in the best interests of all the

American Indians served by the Shawnee Agency to contract for these services."; Plff. A.R., Tab 60, Attachment 1 "[T]he Citizen Band Potawatomi Indian Tribe of Oklahoma agrees to a reduction in BIA provided services." Thus, the language appearing at the end of the agreement unambiguously voices the mutually agreed upon decision to alter the responsibilities of both parties, the Shawnee Agency tribes and the BIA, that the BIA would no longer provide certain services to the tribes and the tribes would contract for these services.

While the resolutions are clear that the tribes will contract for these services instead of relying on the BIA, they are ambiguous as to the application of the factors in the Funding Formula. Citizen Potawatomi Nation v. Director, Office of Self-Governance, 42 IBIA 160, 172 , 2006 WL 581170 at *10 (I.B.I.A.). The IBIA also noted that the agreement was subject to more than one reasonable interpretation. It stated that Plaintiff's argument for recalculation of factors had "some force". Id. at 172. The IBIA provided two reasons in favor of Plaintiff's interpretation: (1) the parties could have set down fixed percentages for each tribe in the agreement if they desired a static application of these factors and (2) "it would be reasonable for a formula to enable the allocation of funds to shift proportionately as the needs among the tribe shifted." Id. The IBIA also found the Defendant's interpretation was reasonable because it would not have been "unreasonable for the parties to intend that existing data be applied to the formula to establish a fixed allocation for future years." Id. In addition, the IBIA found the agreement failed to state the following: (1) whether the formula will be recalculated; (2) when or how often the formula will be recalculated; and (3) how frequently a census would be required to be performed to determine tribal population for each AFA. Id. at 172. In view of these two reasonable interpretations, the IBIA correctly concluded that the Funding Formula was

6

ambiguous. Id.  See 1901 Wyoming Ave. Coop Assoc. v. Lee, 345 A.2d 456, 461 n.7 (D.C. 1975).

Plaintiff attempts to refute the IBIA's finding of ambiguity by arguing the IBIA failed to consider or address the language, "for all Bureau of Indian Affairs provided operations and services in FY 89 and future years."  Plaintiff argues that if the IBIA had considered this material language it "could not have rationally concluded that the Funding Formula agreement does not state if, when or how often the funding percentages will be recalculated or how frequently a census would be required to be performed."  Plff. MSJ at 11.  Plaintiff states that if the Funding formula was to be applied in FY 89 and future years then the three of the four factors of that formula (total tribal enrollment, resident population within each tribe's jurisdictional area,, and amount of trust property in each tribe's jurisdiction) would be rendered meaningless.  Plff. MSJ at 12.

Plaintiff's argument broadens the meaning of the quoted language and ignores the very reasoning that supported the IBIA's finding of ambiguity.  Although that language indicates that the Funding Formula applies to FY 89 and all future years, it says nothing about a recalculation interval.  The formula could still apply to various years while remaining static.  Such an interpretation would not render the factors meaningless but rather would have them serve as fixed reference points.  Each year, the DOI made a funding decision it would refer to these fixed reference points and so, contrary to Plaintiff's assertion, these factors have been applied in every year since FY89.  Indeed, the IBIA decision explicitly acknowledged the reasonableness of this approach.  Citizen Potawatomi Nation, 42 IBIA  at 172 ("Nor do we think that it would have been unreasonable for the parties to intend that existing data  be applied to establish a fixed

allocation for future years."). Also, these factors would not be meaningless because they could

serve as guidance in future negotiations for revisions of the funding agreement. For example,

the tribes would look to the current formula and make proposals for varying the percentages,

defining the factors, or changing the factors. Indeed, the appropriate mechanism for changing

calculation of these factors is for the parties to renegotiate this agreement. Based on this

litigation, these factors would be the main issues of these negotiations. Plaintiff has failed in its

attempt to show that the IBIA decision renders factors 2, 3, and 4 to be meaningless.

Plaintiff further argues that several DOI regulations, 25 C.F.R. § 1000.98(a)(1) and 25

C.F.R. §§ 1000.380-382 require non-static application of the Funding Formula. Plff. MSJ at 13-

14. Plaintiff maintains that the IBIA decision "ignored and otherwise failed to address or explain

the material language in the Funding Formula agreement stating that each of the five tribes 'will

conform to all aspects of the CFR appropriate to the given program to be contracted by all five

tribes of the Shawnee Agency.'" Plff. MSJ at 12. Plaintiff asserts that these regulations provide

the answer to the "very things that the IBIA determined are not specified in the Funding Formula

agreement – if, when and how often funding percentages will be recalculated and how frequently

a census would be required to be performed." Plff. MSJ at 12. Plaintiff's arguments represent a

flawed attempt to apply general, inapplicable language to the specific situation of interpreting the

contract (Funding Formula) in the instant case.

25 C.F.R. § 1000.98(a)(1) provides that "Distribution formulas must be reasonably

related to the function or service performed by an office, and must be consistently applied to all

Tribes within each regional and agency office." The use of a static formula is not unreasonable

because as the IBIA noted, it would **not** have been "unreasonable for the parties to intend that

8

existing data be applied to the formula to establish a fixed allocation for future years." <u>Citizen Potawatomi Nation</u>, 42 IBIA at 172. Such a formula would not necessitate constant revision but at the same time could be renegotiated if the tribes found the formula to be inadequate. The DOI's decision to, as much as possible, defer to the tribes' judgment regarding their needs is a key part of self-determination and self-governance. Plaintiff asserts that "Only current-day data can be used to reasonably determine the functions and services to be performed by each tribe during the fiscal year in which those functions and services are to be performed." Plff. MSJ at 13. Plaintiff is but one of five tribes who is a party to this agreement. If Plaintiff and the other tribes believe that the present static application is unreasonable, they should renegotiate the agreement with the Department. 25 C.F.R. § 1000.98(a)(1) does not mandate Plaintiff's definition of reasonableness. Furthermore, the use of static data for eighteen years undoubtedly shows that the DOI consistently applied the distribution formula to all tribes within the Shawnee Agency.

25 U.S.C.A. § 458ee and 25 C.F.R. § 1000.381 provide that the DOI shall submit an annual report to Congress concerning self-governance. The relative costs and benefits of Self-Governance and the funds transferred to each Self-Governance tribe are among the items that must be included in the report. 25 U.S.C.A. § 458ee (b). The report will be based on, *inter alia*, audit reports routinely submitted by Tribes/Consortia and an annual report submitted to the Secretary by each Tribe/Consortium. 25 C.F.R. § 1000.381 (a) & (f). The purpose of the report is "to provide the Department with information necessary to meet its Congressional reporting responsibilities and to fulfill its responsibility as an advocate for self-governance." 25 C.F.R. § 1000.382 (b). Plaintiff argues that these statutes and regulations as well as the DOI's data

request and collection forms to the tribes (Plff. MSJ at Exhibits B and C) require that current

data should be used in calculating funding under the formula.  See Plff. MSJ at15 (arguing that

without the current data concerning Factors 2, 3, and 4, "there is no basis in the administrative

record to conclude that the Department complied with its own regulations governing the Tribal

Self-Governance Program of the ISDA.").   Although the 2005 Self-Governance Minimum Data

Collection form requests data on Factors 2, 3, and 4 (Plff. MSJ at Exhibit C), it also requests data

on a myriad of other matters that have ***no relation*** to the Funding Formula.  Other data requested

included employment status of the Tribal Resident Indian population ("TRIP"), the total TRIP

employed but below the poverty level, and a breakdown of TRIP members by age and gender.

Exhibit C to Plff. MSJ.  When the data collection form is viewed in its entirety, it is clear that the

Department requested this information for the purpose noted in 25 C.F.R. § 1000.382 (b)( "to

meet its Congressional reporting responsibilities and to fulfill its responsibility as an advocate

for self-governance").  Neither this form nor the accompanying memorandum (Plff. MSJ at

Exhibit B) evince any indication that this data is being collected for application in a funding

formula.

Additionally, the statutes and regulations cited by Plaintiff do not require annual

recalculation of the factors in the Funding Formula.  They only concern data collected for

statutory reporting requirements.  Although 25 U.S.C.A. § 458ee(d) mentions "develop[ing] a

funding formula to determine the individual tribal share of funds controlled by the Central Office

of the Bureau of Indian Affairs for inclusion in the Self-Governance compacts," it makes no

connection between those formulas and tribal statistics such as tribal enrollment, tribal resident

10

population, and trust acreage.  It contains no prohibition on the use of static factors in funding

formulas nor does it require periodic recalculation of factors.

Plaintiff continues to misinterpret these regulations and statutes when it states that the

IBIA erred when it did not require Defendant to produce current data regarding total tribal

enrollment (Factor 2), total resident population (Factor 3), and total trust property (Factor 4).

Plff. MSJ at 17.  Prior to the decision at issue in this case, the IBIA issued an Order Granting in

Part and Overruling in Part Objection to the Administrative Record on September 14, 2004.  See

Plff. A.R., Tab 58.  Plaintiff objected to the administrative record, stating that it was incomplete

because it did not contain "documents pertaining to the 1988 funding formula and its

application."  Plff. A.R. at Tab 58, page 2.  The IBIA overruled Plaintiff's objection because

Plaintiff had not demonstrated that there were "documents that the Director actually utilized or

relied upon in making his decision concerning the disputed 2004 AFA funding."  Plff. Admin.

Record, Tab 58 at 2-3.  Plaintiff does not contest that the Director did not actually consider or

utilize these documents when making the funding determination;  rather, it maintains that the

1988 Agreement (provision requiring conformance to all aspects of the CFR appropriate to the

given program) and statute (25 U.S.C.A. § 458ee) and regulations (25 C.F.R. § 1000.381 and 25

U.S.C. § 1000.382 ) required the IBIA to consider these documents.  See Plff. MSJ at 17 ("[T]he

IBIA should have considered the data in connection with its interpretation of the Funding

Formula agreement at issue here.").  This argument has no legal basis because, as discussed

supra, the cited agreement provision, statute, and regulations do not speak to the type of data that

must be used in funding formulas.

11

Plaintiff's final attack on the IBIA's holding of ambiguity centers around its assertion that the IBIA "relied upon extrinsic evidence of the parties' alleged intent that does not exist anywhere in the administrative record." Plff. MSJ at 18. Specifically, Plaintiff takes issue with the IBIA's statement that "[n]or do we think it would have been unreasonable for the parties to intend that existing data be applied to the formula to establish a fixed allocation for future years." Id. (citing Citizen Potawatomi Nation, 42 IBIA at 172). Plaintiff argues that there is no evidence in the administrative record that could rationally support the IBIA's finding that the five tribal parties intended for a static application of the Funding Formula factors. Plff. MSJ at 18-19. It states the record only contains evidence that contradicts the IBIA's conclusion. Id. at 19.

Plaintiff maintains that the following evidence contradicts the IBIA's conclusion that the parties could have reasonably intended a static application of the funding formula: (1) the language of the agreement itself as set forth in the five tribal resolutions that comprise the agreement; (2) the evidence submitted by Plaintiff indicating that the intent was that the factors specified in the Funding Formula must be applied each year by the Department based on the current, actual tribal enrollment, resident tribal population and trust acreage that exists in that year (Plff. AR at Tab 4 – CPN's AFA for Fiscal Year 2004 (at Section 3 and Footnotes A and W); Plff. AR at Tab 60 – CPN Opening Brief – Exhibit A to CPN Brief – Declaration of Rhonda Butcher; Plff. AR at Tab 66 – IBIA Decision, at page 173 (noting that none of the other four tribal parties came forward to support or deny CPN's interpretation of the Funding Formula agreement)); (3) a letter dated November 15, 1999 from the Interior Assistant Secretary-Indian Affairs (Plff. AR at Tab 40); and (4) a letter dated April 15, 1999 from the Director, Office of

12

Self-Governance, Bureau of Indian Affairs (Plff. A.R. at Tab 44).   Plaintiff, however, offers no explanation as to how this evidence contradicts the IBIA's conclusion.

Plaintiff provides no explanation for its bald assertion because none of the cited evidence contradicts the IBIA's conclusion.  As discussed above, the language of the tribal resolutions provides no indication regarding how the Funding Formula factors should be applied and so it cannot contradict the IBIA's decision.  Plaintiff's evidence of intent likewise fails to provide evidence of the parties' intent for a non-static application of the factors.  Section 3 and Footnotes A and W of the 2004 Annual Funding Agreement essentially contain only the arguments advanced by the DOI and CPN vis a vis this litigation.  It contains nothing regarding the intent of the parties in 1988.  In fact, it confirms that the parties' performance over the years involved static application of these factors.  See Plff. A.R. at 4, footnote W.  The Declaration of Rhonda Butcher (Plff. AR at Tab 60, CPN Opening Brief, Exhibit A to CPN Brief) also discloses no evidence of the parties' intent in 1988 but rather is merely a statement of Plaintiff's agent regarding the disagreements surrounding the 2004 AFA.  Ms. Butcher was the Director of Self Governance for CPN and "was involved in all aspects of negotiating CPN's AFA with the BIA." Plff. AR at Tab 60, Exhibit A at ¶ 1.  Director Butcher stated that the BIA Director "determined CPN's share of funds under its 2004 AFA based on data from 1988" and that "[t]his is contrary to the plain and unambiguous terms of the 1988 inter-tribal agreement executed by the five Shawnee Agency tribes . . . in 1988 which set forth a specific funding formula based on variable factors to be applied in 1988 and each future year."  Plff. AR at Tab 60, Exhibit A at ¶ 2. Director Butcher did ***not*** recite any personal knowledge as the basis for her conclusion about the

parties' intent but rather she cited the five tribal resolutions.  This statement does not appear to be a recitation of facts based on personal knowledge but rather a legal conclusion.  Id.

Since the five tribal resolutions are the basis of this conclusion, Plaintiff once again relies on a misinterpretation of the language of these resolutions.  The remainder of Director Butcher's declaration concerns the amount of funding that Plaintiff would be entitled to if the DOI used current data when calculating the funding factors.  Therefore, Ms. Butcher's Declaration provides ***no evidence*** to contradict the IBIA's conclusion that the parties intended a static application.  Plaintiff states that none of the other four tribes either supported or opposed Plaintiff's interpretation and cites to the IBIA's decision at 173.  This is hardly a contradiction of the IBIA's finding since the IBIA used other tribe's failure to support the Plaintiff's position as part of its conclusion that the Director did not abuse his discretion in determining that the parties' intended a static application of the factors.  Citizen Potawatomi Nation, 42 IBIA at 173.  To further bolster its reasoning, the IBIA duly noted that CPN's calculations showed that the Iowa tribe "would see its allocation increase under a non-static application of the 1988 formula."  Id. at 173 n. 11.  Thus, the very evidence submitted by Plaintiff is at best unhelpful to its argument for non-static application and sometimes even supports Defendant's interpretation of the formula.

Plaintiff also maintains that two letters from DOI officials contradict the IBIA's finding that the parties could have reasonably intended a static application of the funding formula.  This evidence consists of: (1) a letter dated April 15, 1999 from William Sinclair, Director, Office of Self-Governance, Bureau of Indian Affairs to Absentee Shawnee ("AST") Governor Larry Nuckolls  (Plff. A.R. at Tab 44) ("April 15 letter"); and (2) a letter dated November 15, 1999

14

from Assistant Secretary of Indian Affairs Kevin Gover  to counsel for the AST ("November 15 letter") (Plff. A.R. at Tab 40).

Both the April 15 letter and the November 15 letter, indicated that the DOI would have to reduce AST's funding based on the decision in Collier.  Plff. A.R. at Tab 44, page 3, Plff. A.R. at Tab 40, page 3.  These letters does not indicate the DOI was confident in its decision to reduce this funding under factor 3.  Indeed, Secretary Gover noted that the federal government had previously taken the position that Collier did not require that ISDA funds be unilaterally withdrawn from the AST's compact.  Plff. A.R. at Tab 40, page 2.  Even though, the DOI ultimately decided to reduce AST's funding for CY 2000, it noted that it had made a mistake of law (former reservation boundary of CPN) and  that it was entitled to correct this mistake under Section 3 of its AFA with AST.  Plff. A.R. at Tab 40, page 2; See also Plff. A.R. at Tab 44, page 5.  Section 3 of the AFA with AST stated that "Both parties agree to correct any mistakes in calculations or other mistakes as identified in the amount of funding available to the Tribe, and such party who discovers the mistake shall notify the other party prior to the changes to the funding amount as stated herein."  Defendant's Administrative Record (hereinafter "Deft. A.R." at 00480).  Notably, neither Director Sinclair nor Secretary Gover made any mention of the 1988 funding formula as a basis for this correction.  Both DOI officials noted that the DOI encouraged negotiation between the AST and CPN on this matter.  See Plff. A.R. at Tab 44; Plff. A.R. at Tab 40.  The DOI's persistent efforts at negotiation may suggest that neither it nor the tribes viewed changes in the Funding Formula to be either routine or expected.

These letters preceded the decision in Citizen Potawatomi Nation v. Norton, 248 F.3d 993 (10th Cir. 2001) which held Citizen Band Potawatomi v. Collier, 142 F.3d 1325 (10th Cir.

1998) to be inapplicable to the issue of funding.  See Deft. A.R. at 00560.  The November 15

letter shows funding to AST being reduced, not based non-static application of the Funding

Formula but on an apparent mistake of law.  Once Norton made it apparent to the DOI that the

holding of Collier was limited to the acquisition of trust property, the DOI reversed itself and

restored funding to the AST.  This reversal was far from being contradictory with static

application but rather was consistent with it.  Defendant was concerned that the law required it to

revise its contract but once Norton clarified Collier, Defendant believed that its static application

of the factors could stand.  In addition, the record shows that only factor 3 was revised while no

other factor was ever altered.

Plaintiff has failed to show that the IBIA's holding of ambiguity with respect to the

Funding Agreement is arbitrary and capricious.  There is no material evidence in the

administrative record that the IBIA failed to address.  The IBIA did not assume any evidence not

contained in the record.  And, substantial evidence supports the IBIA's finding that the Funding

Agreement was ambiguous concerning the nature of its application- static vs. dynamic.

### b.    The Administrative Record Supports the Interpretation Regarding Intent

Because the IBIA properly found that the terms of the contract were ambiguous, extrinsic

evidence, such as the intent of the parties or the subsequent action of the parties, may be

introduced to clarify the meaning of the agreement.  Consol. Gas Transmission Corp v. FERC,

771 F.2d 1536, 1546 (D.C. Cir. 1985).  The IBIA considered (1) parties' performance, (2) the

absence of past objections, and (3) the lack of support for Plaintiff's interpretation by other tribes

when analyzing the parties intent.  See Citizen Potawatomi Nation, 43 IBIA at 173.  Based on

this extrinsic evidence, the IBIA concluded that "the Director did not err in determining that the

16

parties to the 1988 agreement intended for the formula to apply in a static manner unless and until the parties agreed otherwise and thus did not abuse his discretion in applying the formula in that way."

Plaintiff argues that "In resolving the alleged ambiguity in the Funding Formula agreement, the IBIA Decision relies upon extrinsic evidence relating to the alleged knowledge and actions of CPN that does not exist in the administrative record."  Plff. MSJ at 20. Specifically, Plaintiff states that "The IBIA Decision fails to cite any evidence contained in the administrative record in support of its factual conclusion that CPN had knowledge of and opportunity to object prior to 1998 to the Department's static application of the Funding Formula agreement."  Plff. MSJ at 21.  The evidence in the record shows that all five tribes willfully and knowingly executed the agreement in 1988 and the record discloses no objection from any tribe for a decade.  The first and only objection appeared in 1998 when CPN negotiated its FY 1999 AFA. "Silence speaks louder than words."  Furthermore, Plaintiff's assertion it could not object because it had no knowledge of the DOI's application of the formula before 1998 is hearsay. Plaintiff has not submitted any declaration stating that it lacked such knowledge.  Thus, Plaintiff has not submitted any admissible evidence on this point.

The IBIA's decision can be sustained even if evidence of CPN's knowledge of the nature of the DOI's funding calculations before 1998 is absent from the administrative record.  IBIA supported its conclusion with other factors which Plaintiff does not contest.  Plaintiff admits that the 1988 agreement has been implemented on a static basis since its inception.  See Plff. MSJ at 12 ("Under the construction of the Funding Formula agreement as applied by the Department . . .there is no application of these three factors [2, 3, and 4] in any year other than Fiscal Year1989

17

since only 1988 data is used to establish the percentage of funds to be distributed in all future years . . .").  See also Plff. A.R. at Tab 60, Declaration of Rhonda Butcher ("It is CPN's understanding that the BIA continues to utilize the 31.72% tribal share based on this 1988 data to determine the CPN's share of funds under its AFAs, including funding under its 2004 AFA.").

This performance has been rendered to four other tribes who are party to the 1988 Agreement.  Plaintiff does not dispute that none of the other four tribes of the Shawnee Agency support its position.  See PSOMF at ¶ 4 (citing Citizen Potawatomi Nation, 42 IBIA at 173) (noting that none of the other four tribal parties came forward to support or deny CPN's interpretation of the Funding Formula agreement).  Thus, AST has been part of the Self-Governance Program since January 1, 1991 and it has not objected to the static application.  See Deft. A.R. at 00332 (showing effective date of Self Governance Compact between AST and the Department of the Interior).  In fact, the AST has both explicitly and implicitly favored the static application of the 1988 funding formula.  The AST explicitly endorsed the use of 1988 statistics when it stated "[T]he parties agreed to a fixed formula, as to which there was, and is, no mistake. The parties intended to provide a measure for allocating funds among the five tribes based on circumstances at an agreed upon time– 1988.  The parties did not contemplate, and did not provide for, revisiting the populations or other factors each year or two and readjusting the allocation.  The parties intended to provide a stable basis for their ongoing funding, not a makeshift arrangement that would require constant attention, revision, and controversy each year."  A.R. at 00372-00373.  The AST also implicitly endorsed the DOI's use of 1988 statistics regarding Factor 3 ("resident tribal enrollment within each tribe's jurisdictional area").  See A.R. at 00371 (In opposition to the DOI's reduction in funds to it, the AST rejected using "an *estimate*

of the number of AST members who lived on Absentee Shawnee trust land in 1988 and instead stated that the Funding Formula required that Factor 3 be determined based on the ***actual number*** who ***lived*** in the area historically served by the AST") (emphasis added).  The IBIA also duly noted that even though the Iowa Tribe would see its allocation increase under a non-static application of the 1988 formula from 7.56 percent to 10.71 percent, it did not come forward to support CPN's position.  Id. at 174 n. 11.

Given the number of parties involved, the importance of their interests, and the length of time in which objections could have been registered, it was more than reasonable for the IBIA to conclude that the Director did not err in determining that the parties to the 1988 agreement intended for the formula to apply in a static manner unless and until the parties agreed otherwise and thus did not abuse his discretion in applying the formula in that way.  Thus, the IBIA's decision is amply supported by evidence in the administrative record and is thus not arbitrary and capricious.

Plaintiff failed to show that either the IBIA's decisions regarding the ambiguity of the funding formula or the interpretation of the formula were arbitrary, capricious, or otherwise erroneous.  Accordingly, Plaintiff's Motion for Summary Judgment on Count I of its  Complaint should be denied.

**2.     Summary Judgment for Plaintiff on Count II is Inappropriate**

Plaintiff asserts that the IBIA improperly applied the doctrine of collateral estoppel when it held that the IBCA's decision in <u>Absentee Shawnee Appeals</u> precluded it from litigating its entitlement to at least $65,521 in funds for Fiscal Year 2004 under Factor 3 of the Funding Formula agreement (25% in proportion to resident tribal population within each tribe's

19

jurisdictional area).  Plff. MSJ at 24.  Plaintiff bases its arguments on flawed analyses of

applicable legal precedent and a misreading of the relevant cases contained in the administrative

record.

According to Plaintiff, collateral estoppel is inapplicable here under the three prong test

of <u>Yamaha Corp. of America v. United States</u>, 961 F.2d 245, 254 (D.C. Cir. 1992).  Plff. MSJ at

25.  That test states that collateral estoppel with apply if all three of the following circumstances

are met:  (1) the issue presently being litigated must be the same issues that was contested by the

parties in the first case and submitted for judicial determination in that case*;* (2) a court of

competent jurisdiction must have actually and necessarily determined the issue in the prior case;

and (3) preclusion in the second case must not work a basic unfairness to the party bound by the

first determination.  <u>Yamaha Corp. of America</u>, 961 F.2d at 254.

Plaintiff erroneously argues that "The issue adjudicated by the IBCA in the <u>Absentee</u>

<u>Shawnee</u> Decision is materially different from the issue that was raised by CPN before the

IBIA."  Plff. MSJ at 25.  It asserts that "The issue presented and resolved in the Absentee

Shawnee Decision was a breach of contract dispute" in which the DOI removed $65,521in

funding from the AST in FY 2000 and 2001 after the execution of the AFAs for those years.

Plff. MSJ at 26.  Plaintiff has not properly defined the issue for the purpose of collateral

estoppel.  Disagreement between the AST and the DOI and the CPN over the application of

<u>Collier</u> to the Funding Formula formed the basis of this breach of contract dispute.  <u>See</u> <u>Appeals</u>

<u>of Absentee Shawnee Tribe of Oklahoma</u>, IBCA 4317-4318/2001, 35 IBCA 52 (2002) (the

"Absentee Shawnee Decision") (Plff. A.R. at Tab 16, page 2) ("The United States used this

formula to determine the amount of funding awarded to the tribes in their Annual Funding

20

Agreements. . . .  The tribes with the BIA's Shawnee Agency had been receiving their allocated

funding for over ten years pursuant to their agreement until before the OSG reduced Appellant's

funding on the ***basis of the decision in <u>Collier</u>***.") (emphasis added).  The DOI and CPN favored

the application of <u>Collier</u> to Factor 3.  <u>Id.</u> at 7, 11.  CPN was the recipient of $65,521 that the

DOI denied to the AST.  <u>Id.</u> at 1-2.  Similarly, in the instant case, CPN claim "the right to the

$65,521 that has been in dispute between the two tribes since 2000."  <u>Citizen Potawatomi</u>

<u>Nation</u>, 42 IBIA at 166.  Plaintiff once again bases its claim to these funds on <u>Collier</u> .  Plff. MSJ

at 24 (stating that one of the issues before the IBIA in the present case was CPN's contention

that <u>Collier</u> prohibited the DOI from withholding at least $65, 521 in funding for FY 2004 under

factor 3 of the funding formula.); <u>Citizen Potawatomi Nation</u>, 42 IBIA at 166 (CPN argued that

"following <u>Collier</u>, under factor 3 of the formula their jurisdictional area, and therefore their

service area, is now exclusive and constitutes the entire area within the boundaries of the former

reservation . . . Under this argument, they claim the right to the $65,521.").  Plaintiff submits the

same arguments as the basis for the same relief.  The issues are not materially different.  The

issue presently being litigated is the same issue that was contested by Plaintiff in the first case

and submitted for judicial determination in that case.  Thus, the first prong of <u>Yamaha</u> has been

satisfied.

        Plaintiff's assertion regarding the second prong of <u>Yamaha</u> is also flawed.  Plaintiff

maintains that the IBCA in <u>Appeals of the Absentee Shawnee</u> did not actually and necessarily

determine the issue of whether <u>Collier</u> required a change in the application of Factor 3 of the

Funding Formula.  Plff. MSJ at 27.  Contrary to Plaintiff's assertion, the IBCA devoted  a

substantial part of it analysis to the impact of <u>Collier</u> on Factor 3 and this analysis was essential

to its judgment.  See Plff. A.R. at Tab 16, pages 13-14.  The IBCA rejected the arguments advanced by both the DOI and the CPN that the parties had mistakenly believed that the AST and CPN had joint jurisdiction over the former Potawatomi reservation and that this mistake justified the reduction in funding to AST.  Id. (noting that "'where the existence of a fact is unknowable'- in this case, the fact that the Shawnee were later adjudged not to share jurisdiction over the former reservation area with the Potawatomi, a decision that surprised virtually everyone, as discussed below- 'the parties cannot make a mistake about it.'") (internal citations omitted).  The IBCA then noted that the possibility that the AST and CPN did not have joint jurisdiction of the former Potawatomi reservation was "not within that parties' contemplation at the time of the Compact."  Id. at 13.  Since the parties could not have made a mistake regarding this matter, their understanding of the situation at the time that the AFAs were entered into (their intent) defined their contractual obligations.  See Id. at 13-14.  The funding for the AFAs for the Shawnee Agency tribes was (and is) based on the 1988 Agreement's funding formula.  See Id. at 2 ("Once the United States enters into a compact with a tribe, the parties ordinarily negotiate an Annual Funding Agreement.  In 19[8]8,[1] however, five tribes within the Shawnee Agency of the Bureau of Indian Affairs (BIA) negotiated a formula among themselves for dividing federal appropriations. . . . The United States used this formula to determine the amount of funds awarded to the tribes in their Annual Funding Agreements.").  Thus, all past and present AFAs include the 1988 Funding Formula.  The parties' ignorance of the tribal jurisdiction over the

---

[1]  The IBCA decision appears to contain a typographical error.  It states that "In 1998, however, five tribes within the Shawnee Agency of the Bureau of Indian Affairs ("BIA") negotiated a formula among themselves for dividing federal appropriations."  Plff. A.R. Tab 16 at 2.  The second word in this sentence should read "1988."

former Potawatomi reservation, as informed by <u>Collier</u>, did not justify reduction in the funding

to the AST. <u>Id.</u> at 14 ("Thus, there was obviously no obligation, legal or otherwise, for OSG to

modify the original AFA with the Shawnee as a result of <u>Collier</u>, contrary to the OSG's

assertions.")   There could be no mistake about this issue of jurisdictional area in the 1988

Funding Formula because the parties did not contemplate this matter (CPN having exclusive

jurisdiction over the former reservation) at the time that they agreed upon the formula.  There is

no dispute that the Funding Formula in the 1988 Agreement was the basis for the funding

calculation in the 2004 AFA between Plaintiff and Defendant in this case just as it was the basis

for the funding calculation in 2000 and 2001 AFAs at issue in <u>Appeals of the Absentee Shawnee</u>

.  <u>See</u> <u>Yamaha Corp. of America</u>, 961 F.2d at 254 ("[O]nce an issue is raised and determined, it

is the entire issue that is precluded, not just the particular arguments raised in support of it in the

first case.").  <u>Id.</u> at 254.  Thus, <u>Appeals of the Absentee Shawnee</u>  actually and necessarily

decided that <u>Collier</u> had no impact on Factor 3 of the Funding Formula.

     Plaintiff further argues that the IBCA's subsequent denial of Plaintiff's motion to

reconsider the <u>Appeals of the Absentee Shawnee</u> decision in <u>Appeals of Absentee Shawnee</u>

<u>Tribe of Oklahoma</u>, IBCA No. 4317R-4318R/02 (January 14, 2003), 2003 WL 133,274

(hereinafter "<u>Appeals of the Absentee Shawnee II</u>") indicates that the issue of <u>Collier</u>'s impact

on Factor 3was neither litigated nor actually and necessarily decided by the IBCA.  Plff. MSJ at

27-28.  This is a gross misreading of <u>Appeals of the Absentee Shawnee II</u>.  The IBCA denied

Plaintiff's motion for reconsideration because Plaintiff had not satisfied the standards for such a

motion.  <u>See</u> Plff. MSJ Exhibit D at 1-2.  Specifically, the IBCA found that reconsideration was

not justified because Plaintiff neither presented new evidence nor alleged legal or factul errors.

Id.  Plaintif requested that the IBCA also award them the same amount of money given to the AST because it feared that the DOI would withhold this money from them in the future.  Id. at 2. The IBCA stated that it had no authority to award this money because Plaintiff had not raised this issue of awarding funds to it ("an issue not before the Board").  Id. at 2.  The IBCA's statement shows nothing more than its application of the standards for evaluating a motion for reconsideration.  Plaintiff's motion for reconsideration only asked for new relief and so it failed to meet the criteria for reconsideration (new evidence or factual or legal errors.).

The IBCA made no explicit or implicit mention of the application of Collier to Factor 3 when it denied Plaintiff's motion for reconsideration.  Furthermore, if any mention of that issue could be gleaned from Appeals of the Absentee Shawnee II, it supports Defendants' contention that IBCA found that Factor 3 should be applied according to the parties' understanding of the jurisdictional area situation in 1988.  The IBCA stated "***Under the facts of this Appeal***, we have no authority" to award the CPN the same amount of money as the AST.   See Plff. MSJ Exhibit D at 1 (emphasis added).  The facts of Appeals of the Absentee Shawnee show the parties understood CPN and AST to have concurrent jurisdiction over the former Potawatomi tribe and that their intent was to apply Factor 3 according to that understanding.  See Plff. A.R. at Tab 16, pages 13-14.  Thus, the IBCA could have been stating that it had no authority to award the funds to CPN because CPN was not entitled to those funds under Factor 3 of the funding agreement. Regardless of the meaning of this language, the IBCA's denial of Plaintiff's motion for reconsideration in Appeals of the Absentee Shawnee II did not suggest that the IBCA had not actually and necessarily determined the impact of Collier on Factor 3.

Plaintiff's arguments regarding the "actual and necessary" prong of <u>Yamaha</u> fail. Plaintiff ignores the language of <u>Appeals of the Absentee Shawnee</u> regarding interpretation of the Funding Formula.  Plaintiff applies an impermissibly broad reading to <u>Appeals of the Absentee Shawnee II</u>. The IBIA correctly determined that the issue of <u>Collier</u>'s impact on Factor 3 was essential to the judgment in <u>Appeals of the Absentee Shawnee</u> . <u>Citizen Potawatomi Nation</u>, 42 IBIA 169, 170.  Accordingly, prong two of <u>Yamaha</u> is satisfied.

Despite its prevalent participation in <u>Appeals of the Absentee Shawnee</u>, Plaintiff makes the incredible allegation that it was not a party to that action and thus, under prong three of <u>Yamaha</u> it would be unfair to apply the doctrine of collateral estoppel to its claim in this case. <u>See</u> Plff. MSJ at 28-31.  This assertion is erroneous.  On August 9, 2002, Plaintiff filed a motion to intervene either as party or an amicus.  Plff. A.R. at Tab 16, page 6.  The IBCA granted Plaintiff's status as an Intervenor, not an amicus.  The Federal Rules of Civil Procedure state intervention and joinder result in persons being added as parties to the suit.  <u>See</u>  Fed R. Civ. P. 19 ("A person . . . whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a **party** in the action); Fed. R. Civ. P. 20 ( is entitled "Permissive Joinder of Parties" and states "All persons may join in one action as **plaintiffs** if they assert any right to relief . . ."); Fed. R. Civ. P. 24 ("In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the **original parties**) (emphasis added).  Thus, an intervenor is a party and Plaintiff was in fact a

25

party to <u>Appeals of the Absentee Shawnee</u>.[2]  There is nothing unfair about precluding Plaintiff

from re-litigating the issue of <u>Collier</u>'s impact on Factor 3.

The third prong of <u>Yamaha</u> is satisfied in this case.  That prong provides that "preclusion

in the second case must not work a **basic unfairness** to the party bound by the first

determination."  <u>Yamaha Corp. of America</u>, 961 F.2d at 254 (emphasis added).  <u>Yamaha</u> gives

some examples of basic unfairness:  (1) "the losing party clearly lacked any incentive to litigate

the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude"; (2)

plaintiff uses collateral estoppel offensively against a defendant that was not a party to the first

suit; and (3) a risk exists that the prior proceedings were defective.  <u>Id.</u>  These examples show

unfairness at a **basic** level.  Plaintiff's allegations of unfairness do not even approach the degree

of unfairness exhibited in these examples.

Plaintiff alleges an unfairness that is anything but basic.  Plaintiff argues that it would be

fundamentally unfair to apply collateral estoppel to its claims because it was a permissive

intervenor in <u>Appeals of the Absentee Shawnee</u> and its participation in that prior action was

limited.  Plff. MSJ at 30.  Even though the IBCA granted Plaintiff's status as an intervenor just

two months before the final brief was received by the IBCA (Plff. A.R. Tab 16 at 6), the decision

in <u>Appeals of the Absentee Shawnee</u> reflects robust participation by Plaintiff and careful

consideration of Plaintiff's arguments by the IBCA.  The IBCA's opinion dedicates a Section to

"Intervenor's Positions."  Plff. A.R. at Tab 16, page 11.  In the Discussion section, the IBCA

---

[2] When the IBCA denied Plaintiff's Motion for Reconsideration, it stated that Plaintiff
was "not a party to the Appeal before the Board."  Plff. MSJ, Exhibit D at page 1.  In view of the
explicit language of the Federal Rules of Civil Procedure, Defendants respectfully submit the
IBCA erred in this legal determination.

makes prominent references to Plaintiff.  Id. at 13 (distinguishing a case cited by Plaintiff) and

Id. at 14 ("We find no merit in the Government's arguments, and nothing n the Intervenor's

briefs sufficient to alter our conclusion.").  Clearly, Plaintiff had ample opportunity to argue its

position regarding the effect of Collier on Factor 3.  Indeed, Plaintiff took full advantage of that

opportunity.  Id. at 11 (In its brief, Plaintiff argued that "The Absentee Shawnee have disputed

the OSG's right to correct a previous mistake in implementing the 'formula' to which the parties

agreed.").  Plaintiff's argument in Appeals of the Absentee Shawnee is the same as its argument

in this case:  the DOI should correct its mistake of law by applying Collier to the funding

calculation of factor three.

     Far from being limited, Plaintiff's participation afforded it a full and fair opportunity to

argue its case regarding the impact of Collier on factor 3.  See City of Port Arthur, Tex. v.

U.S.,517 F.Supp. 987, 1005 n. 119 (D.D.C. 1981) ("The requirement of identity of parties is

justified by the ancient doctrine that a person cannot be bound by a judgment unless he has had

reasonable notice of the claim against him and an opportunity to be heard in opposition to that

claim; due process requires no less."); Defenders of Wildlife v. Andrus, 77 F.R.D. 448, 453

(D.D.C. 1978).  "'Actual litigation' does not necessarily require that each party respond to the

other party; it is sufficient that the issue is in fact raised, and each party has an opportunity to

argue its position in some form.

     Plaintiff argues that it would be fundamentally unfair to apply collateral estoppel because

it lacked the rights to pursue an appeal in court.  Plff. MSJ at 29-30.  It maintains that permissive

intervenors are not bound by subsequent litigation involving the same issues.  Plaintiff cites no

controlling precedent that stands directly for these propositions.  See Adams v. Bell, 711 F.2d

161, 197 n. 128 (states only that preclusion does not apply to amici, it fails to mention intervenors).

Plaintiff also bases its assertion that it had no right to appeal the IBCA's decision in Appeals of the Absentee Shawnee on a flawed interpretation of 41 U.S.C. § 607(g)(1).  See Plff. MSJ at 29.  That statutory section provides that "The decision of an agency board of contract appeals shall be final, except that– a contractor may appeal such a decision to the United States Court of Appeals for the Federal Circuit within one hundred twenty days after the date of receipt of a copy of such decision."  41 U.S.C. § 607(g)(1).  "The term 'contractor' means a party to a Government contract other than the Government."  41 U.S.C. § 601(4).  Plaintiff, along with five other tribes, contracted with the DOI when it entered into the 1988 funding agreement.  That contract was at issue in Appeals of the Absentee Shawnee and no doubt prompted Plaintiff's intervention.  Plaintiff was a contractor under 41 U.S.C. § 601(4) so it could have appealed the IBCA's decision in Appeals of the Absentee Shawnee under 41 U.S.C. § 607(g)(1).  Plaintiff did not avail itself of this option and now tries to claim that it possessed no such right.  In addition, Plaintiff claimed that because it lacked this right, its participation in the case was limited and so it would be fundamentally unfair to apply issue preclusion in the instant case.  Plff. MSJ at 29-30.  Since Plaintiff did possess a right to appeal under 41 USCA § 607(g)(1), its claim of fundamental unfairness on this point fails.

Although Plaintiff may not have obtained all of the relief that it desired, the record shows that it was given ample opportunity to be heard and that the IBCA, carefully analyzed its arguments.  Issue preclusion would not work a basic unfairness against Plaintiff.  Indeed, the very policies behind issue preclusion favor its application in the instant case.  Nasem v. Brown,

595 F.2d 801, 806 (D.C. Cir. 1979) (Application of the doctrine of collateral estoppel "represents

a decision that the needs of judicial finality and efficiency outweigh the possible gains of

fairness or accuracy from continued litigation of an issue that previously has been considered by

a competent tribunal.").   Application of the doctrine serves to relieve parties of the burdens

attending multiple lawsuits; conserves judicial resources; minimizes the risk of forum-shopping,

piecemeal litigation, and inconsistent decisions; and provides finality in the resolution of

disputes.  United States v. Mendoza, 464 U.S. 154, 158 (1984); Cutler v. Hayes, 549 F. Supp. at

1343; Hardison v. Alexander, 655 F.2d 1281, 1288 (D.C. Cir. 1981).

Plaintiff has failed to show the application of issue preclusion to the factor 3 issue would

work a basic unfairness to it.  Thus, the third prong of Yamaha has been satisfied.

In a final attempt to block the application of collateral estoppel, Plaintiff asserts that

IBCA's decision in Appeal of Citizen Potawatomi Nation of Oklahoma, IBCA No. 4522/04,

2005 WL 729,941 (March 22, 2005) (Plff. MSJ. Exhibit E), shows that the IBCA's prior

decision in Appeals of the Absentee Shawnee has no preclusive effect.  Appeal of Citizen

Potawatomi Nation of Oklahoma does not stand for this proposition.

When the DOI subsequently withdrew $65,521 in funds from the CPN's FY 2003 AFA,

the CPN challenged this action before the IBCA in a post-award action.  See Plff. MSJ at Exhibit

E, page 3.  The IBCA stated that res judicata did not bar the issue of "withholding of $65,521

from the [Citizen Potawatomi] Nation" because Absentee Shawnee Appeals involved

"withholding of $65,521 from the Shawnees." See Id. at 3.  Plaintiff cites this determination in

support of his contention that collateral estoppel should not apply.  See Plff. MSJ at 32 ("The

IBIA Decision at issue here cites to and relies upon the IBCA's prior CPN Decision but fails to

address or acknowledge the IBCA's holding in the CPN Decision that CPN was not barred from litigating its entitlement to the $65,521 in funds for Fiscal Year 2003"). The IBIA did not need to address or acknowledge Appeal of Citizen Potawatomi Nation of Oklahoma since it did not consider res judicata. Res judicata and collateral estoppel are two distinct doctrines. Collateral estoppel rather than res judicata is appropriate when the case involves the same set of facts, parties, and legal issues but involves different causes of action. Defenders of Wildlife, 77 F.R.D. at 453. Thus, Plaintiff's reasoning is flawed when it suggests that the IBCA's holding regarding the inapplicability of res judicata in Appeal of Citizen Potawatomi Nation of Oklahoma is determinative of the applicability of collateral estoppel to the instant case.

Plaintiff argues that IBCA's award of $65,521 to the CPN for FY 2003 renders the IBIA's finding of collateral estoppel to be irrational. Plff. MSJ at 32-33. This argument entirely ignores the rationale of Appeal of Citizen Potawatomi Nation of Oklahoma.

The IBCA based its decision on contract law (interpretation of the 2003 AFA). Id. at 5. The IBCA listed several ways in which the **post-award** unilateral removal of the $65,521 in funds constituted a **breach of the 2003 AFA**. Id. at 5. When executing the **2003 AFA**, the DOI specifically agreed that the CPN's service area for purposes of funding is not shared with any other tribe including the Absentee Shawnee Tribe. Id. at 4, 5; Deft. A.R. at 00166 (Footnote A of the 2003 AFA). The DOI also agreed that "nothing in the **2003 AFA** limits or reduces in any way the funding or programs or functions or activities that any other Indian tribe or tribal organization is eligible to receive." Id. (emphasis added). The IBCA thus concluded that the DOI's subsequent reduction in funds during FY 2003 was a clear violation of the 2003 AFA. Id. at 7.

30

The IBCA's opinion in Appeal of Citizen Potawatomi Nation of Oklahoma.is perfectly consistent with the IBIA's decision in the instant case. In Appeal of Citizen Potawatomi Nation of Oklahoma the IBIA focused it analysis on the particular representations in the 2003 AFA and not the Funding Formula's application to the AFA. The IBCA awarded the $65,521 to Plaintiff for FY 2003 based on 2003 AFA. Id. at 7. Even though the application of Collier to the Funding Formula had been previously litigated and actually decided in Appeals of the Absentee Shawnee, the interpretation of various provisions of CPN's 2003 AFA had not been previously litigated or decided. Thus, the IBIA aptly acknowledged that cases such as Appeal of Citizen Potawatomi Nation of Oklahoma are very fact specific . See Id. at 9 ("[I]t is conceivable that other cases dealing with matters similar to those in this case may arise again, as this one did after Absentee Shawnee was decided. If so, as always, their outcome will turn on the facts involved."). The instant case turns on a set of facts and legal issues that are different from the ones involved in Appeal of Citizen Potawatomi Nation of Oklahoma. Plaintiff argues only that hit is entitled to $65,521 under the FY 2004 Agreement based on Collier's application to the Funding Formula. See Plff. MSJ at 24. Since the issue of Collier's impact on the Funding Formula was already actually litigated and decided in Appeals of the Absentee Shawnee, the doctrine of collateral estoppel should bar relitigation of this issue.

Plaintiff has not shown that the three prongs of Yamaha were not satisfied. The administrative record and applicable legal precedent amply support the IBIA's determination that collateral estoppel bars litigation of the Plaintiff's claim regarding the impact of Collier on the funding formula. Accordingly, Plaintiff's Motion for Summary Judgment as to Count II of its Complaint should be denied.

### 3.    This Court Should Deny Plaintiff's Motion Regarding Count III

The IBIA properly concluded that, even if collateral estoppel did not bar Plaintiff from litigating their entitlement funds under Factor 3, funding under Factor 3 would be apportioned based on the number of tribal members each tribe had within the former reservation boundaries in 1988. Citizen Potawatomi Nation, 42 IBIA at 170-171.

Plaintiff contends that the IBIA erred when it found that Plaintniff was not entitled to the $65,521 in funds under Factor 3 for Fiscal Year 2004 because the IBIA failed to address or consider material facts in the record and the material facts in the record contradicted this conclusion. Plff. MSJ at 33. Specifically, Plaintiff takes issue with the IBIA's conclusion that the Collier Decision has no impact on how funds are to be apportioned to CPN under Factor 3 of the Funding Formula. See Plff. MSJ at 35. The crux of Plaintiff's argument again focuses on its assertion that the Funding Formula requires a non-static application of factors. See Plff. MSJ at 34 (stating that the IBIA Decision "further perpetuates the Department's erroneous position that all funding percentages under the Funding Formula are to be fixed and forever locked into place based on data that existed only in 1988.").

Plaintiff attempts to secure summary judgment on Count III through repetition of the meritless arguments and erroneous interpretation of legal precedents. Plaintiff repeats its previous assertion that the administrative record contains no evidence supporting a static application of the factors in the Funding Formula. See Plff. MSJ at 35 ("As indicated above, the administrative record does not contain any evidence that could rationally support the IBIA Decision's conclusion that the five tribal parties to the Funding Formula agreement intended that all funding percentages were to be forever locked into place based on data and events that

existed or were understood to exist only in 1988.").  As discussed fully, in Section II B. 1, <u>supra</u>, the very actions of multiple parties (i.e., the Shawnee Agency tribes) over the eighteen year period since the establishment of the funding formula provide ample support for the IBIA's conclusion that the parties intended the factors to be applied in a static fashion until renegotiation of the agreement.

Plaintiff not only ignores the solid evidence of the parties' intent for static application, it also mischaracterizes the IBIA's treatment of the <u>Collier</u> decision in two ways.  First, Plaintiff incorrectly asserts that the IBIA Decision was a summary conclusion with no explanation of its holding that the <u>Collier</u> Decision had no impact on the allocation of funds under Factor 3 of the Funding Formula agreement."  Plff. MSJ at 36-37.  Second, Plaintiff asserted that the IBIA ignored evidence in the administrative record which supported its contention that <u>Collier</u> would impact funding calculations under Factor 3.  <u>See</u> Plff. MSJ at 37.

Plaintiff erroneously asserts that "The IBIA Decision fails to address or explain the fact that the <u>Collier</u> Decision held that the CPN and the Absentee Shawnee do not share a common former reservation area and that the Absentee Shawnee has no jurisdiction over the CPN's exclusive former reservation area."  Plff MSJ at 35.  Contrary to Plaintiff's assertion, the IBIA did, in fact, address the holding of <u>Collier</u>.  <u>See</u> <u>Citizen Potawatomi Nation</u>, 42 IBIA at 166 (noting that Plaintiff argued that <u>Collier</u> supported their assertion that their jurisdictional area "is now exclusive and constitutes the entire area within the boundaries of their former reservation, excluding only Absentee Shawnee trust lands and allotments.").

Far from being a summary conclusion, the IBIA Decision provided a detailed, rational analysis of the its conclusion that the "1988 formula does not apportion funding to the Citizen

Potawatomi and Absentee Shawnee based on legal determinations regarding the extent of their territorial jurisdiction." See Id. at 167, 170-71.  The IBIA analyzed Factor 3 of the Funding Formula in the context of the situation in 1988 in order to ascertain the parties' understanding of the Agreement at the time of execution.  Id. at 170-71.  "[F]actor 3 contemplated that, in carrying out duties contracted under ISDA, the Citizen Potawatomi and the Absentee Shawnee each would serve their own tribal members.  Factor 3 provides for the allocation of a portion of funds based on the 'tribal population within each tribe's jurisdictional area.'"  Citizen Potawatomi Nation, 42 IBIA at 170.  The IBIA noted that typically the language of factor 3 would refer to a certain geographical area and each tribe would serve whatever tribal members resided within that area.  Id.  However, the IBIA stated that the CPN and the AST had an unusual situation and that a typical interpretation of the language "could lead to an anomalous and implausible result."  Id. The IBIA asserted, and all parties to this action agree, that when the agreement was signed, all parties believed that the CPN and the AST shared a "'jurisdictional area' represented by the boundaries of the former reservation."  Id.  The usual understanding of "jurisdictional area" should not apply to these unusual circumstances because that definition would fail to "provide a basis for apportioning funds between the two tribes."  Id.  If Factor 3 was read literally, "funding [would] be apportioned to both tribes based on the entire tribal population within the former reservation boundaries, thus covering each tribal member twice."  Id.  The IBIA properly found such an interpretation of the parties' intent to be "implausible."  Citizen Potawatomi Nation, 42 IBIA at 170-71.  The IBIA also determined that such an interpretation was "inconsistent with past practice, because the record shows that the two tribes were apportioned different percentages of funds under factor 3, with the Citizen Potawatomi allocated approximately 36

percent (of the 25 percent of total funding allocated pursuant to factor 3), and the Absentee

Shawnee approximately 22 percent." Id. (internal citations omitted).

In view of practical results and past practices, the IBIA determined that the parties

intended Factor 3 to mean that funding would be apportioned between the CPN and the AST

based on the number of tribal members each tribe had within the former reservation boundaries.

Id. It would be illogical and illegal for the IBIA to substitute the holding of Collier into the

painstakingly crafted Factor 3. While the legal determinations of Collier afford CPN protection

of the interest in trust property, its holding did not require revision of Factor 3. See Collier, 142

F.3d at 1334 (In Collier, the AST had applied to place land, which was in the boundaries of the

former CPN reservation, into trust land.). Thus, the IBIA undertook a rigorous legal analysis of

the agreement and properly determined that Collier could have no effect on the parties' orginal

intent. Id.

Contrary to Plaintiff's assertion, the administrative record provides ample evidence to

support the IBIA's analysis. Factor 3 makes no reference to "service area population." Deft.

A.R. at 00371. In July 2001, the AST asserted that the 1988 Agreement's reference to the

resident tribal population in the tribe's "jurisdictional area," pertains to the tribe's service area

and not its territorial jurisdiction. Deft. A.R. at 00208. The AST argued that this definition was

the only reasonable definition because some tribal members, who needed services, resided on fee

lands and no tribe in Oklahoma has territorial jurisdiction over fee lands. Deft. A.R. at 00208. If

the DOI reduced the funds available to the AST, it would force several hundred AST members

who are now served by their tribe to seek BIA funded services from CPN or go without services

entirely. Deft. A.R. at 00208. Self-Determination is based on the notion that tribes as

35

governments are the entities best situated to provide governmental services to their people.  A.R. at 00374.  The ISDA is designed to provide assurances to tribes that they will be provided with federal funds to enable them to provide a better life for their members.  A.R. at 00374.  Thus, the IBIA's decision properly interprets the Funding Formula's text and the parties' intent while comporting with the policy objectives of the ISDA.

Plaintiff argues that the IBIA unduly relied on Citizen Potawatomi Nation v. Norton, 248 F.3d 993 (10th Cir. 2001), modified on rehearing, 257 F.3d 1158 (10th Cir. 2001), for the proposition that Collier had no impact for apportioning funding under Factor 3.  Plff. MSJ at 35.  The IBIA did not improperly rely on Norton.  In fact, the IBIA duly noted two aspects of Norton that Plaintiff emphasizes in its Motion for Summary Judgment.   First, the IBIA noted that the IBCA made a harmless error in Appeals of the Absentee Shawnee when it failed to observe that Norton had been modified on rehearing to foreclose the possibility of the United States later proffering evidence of joint jurisdiction by AST and CPN.   Citizen Potawatomi Nation, 42 IBIA at 168 n. 7; Plff. MSJ at 36 (noting this modification upon rehearing).  Second, the IBIA observed that Norton did not resolve CPN's claim of annual recalculation of the Funding Formula but rather dismissed it on indispensable party grounds.  Citizen Potawatomi Nation, 42 IBIA at 171; Plff. MSJ at 35-36 ("The Norton Decision dismissed the action without addressing the merits of the issues raised.").  The IBIA did not rely on the Norton decision's interpretation of Collier when it determined that the Funding Formula required a static application of Factor 3.  Indeed, it conducted its contract analysis "regardless of the meaning of Collier."  Citizen Potawatomi Nation, 42 IBIA at 170.

36

Plaintiff maintains that the IBIA also erroneously ignored contradictory evidence in the administrative record which established that the <u>Collier</u> Decision does impact Factor 3 of the Funding Agreement. Plff. MSJ at 37. Specifically, Plaintiff asserts that the evidence in the administrative record establishes that in developing Factor 3 (25% in proportion to resident tribal population within each tribe's jurisdictional area) of the Funding Formula, a tribe's former reservation boundaries were used to define the tribe's jurisdictional area for purposes of allocating funding under Factor 3 and that jurisdictional area and service area were co-extensive. Plff. MSJ at 37. Plaintiff again cites to the 1999 memorandum from Director Sinclair ("April 15 letter") (Plff. A.R, at Tab 44, pages 2-3) and the November 15, 1999 letter ("November 15 letter") from Assistant Secretary Kevin Gover as evidence for this proposition (Plff. A.R. at Tab 40, pages 2-3). Plff. MSJ at 37-38. Plaintiff cited this same evidence in support of his general opposition to the BIA's finding that all Funding Formula factors were static. <u>See</u> Plff. MSJ at 19. That evidence failed to show that the IBIA's determination concerning static application of the Funding Formula was arbitrary and capricious. This same evidence once again fails to show that the IBIA acted arbitrarily and capriciously with regard to its interpretation of Factor 3.

Neither of these pieces of evidence establish that <u>Collier</u> properly impacts Factor 3. Both the April 15 letter and November 15 letter expressed the DOI's concern that <u>Collier</u> dictated a change in funding despite the parties' intent. In his April 15 letter to Governor Larry Nuckolls of the AST, Director Sinclair acknowledges that the "service area designations were made with specific and exclusive reference to territorial jurisdiction **as it was known at the time of the tribal contracts**." <u>See</u> Plff. A.R. at Tab 44, page 3 (emphasis added). This statement indicates that the parties intended the formula to apply service areas according to their understanding **at**

37

**the time of the tribal contracts** (i.e.,1988).  A subsequent legal event, such as the one in

Collier, could only alter that contract if it mandated an action despite the parties' intent.  The

DOI believed that Collier contained such a mandate.  See Plff. A.R. at Tab 44, page 4 ("It is the

position of the DOI that the Department is obligated to bring the service area and associated

funding into conformance with the Federal Court's holding in Collier II).[3]  However, the April

15 letter does not contain any easy solution to this perceived dilemma.  Id. at pages 4-5

(proposing negotiations between DOI and the AST and suggesting that this error be rectified

under the "mistakes clause" of Section 3 of the AST's AFA.").  If the DOI believed the Funding

Formula to be so adaptable to change, it would seem that the DOI would have conspicuously

mentioned this aspect of the Formula when addressing the apparent conundrum presented by

Collier.

        Likewise, the November 15 letter expressed the same bewilderment regarding the

reconciliation of Factor 3 with Collier.  It appeared that both AST and the DOI believed that "the

Collier decision does not directly hold that ISDA funds must be unilaterally withdrawn from the

AST's compact."  Plff. A.R. at Tab 40, page 2.  Assistant Secretary Kevin Gover echoed the

sentiments of the April 15 letter when he encouraged negotiation with the AST and CPN and

noted the mutual mistake clause as the authority for fund reduction.  Plff. A.R. at Tab 40, page 2-

3.  While Assistant Secretary Gover noted the importance of "former reservation boundaries"

when determining Factor 3 (jurisdictional area) (Plff. A.R. at Tab 40, page 2), he made no

---

[3] Here, Collier II refers to the decision which this motion has consistently referred to as
Collier (Citizen Potawatomi Indian Tribe of Oklahoma v Collier, CIV 92-2161-R (W.D. Okla.
1996), aff'd, 142 F.3d at 1334 (10th Cir.).  Some areas of the Administrative Record refer to
Collier I which is an abbreviated reference to Citizen Potawatomi Indian Tribe of Oklahoma v
Collier, 17 F.3d 1292 (10th Cir. 1994).

mention of the Funding Formula as a source of rights allowing the DOI to adjust the factors periodically according to various new developments.

Plaintiff has failed to show that the IBIA's conclusion that <u>Collier</u> had no impact on Factor 3 of the Funding Formula agreement is inadequate and without any support in the administrative record.  Thus, the IBIA's decision regarding Count III of Plaintiff's Complaint is neither arbitrary and capricious nor erroneous.  <u>Collier</u> forms the sole basis under which Plaintiff seeks to modify Factor 3.  Accordingly, Plaintiff's Motion for Summary Judgment with respect to Count II of its Complaint should be denied.

**C.     The Absence of Necessary and Indispensable Parties Precludes the Court from Granting the Plaintiff's Motion for Summary Judgment**

Plaintiff asserts that there are no indispensable party issues that could affect this court's ability to grant this motion for summary judgment against the government.  Plff. MSJ at 40-43. Plaintiff does not dispute that either the AST or any of the other Shawnee Agency tribes are indispensable tribes but rather Plaintiff stresses that remand to the IBIA is a remedy that will not implicate rights of indispensable parties.  See Plff. MSJ at 43.  In particular, Plaintiff maintains that the IBIA's trust responsibility, which requires it to consider the rights of absent indispensable parties, will protect the rights of these tribes on remand.  See Id. at 42.  Plaintiff also notes that "Other courts that have reviewed IBIA decisions involving potential issues of the joinder of indispensable parties have been able to afford some review of the IBIA decision while limiting the relief granted to remand of the decision back to the IBIA for further proceedings on the merits of the issues."  Plff. MSJ at 43.  All of these arguments are seriously flawed.

Plaintiff attempts to characterize its requested relief as limited in order to distinguish the <u>Norton</u> precedent.  A closer look at the nature and consequences of this relief shows that the

39

substance of the relief which Plaintiff now seeks is identical to the relief that it sought in <u>Norton</u> and even though it differs in form, it would likewise profoundly impact the rights of indispensable parties.  The relief sought by Plaintiff effectively reverses the IBIA decision and dictates a result in favor of Plaintiff.  Plaintiff seeks the following: (1) a declaration from this Court that the IBIA Decision is erroneous; (2) an injunction preventing the Department from implementing the IBIA decision as the final decision of the agency; and (3) remand back to the IBIA for further proceedings.  Plff. MSJ at 1, 44.  "CPN asks this Court to find that the conclusions reached by the IBIA Decision are without any support in the administrative record and otherwise erroneous as a matter of law."  Plff. MSJ at 42.

The undeniable effect of this relief is to overturn the IBIA's decision and require it to adopt the Plaintiff's interpretation of the 1988 Agreement.  Plaintiff's Proposed Order would require the IBIA to supplement the administrative record with current data for Fiscal Year 2004 on actual tribe enrollment, resident tribal population, and trust acreage that exists in that year for the five Shawnee Agency tribes "in order to establish a basis for the IBIA to determine whether the Department complied with its governing regulation at 25 C.F.R. § 1000.98(a)(1)."  Plaintiff's Proposed Order (Pacer Document 24-7) at page 2-3, paragraph (iv).  The IBIA had rejected Plaintiff's request that Defendants provide additional documents pertaining to the 1988 funding formula and its application because it concluded that CPN had not shown that there were documents on which the Defendants had based its disputed 2004 funding decision .  Plff. A.R. at Tab 58, page 2.  Thus, this request is a "backdoor" approach to mandating that the IBIA adopt Plaintiff's interpretation of the 1988 Agreement.

A declaration that the IBIA's decision is erroneous is a declaration that the IBIA did not properly interpret the terms of the 1988 Agreement. The IBIA decision concluded that the 1988 Agreement provided for static application of the four factors. Citizen Potawatomi Nation, 42 IBIA at 173. If the Court declares that the IBIA's decision was erroneous, then the only way for the IBIA to render a legally correct decision would be to hold that Plaintiff's interpretation (non-static interpretation) is correct. Thus, instead of resulting in a benign remand to the IBIA, the Plaintiff's request for a court order declaring the IBIA's decision to be erroneous dictates a decision on the merits in the absence of necessary and indispensable parties.

Although the IBIA would be required to dutifully observe its trust responsibility, a court order containing Plaintiff's requested relief would severely and unduly limit the IBIA's options for safeguarding the interests of absent tribes. The court order would render the IBIA nothing more than a strawman. Instead of explicitly ordering the IBIA to adopt Plaintiff's interpretation of the 1988 Agreement and thereby failing to join necessary and indispensable parties, Plaintiff asks that the Court have the IBIA act as its agent. The IBIA's trust responsibility would allow it to grant the substantive relief that Plaintiff seeks while not joining indispensable and necessary parties. This responsibility would be virtually irrelevant in the face of a court order effectively requiring non-static interpretation of the 1988 Agreement. Plaintiff's arguments in favor of remand are a smokescreen for preventing the joinder of necessary and indispensable parties.

Plaintiff cites two precedents in support of its argument that remedy of remand to IBIA will not require the Court to consider the issue of indispensable parties: (1) Feezor v. Babbit, 953 F.Supp.1, 6 (Footnote 4) (D.D.C. 1996) and (2) Ransom v. Babbitt, 69 F.Supp.2d 141, 148

(D.D.C. 1999). Both of these cases are readily distinguishable from the instant case. Plff. MSJ at 42-43.

Feezor v. Babbit, states "There is no need to address the question of the absence of the Community as an indispensable party, **as defendants concede** that the question arises only if the Court awards relief beyond remand to IBIA." 953 F. Supp. at 6 n. 4 (emphasis added). Thus, this Court did not hold in Feezor that, as matter of law, remand to the IBIA precludes consideration of an indispensable party but rather did not address the issue because the defendants conceded it. In fact, this Circuit has stated a position contrary to that assertion. In Wichita and Affiliated Tribes of Oklahoma , 788 F.2d at 776 , the Court of Appeals noted that "while a remand might be a bit less prejudicial than a judgment ordering immediate redistributions, there would still be substantial prejudice to the Wichitas [absent tribe]." The Court contrasted Witchita and Affiliated Tribes of Oklahoma to cases where the remand is for reevaluation in light of a procedural defect. Id. It found that a remand "would be premised on a holding that the agency made a substantive mistake"and that holding would in effect be "binding on the agency." The Court, thus concluded that the remand "would not in fact mitigate the prejudice to the Wichitas." Id. In essence, the Court found that, remand in Witchita and Affiliated Tribes of Oklahoma was in effect "relief beyond remand to IBIA." In the instant case, a remand to IBIA on plaintiff's terms would also be in effect "relief beyond remand to IBIA" because it would be premised on a holding that the IBIA made a substantive mistake regarding the factors in the Funding Formula. Thus, the CPN's assertion that the remand remedy would allow this Court to award them relief without the presence of the absent but indispensable Shawnee Agency tribes is contrary to this Circuit's precedent.

The CPN's reliance on Ransom v. Babbitt, 69 F.Supp.2d 141, 148 (D.D.C. 1999) is likewise factually distinguishable from the case at bar.  In Ransom, the plaintiffs stated that they comprised the Three Chief System Tribal Council ("Three Chief System"), which they asserted was the governing body of the Saint Regis Mohawk Tribe.  Id. at 142.  The plaintiffs challenged the defendants' (BIA's and IBIA's) decision not to recognize the Three Chief System Tribal Council as the legitimate government of the Saint Regis Mohawk Tribe but instead to recognize an entity referred to as the Constitutional Government.  Id. at 142, 144-146.  The Defendants moved to Amend their Answer in order to incorporate an affirmative defense of failure to join a necessary or indispensable party (the Constitutional Government).  Id. at 148.   This Court held that it was it was not necessary to join  the Constitutional Government even though it "might be affected by this Court's review of BIA's actions."  Id. at 148 (internal citations omitted).  However, the Court noted several characteristics of  the Constitutional Government that materially distinguished it from the absent tribes in the instant case: (1) it took "no interest in this proceeding"; (2) the plaintiffs were leaders of the Constitutional Government; and (3) the defendants would adequately represent any interests that the Constitutional Government might have in the case.  Id.  In contrast, Norton explained why the absent tribes in the case at bar had an interest in the litigation and why the parties in that suit could not represent its interests.  It determined that the Defendant DOI did not adequately represent the interests of  the absent tribes on the issues regarding interpretation of the 1988 funding formula.  Norton, 248 F.3d at 1000.  Furthermore, the AST has shown an interest in related proceedings such as Collier (AST as an intervenor Deft. A.R. at 00553) and Absentee Shawnee Appeals.  Thus, contrary to Plaintiff's assertion, this Court's determination in Ransom is inapplicable to the instant case.

43

Plaintiff has failed to show that remand to the IBIA is a remedy that will not implicate the rights of the absent indispensable parties.  In the context of this case, remand is effectively a ruling on the merits (substantive), not merely an order to reevaluate the case in light of a procedural defect (procedural).  The IBIA's trust responsibility would not be a sufficient substitute for the participation of the indispensable parties because Plaintiff's proposed remand order would effectively require the IBIA to adopt Plaintiff's interpretation of the 1988 Agreement thereby rendering the IBIA's trust responsibility irrelevant.  Plaintiff has not cited any applicable precedent that allows this Court to remand this case to the IBIA in the absence of necessary and indispensable parties.  Plaintiff asks this Court to ignore the rights of indispensable parties and issue a substantive ruling in its favor.  This request is contrary to Federal Rule of Civil Procedure 19(b).

The issues regarding the CPN's service Area and the CPN's service area population were last addressed in the 1988 agreement between the DOI and the Shawnee Agency tribes.  This agreement cannot be altered absent renewed negotiations involving the DOI, the CPN, and other Shawnee Agency tribes.  CPN has not joined the four other tribes of the Shawnee Agency as parties in this lawsuit.  These four other tribes are participants in the funding agreement between DOI and the five tribes of the Shawnee Agency.  As such, those tribes are indispensable parties.  The other tribes are sovereign nations so sovereign immunity protects them from suit.  Fletcher v. United States, 116 F.3d 1315, 1324 (10th Cir.1997).  Thus, CPN cannot join  these indispensable parties and the Court should dismiss this action under Fed. R. Civ. P. 19.  See Citizen Potawatomi Nation v. Norton, 248 F.3d 993, 996 (10th Cir. 2001).

44

Citizen Potawatomi Nation v. Norton, 248 F.3d 993 (10th Cir. 2001) is virtually indistinguishable from the instant case. It involved the same issues (the use of 1988 statistics in the funding formula and territorial jurisdiction (as defined in the 1988 funding agreement)), the same parties (the DOI and the CPN), and the same absent parties (AST and the other tribes of the Shawnee Agency) as the instant case. For the same reasons cited in Norton, the absent tribes in the instant case are necessary, their joinder is not feasible, and they are indispensable to this case. Accordingly, this Court should dismiss this case under Fed. R. Civ. P. 19.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's Motion for Summary Judgment.

February 1, 2007                    Respectfully submitted,

                                    _____/s/_____
                                    JEFFREY A. TAYLOR, D.C. Bar # 489610
                                    United States Attorney

                                    _____/s/_____
                                    RUDOLPH CONTRERAS, DC BAR #434122
                                    Assistant United States Attorney

                                    _____/s/_____
                                    JOHN F. HENAULT, D.C. Bar # 472590
                                    Assistant United States Attorney
                                    555 4th Street, N.W.
                                    Washington, DC 20530
                                    (202) 307-1249
                                    (202) 514-8780 (facsimile)

45